

**Your Missouri Courts**

ase.net

Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print

GrantedPublicAccess  Logoff ERINKMCGOWAN

### 2222-CC08920 - THE STATE OF MISSOURI V THE CITY OF ST LOUIS ET AL (E-CASE)

| Case Header FV Judge Reviewer | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |
|---|---|---|---|---|---|---|---|---|

**Click here to eFile on Case**
Click here to Respond to Selected Documents

Sort Date Entries: ● Descending  ○ Ascending

Display Options: All Entries ▾

---

**07/26/2022** ☐ **Request Filed**
Amended Request for Appointment of Process Server.
**Filed By:** DEAN JOHN SAUER
**On Behalf Of:** STATE OF MISSOURI

☐ **Summons Issued-Circuit**
Document ID: 22-SMCC-9494, for DAVIS, MATI HLATSHWAYO.

☐ **Summons Issued-Circuit**
Document ID: 22-SMCC-9493, for GREEN, DARLENE.

☐ **Summons Issued-Circuit**
Document ID: 22-SMCC-9492, for LAYNE, ADAM L.

☐ **Summons Issued-Circuit**
Document ID: 22-SMCC-9491, for THE CITY OF ST LOUIS.

**07/25/2022** ☐ **Motion Special Process Server**
Request for Appointment of Process Server.
**Filed By:** DEAN JOHN SAUER
**On Behalf Of:** STATE OF MISSOURI

**07/21/2022** ☐ **Motion Filed**
Plaintiffs Motion for Preliminary Injunction; Affidavit of Tammy Glenn in Support of Plaintiffs Motion for Preliminary Injunction.
**Filed By:** DEAN JOHN SAUER
**On Behalf Of:** STATE OF MISSOURI

☐ **Confid Filing Info Sheet Filed**
**Filed By:** DEAN JOHN SAUER

☐ **Note to Clerk eFiling**
**Filed By:** DEAN JOHN SAUER

☐ **Petition Filed - No Fees**
Petition; Exhibit A; Exhibit B; Exhibit C; Exhibit D.
**Filed By:** DEAN JOHN SAUER
**On Behalf Of:** STATE OF MISSOURI

☐ **Judge Assigned**

---

**EXHIBIT A**

**2222-CC08920**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

## THE CIRCUIT COURT OF ST. LOUIS CITY
## TWENTY-SECOND JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI ex rel.
ERIC S. SCHMITT;

       *Plaintiff*,

       v.

THE CITY OF ST. LOUIS;

ADAM L. LAYNE, TREASURER OF ST.
LOUIS CITY;

DARLENE GREEN, COMPTROLLER OF
ST. LOUIS CITY; and

DR. MATI HLATSHWAYO DAVIS,
DIRECTOR OF HEALTH OF ST. LOUIS
CITY,

       *Defendants*.

No.

## PETITION

1.    This case challenges the City of St. Louis's recently enacted Board Bill 61, which violates State law by using taxpayer-funded resources to support, encourage, and assist out-of-state abortions.

2.    Missouri law has long prohibited the use of public funds, public employees, and public facilities to support, encourage, or assist abortion.

3.    Section 188.205, RSMo, provides that "[i]t shall be unlawful for any public funds to be expended for the purpose of … assisting an abortion … or for the purpose of encouraging … a woman to have an abortion not necessary to save her life."

4.    Section 188.210, RSMo, provides that "[i]t shall be unlawful for any public employee within the scope of his employment to … assist an abortion," or for a healthcare worker

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

"who is a public employee within the scope of his public employment to encourage … a woman to have an abortion not necessary to save her life."

5.      Section 188.215, RSMo, provides that "[i]t shall be unlawful for any public facility to be used for the purpose of … assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging … a woman to have an abortion not necessary to save her life."

6.      Missouri law defines "public funds" broadly to include "any funds received or controlled by this state or any agency or political subdivision thereof, including, but not limited to, funds derived from federal, state or local taxes, gifts or grants from any source, public or private, federal grants or payments, or intergovernmental transfers."  § 188.200(3), RSMo.  It defines "public employee" to include "any person employed by this state or any agency or political subdivision thereof."  § 188.200(1), RSMo.  And it defines "public facility" to include "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof."  § 188.200(2), RSMo.

7.      On June 24, 2022, the Supreme Court of the United States handed down its opinion in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392, 597 U.S. __ (2022).  *Dobbs* held "that the Constitution does not confer a right to abortion." *Id*., slip op. at 69. As a result, "the authority to regulate abortion" has "returned to the people and their elective representatives." *Id.*

8.      In May 2019, the Missouri General Assembly passed House Bill 126 ("HB 126") (*see* Exhibit A) with supermajorities in both chambers. The Senate voted in favor of the bill 24-10. The House of Representatives approved the bill by a vote of 110-44, with an additional vote on an emergency clause approved by a vote of 109-46.

9.      In HB 126, the General Assembly reiterated "that all men and women are endowed by their Creator with certain unalienable Rights, that among these are Life …." § 188.010, RSMo.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

Accordingly, the General Assembly declared "that the state and *all of its political subdivisions* are a 'sanctuary of life' that protects pregnant women and their unborn children."  § 188.010, RSMo (emphasis added).

10.     In short, Missouri recognizes that unborn children are fully entitled to the right to life.  The State and "all of its political subdivisions," *id.*, are to abide by this fundamental policy.

11.     That position is consistent with previously passed Missouri statutes. For example, § 1.205, RSMo, passed in 1986, provides that: "[t]he life of each human being begins at conception," § 1.205.1(1); "[u]nborn children have protectable interests in life, health, and well-being," § 1.205.1(2); and (3) "the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state," § 1.205.2.

12.     In 1986, consistent with Missouri's fundamental policy favoring the right to life of the unborn, Missouri passed House Bill 1596, which prohibits using public resources for the purpose of supporting or assisting abortion.

13.     HB 1596 provides: "It shall be unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life." § 188.205.  As noted above, HB 1596 includes similar prohibitions against the use of public employees and public facilities to support, encourage, or assist abortion.  §§ 188.210, 188.215.

14.     The attorney general has "concurrent original jurisdiction throughout the state … to commence actions for a violation of any provision" of Chapter 188.  § 188.075.  He also "may seek injunctive or other relief against any person who, or entity which, is in violation of any

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

provisions of this chapter, *misuses public funds for an abortion*, or violates any state law which regulates an abortion facility or a person who performs or induces an abortion." *Id.* (emphasis added).

15.     This action is necessary because Defendant City of St. Louis (the "City"), by enacting Board Bill 61 to create a "Reproductive Equity Fund" to provide taxpayer-funded "logistical support" for abortion, has chosen to use public funds and resources illegally to support, encourage, and assist abortion, in violation of §§ 188.205, 188.210, 188.215, RSMo.

### Jurisdiction and Venue

16.     This Court has jurisdiction under Mo. Const. art V, § 14(a), § 527.010, RSMo, *et seq.*, § 536.150, RSMo, and other applicable law.

17.     Venue is proper in this Court under section 508.060, RSMo.

### Parties

18.     Plaintiff State of Missouri is a sovereign State of the United States of America.

19.     Eric S. Schmitt is the 43rd Attorney General of the State of Missouri. Attorney General Schmitt is authorized to "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved."  § 27.060, RSMo.

20.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in controlling the exercise of sovereign power over individuals and entities within its borders; Missouri's sovereign interest in ensuring the enforcement of Missouri law within Missouri's

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

borders; and Missouri's quasi-sovereign and *parens patriae* interest in the freedom, health, and physical, psychological, educational, and economic well-being of a significant segment of persons within its borders.

21.     This interest includes, but is not limited to, protecting Missouri citizens' health and welfare from arbitrary, capricious, unreasonable, unlawful, and ultimately harmful policies. This includes policies that deprive Missourians, including unborn Missourians, of their fundamental right to life.

22.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in ensuring that its political subdivisions do not act *ultra vires* or exercise authority vested in them under state law in a fashion that violates the Missouri Constitution or Missouri law.

23.     As noted above, state law explicitly vests Attorney General Schmitt with authority to sue to prevent violations of Chapter 188, including the provisions that prohibit the public funding of abortion: "The attorney general shall have concurrent original jurisdiction throughout the state, along with each prosecuting attorney and circuit attorney within their respective jurisdictions, to commence actions for a violation of any provision of this chapter, for a violation of any state law on the use of public funds for an abortion, or for a violation of any state law which regulates an abortion facility or a person who performs or induces an abortion.  The attorney general, or prosecuting attorney or circuit attorney within their respective jurisdictions, may seek injunctive or other relief against any person who, or entity which, is in violation of any provision of this chapter, misuses public funds for an abortion, or violates any state law which regulates an abortion facility or a person who performs or induces an abortion."  § 188.075.3, RSMo.

24.     Attorney General Schmitt sues to protect unborn children's right to life by commencing actions for violations of Chapter 188. § 188.075.3.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

25.     Defendant The City of St. Louis ("City") is a charter city of Missouri.

26.     Because the City operates under a constitutional charter, it is a political subdivision of Missouri, and thus it should be a "sanctuary of life" for the unborn under Missouri law.

27.     Adam L. Layne is the Treasurer of the City.

28.     Darlene Green is the Comptroller of the City.  On information and belief, she is responsible for the receipt and disbursement of American Rescue Plan Act ("ARPA") funds by and for the City.

29.     Dr. Mati Hlatshwayo is the Director of Health for the City.  She is a medical doctor and leads the City's Department of Health.

### Factual Allegations

30.     On May 24, 2019, Governor Michael Parson signed HB 126 into law.

31.     HB 126 contained several distinct sections, each of which advances Missouri's interest and obligation to protect every human being's inherent right to life.

32.     HB 126 expressly identified the General Assembly's interest in encouraging childbirth over abortion.  § 188.026.5.

33.     After the Governor signed the bill, most of the provisions went into effect on August 28, 2019. *See* Mo. Const. art. III, § 29.

34.     The General Assembly also enacted the Right to Life of the Unborn Child Act ("Act"), § 188.017, RSMo, with a contingent effective date.

35.     Shortly after the U.S. Supreme Court's issuance of *Dobbs*, Missouri Attorney General Eric S. Schmitt issued an opinion letter informing the Revisor that the *Dobbs* opinion satisfied the first condition of § 188.017.4. Mo. Att'y Gen. Op. 22-2022 (Ex. B).

36.     As a result, the Right to Life of the Unborn Child Act (the "Act") became effective on June 24, 2022.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

37.     The Act mandates that "no abortion shall be performed or induced upon a woman, except in cases of medical emergency." § 188.017, RSMo.

38.     Notwithstanding these provisions, the City passed Resolution Number 141 on December 10, 2021, declaring its intention to violate State law after *Roe v. Wade* was overruled. Ex. C, Resolution No. 141.  Resolution 141 declared that the City is a "safe zone" for abortion. *Id.*

39.     On July 15, 2022, the City's Board of Aldermen voted to pass Board Bill 61 ("BB61"), which purported to establish a "Reproductive Equity Fund." Ex. D, p.4.

40.     The Mayor signed Board Bill 61 on July 21, 2022.

41.     BB61 funds the Reproductive Equity Fund with $1.5 million in ARPA funds. Ex. D, BB61 §§ 1-2, pp.4–5.  It also provides $250,000 in ARPA funds for "administrative oversight and evaluation" of the Reproductive Equity Fund.  *Id.* § 3.

42.     Of that $1.5 million, $1 million in the Reproductive Equity Fund "provide[s] access to abortion through logistical support including but not limited to the funding of childcare, transportation, and other logistical support needs." *Id*. § 1.

43.     BB61 authorizes the City's Director of the Department of Health to "make, negotiate, and execute any and all contracts or other documents on behalf of the City to expend such funds." *Id*.

44.     BB61 directs the City Comptroller to "issue warrants upon the City Treasury for payment of all expenditures authorized" under the Reproductive Equity Fund's purposes. *Id*.

45.     The other $500,000 of the Reproductive Equity Fund "provide[s] direct services to support reproductive healthcare access in the region…." *Id*. at § 2, p.5.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

46.     Though this section permits funds to be used for doulas and lactation support, it does not limit use of the funds to those services. Rather, it allows funds to "provide[ ] direct services to *reproductive healthcare access* in the region." *Id.* On information and belief, "reproductive healthcare access" includes supporting, encouraging, and assisting abortions.  There is no provision in BB61 § 2 prohibiting the Reproductive Equity Fund from funding abortions or otherwise using funding or aiding women to receive an abortion.

47.     In addition, BB61 appropriates $250,000 "to provide administrative oversight and evaluation for the Reproductive Equity Program and Fund." *Id.* § 3, p.5.  Using these public funds, "[t]he Director of the Department of Health is authorized to make, negotiate, and execute any and all contracts or other documents on behalf of the City to expend such funds…" *Id.*  Further, "[t]he Comptroller is authorized and directed to issue warrants upon the City Treasury for payment of all expenditures authorized in this Section…" *Id.*

48.     BB61 contains an emergency clause stating that it "shall become effective immediately upon its passage and approval by the Mayor." *Id.* § 7, p.6.

49.     As a result, the City has dedicated at least $1.25 million, and up to $1.75 million, to assist and encourage pregnant women to seek and receive abortions.

<u>**Count I: Unlawful Use of Public Funds**</u>

50.     All prior allegations are incorporated by reference as if fully alleged herein.

51.     In Missouri, it is "unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life." § 188.205.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

52.    "Assist" means "to give support or aid." *Assist*, Webster's Third New International Dictionary 132 (2002). Providing "logistical support" for abortion, including "the funding of childcare, transportation, and other logistical support needs," Ex. D § 1, constitutes a form of "giving support or aid" to abortion.

53.    "Encourage" means "to spur on: stimulate" or "to give help or patronage to: foster." *Encourage*, Webster's Third New International Dictionary 747 (2002).  Providing "logistical support" for abortion, including "the funding of childcare, transportation, and other logistical support needs," as provided in BB61, Ex. D § 1, constitutes a form of spurring on or stimulating abortion, giving help or patronage to abortion, and fostering abortion.

54.     "Public funds" include any funds received or controlled by Missouri, its agencies, or political subdivisions. It also includes funds derived from federal, state, or local taxes, gifts, grants, or payments. § 188.200.

55.    The City is using public funds to pay for abortion-related logistical support, including childcare and travel expenses.

56.    The City intends to assist abortions by providing women the means to travel to obtain an abortion.

57.    The City's use of public funds, public employees, and public facilities to encourage and assist abortion violates the Missouri General Assembly's determination "that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children."  § 188.010(2), RSMo.  The City is a "political subdivision" of the State, and thus it is a "sanctuary of life" that "protects pregnant women and their unborn children" under state law.  *Id.* The City's obligations under Sections 188.205, .210, and .215 must be read in light of this recent enactment of the General Assembly in 2019.  The City's attempt to encourage and assist abortion

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

through taxpayer-funded "logistical support" for abortion is fundamentally at odds with the City's duty under State law to serve as a "sanctuary of life," including for "unborn children." *Id.*

58.     As a result, the City violates § 188.205 by expending public funds for the purpose of assisting or encouraging an abortion.

<u>**Count II: Unlawful Activity by Public Employees**</u>

59.     All prior allegations are incorporated by reference as if fully alleged herein.

60.     Any person employed by Missouri, its agencies, or its political subdivisions is a public employee. § 188.200.

61.     Section 188.210 of the Missouri Revised Statutes makes it "unlawful for any public employee within the scope of his [or her] employment to . . . assist an abortion, not necessary to save the life of the mother."

62.     Section 188.210 also makes it unlawful for any public-employee doctors, nurses or other health care personnel, social workers, counselors, or persons of similar occupation, acting within the scope of public employment, to encourage elective abortion.

63.     BB61 requires City employees in its Department of Health to create and manage the Reproductive Equity Fund. In managing that fund, public employees will be assisting or encouraging abortion by processing claims for public funds to cover costs incurred in obtaining abortions.

64.     BB61 requires the City Comptroller to "issue warrants upon the City Treasury for payment of all expenditures" for logistical abortion support.  In doing so, public employees employed by the City will be assisting or encouraging abortions by providing money for incidentals related to them.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

65.     BB61 requires the City Treasurer to pay expenditures for logistical abortion support requested by the City Comptroller.  In doing so, public employees employed by the City will be assisting or encouraging abortions by providing money for incidentals related to them.

66.     The City's Medical Director is a "doctor," and thus she is a "public employee" who is forbidden by § 188.210 "to encourage … a woman to have an abortion not necessary to save her life" when acting in the scope of public employment.  § 188.210.  By her participation in the implementation of BB61, she violates this statute.

67.     The City's use of public funds, public employees, and public facilities to encourage and assist abortion violates the Missouri General Assembly's determination "that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children." § 188.010(2), RSMo.  The City is a "political subdivision" of the State, and thus it is a "sanctuary of life" that "protects pregnant women and their unborn children" under state law.  *Id.* The City's obligations under Sections 188.205, .210, and .215 must be read in light of this recent enactment of the General Assembly in 2019.  The City's attempt to encourage and assist abortion through taxpayer-funded "logistical support" for abortion is fundamentally at odds with the City's duty under state law to serve as a "sanctuary of life," including of "unborn children." *Id.*

## Count III: Unlawful Use of Public Facilities

68.     All prior allegations are incorporated by reference as if fully alleged here.

69.     Section 188.215 of the Missouri Revised Statutes prohibits public facilities from being "used for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life."

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

70.      The statute defines "public facilities" broadly to include "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof."  § 188.200(3), RSMo.  The City's facilities, equipment, and assets are all "public facilities."

71.      The City uses public facilities when it receives and processes claims for reimbursement of costs incurred in obtaining an abortion through programs created as a result of BB61.

72.      The City uses public facilities when it provides funding for programs that fund abortions or assistance to women to procure abortions under BB61.

73.      The City's use of public funds, public employees, and public facilities to encourage and assist abortion violates the Missouri General Assembly's determination "that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children." § 188.010(2), RSMo.  The City is a "political subdivision" of the State, and thus it is a "sanctuary of life" that "protects pregnant women and their unborn children" under state law.  *Id.* The City's obligations under Sections 188.205, .210, and .215 must be read in light of this recent enactment of the General Assembly in 2019.  The City's attempt to encourage and assist abortion through taxpayer-funded "logistical support" for abortion is fundamentally at odds with the City's duty under state law to serve as a "sanctuary of life," including of "unborn children."  *Id.*

74.      Accordingly, the City violates Missouri law when it implements BB61.

### Count IV: The City's Policy Is Preempted by State Law

75.      All prior allegations are incorporated by reference as if fully alleged here.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

76.     A constitutional charter city possesses only those powers that the Missouri Constitution confers in article VI, section 19(a). Article VI, section 19(a) states that those powers may be additionally limited by the city's charter or by statute.

77.     Thus, State statutes preempt local legislation inconsistent with or conflicting with State law. *Id*.

78.     BB61 is inconsistent with and irreconcilably conflicts with Chapter 188 of the Missouri Revised Statutes in that it subsidizes, encourages, and attempts to increase access to abortion rather than protecting pregnant women and their unborn children.

79.     The City's use of public funds, public employees, and public facilities to encourage and assist abortion violates the Missouri General Assembly's determination "that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children." § 188.010(2), RSMo.  The City is a "political subdivision" of the State, and thus it is a "sanctuary of life" that "protects pregnant women and their unborn children" under state law.  *Id.* The City's obligations under Sections 188.205, .210, and .215 must be read in light of this recent enactment of the General Assembly in 2019.  The City's attempt to encourage and assist abortion through taxpayer-funded "logistical support" for abortion is fundamentally at odds with the City's duty under state law to serve as a "sanctuary of life," including of "unborn children."  *Id.*

### CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court:

a.   Declare that the City's actions to earmark public funds to provide access to abortion are unconstitutional, unlawful, and/or *ultra vires*;

b.   Declare that BB61 is unconstitutional and unlawful because it fails to account for the impact on unborn children;

c.   Declare that BB61 violates §§ 188.205, 188.210, and 188.215;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

d.  Enjoin the City and its officers, employees, and agents from taking any action to carry out any of BB61 §§ 1, 2, and 3, and from taking any action that would provide in any manner for the use of public funds, public employees, public facilities, and/or public resources for abortions or abortion assistance, including any "logistical support" for abortion;

e.  Grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action against the City and its officers, employees, and agents;

f.  Enter a final judgment in Plaintiff's favor on all Counts in this Petition; and

g.  Grant such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

ERIC S. SCHMITT
Missouri Attorney General

/s/ *D. John Sauer*
D. John Sauer, #58721
    *Solicitor General*
Maria A. Lanahan, #65956
    *Deputy Solicitor General*
Office of the Attorney General
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
(573) 751-0774 (fax)
John.Sauer@ago.mo.gov
Maria.Lanahan@ago.mo.gov

*Counsel for Petitioner/Plaintiff*

2222-CC08920

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

FIRST REGULAR SESSION

[TRULY AGREED TO AND FINALLY PASSED]

SENATE SUBSTITUTE FOR

SENATE COMMITTEE SUBSTITUTE FOR

# HOUSE BILL NO. 126

## 100TH GENERAL ASSEMBLY

0461S.18T                           2019

---

## AN ACT

To repeal sections 135.630, 188.010, 188.015, 188.027, 188.028, 188.043, and 188.052, RSMo, and to enact in lieu thereof seventeen new sections relating to abortion, with penalty provisions, a contingent effective date for a certain section, and an emergency clause for a certain section.

---

*Be it enacted by the General Assembly of the state of Missouri, as follows:*

Section A.  Sections 135.630, 188.010, 188.015, 188.027, 188.028, 188.043, and
2  188.052, RSMo, are repealed and seventeen new sections enacted in lieu thereof, to be known
3  as sections 135.630, 188.010, 188.015, 188.017, 188.018, 188.026, 188.027, 188.028, 188.033,
4  188.038, 188.043, 188.044, 188.052, 188.056, 188.057, 188.058, and 188.375, to read as
5  follows:

135.630.  1.  As used in this section, the following terms mean:
2  (1)  "Contribution", a donation of cash, stock, bonds, or other marketable securities, or
3  real property;
4  (2)  "Director", the director of the department of social services;
5  (3)  "Pregnancy resource center", a nonresidential facility located in this state:
6  (a)  Established and operating primarily to provide assistance to women **and families**
7  with crisis pregnancies or unplanned pregnancies by offering pregnancy testing, counseling,
8  emotional and material support, and other similar services **or by offering services as described**

EXPLANATION —  Matter enclosed in bold-faced brackets **[thus]** in the above bill is not enacted and is intended to be omitted from the law. Matter in **bold-face** type in the above bill is proposed language.

SS SCS HB 126                                          2

9    **under subsection 2 of section 188.325,** to encourage and assist such women **and families** in
10   carrying their pregnancies to term; and

11         (b)  Where childbirths are not performed; and

12         (c)  Which does not perform, induce, or refer for abortions and which does not hold itself
13   out as performing, inducing, or referring for abortions; and

14         (d)  Which provides direct client services at the facility, as opposed to merely providing
15   counseling or referral services by telephone; and

16         (e)  Which provides its services at no cost to its clients; and

17         (f)  When providing medical services, such medical services must be performed in
18   accordance with Missouri statute; and

19         (g)  Which is exempt from income taxation pursuant to the Internal Revenue Code of
20   1986, as amended;

21         (4)  "State tax liability", in the case of a business taxpayer, any liability incurred by such
22   taxpayer pursuant to the provisions of chapters 143, 147, 148, and 153, excluding sections
23   143.191 to 143.265 and related provisions, and in the case of an individual taxpayer, any liability
24   incurred by such taxpayer pursuant to the provisions of chapter 143, excluding sections 143.191
25   to 143.265 and related provisions;

26         (5)  "Taxpayer", a person, firm, a partner in a firm, corporation, or a shareholder in an S
27   corporation doing business in the state of Missouri and subject to the state income tax imposed
28   by the provisions of chapter 143, or a corporation subject to the annual corporation franchise tax
29   imposed by the provisions of chapter 147, or an insurance company paying an annual tax on its
30   gross premium receipts in this state, or other financial institution paying taxes to the state of
31   Missouri or any political subdivision of this state pursuant to the provisions of chapter 148, or
32   an express company which pays an annual tax on its gross receipts in this state pursuant to
33   chapter 153, or an individual subject to the state income tax imposed by the provisions of chapter
34   143, or any charitable organization which is exempt from federal income tax and whose Missouri
35   unrelated business taxable income, if any, would be subject to the state income tax imposed
36   under chapter 143.

37         2.  (1)  Beginning on March 29, 2013, any contribution to a pregnancy resource center
38   made on or after January 1, 2013, shall be eligible for tax credits as provided by this section.

39         (2)  For all tax years beginning on or after January 1, 2007, **and ending on or before**
40   **December 31, 2020,** a taxpayer shall be allowed to claim a tax credit against the taxpayer's state
41   tax liability in an amount equal to fifty percent of the amount such taxpayer contributed to a
42   pregnancy resource center. **For all tax years beginning on or after January 1, 2021, a**
43   **taxpayer shall be allowed to claim a tax credit against the taxpayer's state tax liability in**

44   **an amount equal to seventy percent of the amount such taxpayer contributed to a**
45   **pregnancy resource center.**
46        3.  The amount of the tax credit claimed shall not exceed the amount of the taxpayer's
47   state tax liability for the tax year for which the credit is claimed, and such taxpayer shall not be
48   allowed to claim a tax credit in excess of fifty thousand dollars per tax year.  However, any tax
49   credit that cannot be claimed in the tax year the contribution was made may be carried over only
50   to the next succeeding tax year.  No tax credit issued under this section shall be assigned,
51   transferred, or sold.
52        4.  Except for any excess credit which is carried over pursuant to subsection 3 of this
53   section, a taxpayer shall not be allowed to claim a tax credit unless the total amount of such
54   taxpayer's contribution or contributions to a pregnancy resource center or centers in such
55   taxpayer's tax year has a value of at least one hundred dollars.
56        5.  The director shall determine, at least annually, which facilities in this state may be
57   classified as pregnancy resource centers.  The director may require of a facility seeking to be
58   classified as a pregnancy resource center whatever information which is reasonably necessary
59   to make such a determination.  The director shall classify a facility as a pregnancy resource
60   center if such facility meets the definition set forth in subsection 1 of this section.
61        6.  The director shall establish a procedure by which a taxpayer can determine if a facility
62   has been classified as a pregnancy resource center.  Pregnancy resource centers shall be permitted
63   to decline a contribution from a taxpayer.  The cumulative amount of tax credits which may be
64   claimed by all the taxpayers contributing to pregnancy resource centers in any one fiscal year
65   shall not exceed two million dollars for all fiscal years ending on or before June 30, 2014, and
66   two million five hundred thousand dollars for all fiscal years beginning on or after July 1, 2014,
67   and ending on or before June 30, 2019, and three million five hundred thousand dollars for all
68   fiscal years beginning on or after July 1, 2019**, and ending on or before June 30, 2021.  For**
69   **all fiscal years beginning on or after July 1, 2021, there shall be no limit imposed on the**
70   **cumulative amount of tax credits that may be claimed by all taxpayers contributing to**
71   **pregnancy resource centers under the provisions of this section**.  Tax credits shall be issued
72   in the order contributions are received.  If the amount of tax credits redeemed in a fiscal year is
73   less than the cumulative amount authorized under this subsection, the difference shall be carried
74   over to a subsequent fiscal year or years and shall be added to the cumulative amount of tax
75   credits that may be authorized in that fiscal year or years.
76        7.  **For all fiscal years ending on or before June 30, 2021,** the director shall establish
77   a procedure by which, from the beginning of the fiscal year until some point in time later in the
78   fiscal year to be determined by the director, the cumulative amount of tax credits are equally
79   apportioned among all facilities classified as pregnancy resource centers.  If a pregnancy resource

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

80  center fails to use all, or some percentage to be determined by the director, of its apportioned tax
81  credits during this predetermined period of time, the director may reapportion these unused tax
82  credits to those pregnancy resource centers that have used all, or some percentage to be
83  determined by the director, of their apportioned tax credits during this predetermined period of
84  time.  The director may establish more than one period of time and reapportion more than once
85  during each fiscal year.   To the maximum extent possible, the director shall establish the
86  procedure described in this subsection in such a manner as to ensure that taxpayers can claim all
87  the tax credits possible up to the cumulative amount of tax credits available for the fiscal year.

88         8.  Each pregnancy resource center shall provide information to the director concerning
89  the identity of each taxpayer making a contribution to the pregnancy resource center who is
90  claiming a tax credit pursuant to this section and the amount of the contribution.  The director
91  shall provide the information to the director of revenue.  The director shall be subject to the
92  confidentiality and penalty provisions of section 32.057 relating to the disclosure of tax
93  information.

94         9.  [Under section 23.253 of the Missouri sunset act:
95         (1)  The provisions of the program authorized under this section shall automatically
96  sunset on December thirty-first six years after August 28, 2018, unless reauthorized by an act of
97  the general assembly;
98         (2)  If such program is reauthorized, the program authorized under this section shall
99  automatically sunset on December thirty-first six years after the effective date of the
100  reauthorization of this section;
101         (3)  This section shall terminate on September first of the calendar year immediately
102  following the calendar year in which a program authorized under this section is sunset; and
103         (4)  The provisions of this subsection shall not be construed to limit or in any way impair
104  the department's ability to issue tax credits authorized on or before the date the program
105  authorized under this section expires or a taxpayer's ability to redeem such tax credits.] **The**
106  **provisions of section 23.253 shall not apply to this section.**

       188.010.  **In recognition that Almighty God is the author of life, that all men and**
2  **women are "endowed by their Creator with certain unalienable Rights, that among these**
3  **are Life", and that article I, section 2 of the Constitution of Missouri provides that all**
4  **persons have a natural right to life,** it is the intention of the general assembly of the state of
5  Missouri to [grant]:

6         **(1)  Defend** the right to life [to] **of** all humans, born and unborn[, and to];

7         **(2)  Declare that the state and all of its political subdivisions are a "sanctuary of**
8  **life" that protects pregnant women and their unborn children; and**

SS SCS HB 126                                 5

9     **(3)**  Regulate abortion to the full extent permitted by the Constitution of the United
10  States, decisions of the United States Supreme Court, and federal statutes.

       188.015.  As used in this chapter, the following terms mean:

2     (1) "Abortion":

3     (a)  The act of using or prescribing any instrument, device, medicine, drug, or any other
4  means or substance with the intent to destroy the life of an embryo or fetus in his or her mother's
5  womb; or

6     (b)  The intentional termination of the pregnancy of a mother by using or prescribing any
7  instrument, device, medicine, drug, or other means or substance with an intention other than to
8  increase the probability of a live birth or to remove a dead [or dying] unborn child;

9     (2)  "Abortion facility", a clinic, physician's office, or any other place or facility in which
10  abortions are performed or induced other than a hospital;

11     (3)  "Conception", the fertilization of the ovum of a female by a sperm of a male;

12     (4)  "Department", the department of health and senior services;

13     **(5) "Down Syndrome", the same meaning as defined in section 191.923;**

14     **(6)**  "Gestational age", length of pregnancy as measured from the first day of the woman's
15  last menstrual period;

16     [(6)] **(7)**  "Medical emergency", a condition which, based on reasonable medical
17  judgment, so complicates the medical condition of a pregnant woman as to necessitate the
18  immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a
19  delay will create a serious risk of substantial and irreversible physical impairment of a major
20  bodily function of the pregnant woman;

21     [(7)] **(8)**  "Physician", any person licensed to practice medicine in this state by the state
22  board of registration for the healing arts;

23     [(8)] **(9)**  "Reasonable medical judgment", a medical judgment that would be made by a
24  reasonably prudent physician, knowledgeable about the case and the treatment possibilities with
25  respect to the medical conditions involved;

26     [(9)] **(10)**  "Unborn child", the offspring of human beings from the moment of conception
27  until birth and at every stage of its biological development, including the human conceptus,
28  zygote, morula, blastocyst, embryo, and fetus;

29     [(10)] **(11)**  "Viability" or "viable", that stage of fetal development when the life of the
30  unborn child may be continued indefinitely outside the womb by natural or artificial life-
31  supportive systems**;**

32     **(12) "Viable pregnancy" or "viable intrauterine pregnancy", in the first trimester**
33  **of pregnancy, an intrauterine pregnancy that can potentially result in a liveborn baby**.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                          6

**188.017.  1.  This section shall be known and may be cited as the "Right to Life of the Unborn Child Act".**

**2.  Notwithstanding any other provision of law to the contrary, no abortion shall be performed or induced upon a woman, except in cases of medical emergency.  Any person who knowingly performs or induces an abortion of an unborn child in violation of this subsection shall be guilty of a class B felony, as well as subject to suspension or revocation of his or her professional license by his or her professional licensing board.  A woman upon whom an abortion is performed or induced in violation of this subsection shall not be prosecuted for a conspiracy to violate the provisions of this subsection.**

**3.  It shall be an affirmative defense for any person alleged to have violated the provisions of subsection 2 of this section that the person performed or induced an abortion because of a medical emergency.  The defendant shall have the burden of persuasion that the defense is more probably true than not.**

**188.018.  If any one or more provisions, sections, subsections, sentences, clauses, phrases, or words of this chapter or the application thereof to any person, circumstance, or period of gestational age is found to be unenforceable, unconstitutional, or invalid by a court of competent jurisdiction, the same is hereby declared to be severable and the balance of this chapter shall remain effective notwithstanding such unenforceability, unconstitutionality, or invalidity.  The general assembly hereby declares that it would have passed each provision, section, subsection, sentence, clause, phrase, or word thereof, irrespective of the fact that any one or more provisions, sections, subsections, sentences, clauses, phrases, or words of this chapter, or the application of this chapter to any person, circumstance, or period of gestational age, would be declared unenforceable, unconstitutional, or invalid.**

**188.026.  1.  This section and sections 188.056, 188.057, and 188.058 shall be known and may be cited as the "Missouri Stands for the Unborn Act".**

**2.  In Roe v. Wade, 410 U.S. 113 (1973), certain information about the development of the unborn child, human pregnancy, and the effects of abortion was either not part of the record or was not available at the time.  Since 1973, advances in medical and scientific technology have greatly expanded our knowledge of prenatal life and the effects of abortion on women.  The general assembly of this state finds:**

**(1)  At conception, a new genetically distinct human being is formed;**

**(2)  The fact that the life of an individual human being begins at conception has long been recognized in Missouri law: "[T]he child is, in truth, alive from the moment of conception".  State v. Emerich, 13 Mo. App. 492, 495 (1883), affirmed, 87 Mo. 110 (1885).  Under section 1.205, the general assembly has recognized that the life of each human being**

SS SCS HB 126                          7

13   begins at conception and that unborn children have protectable interests in life, health, and
14   well-being;

15          (3)  The first prohibition of abortion in Missouri was enacted in 1825.  Since then,
16   the repeal and reenactment of prohibitions of abortion have made distinctions with respect
17   to penalties for performing or inducing abortion on the basis of "quickening"; however,
18   the unborn child was still protected from conception onward;

19          (4)  In ruling that Missouri's prohibition on abortion was constitutional in 1972, the
20   Missouri supreme court accepted as a stipulation of the parties that "'[i]nfant Doe,
21   Intervenor Defendant in this case, and all other unborn children have all the qualities and
22   attributes of adult human persons differing only in age or maturity.  Medically, human life
23   is a continuum from conception to death.'"  Rodgers v. Danforth, 486 S.W.2d 258, 259
24   (1972);

25          (5)  In Webster v. Reproductive Health Services, 492 U.S. 490 (1989), the Supreme
26   Court, while considering the "preamble" that set forth "findings" in section 1.205, stated:
27   "We think the extent to which the preamble's language might be used to interpret other
28   state statutes or regulations is something that only the courts of Missouri can definitively
29   decide.  State law has offered protections to unborn children in tort and probate law". Id.
30   at 506. Since Webster, Missouri courts have construed section 1.205 and have consistently
31   found that an unborn child is a person for purposes of Missouri's homicide and assault
32   laws when the unborn child's mother was killed or assaulted by another person.  Section
33   1.205 has even been found applicable to the manslaughter of an unborn child who was
34   eight weeks gestational age or earlier.  State v. Harrison, 390 S.W.3d 927 (Mo. Ct. App.
35   2013);

36          (6)  In medicine, a special emphasis is placed on the heartbeat. The heartbeat is a
37   discernible sign of life at every stage of human existence.  During the fifth week of
38   gestational age, an unborn child's heart begins to beat and blood flow begins during the
39   sixth week;

40          (7)  Depending on the ultrasound equipment being used, the unborn child's
41   heartbeat can be visually detected as early as six to eight weeks gestational age.  By about
42   twelve weeks gestational age, the unborn child's heartbeat can consistently be made
43   audible through the use of a handheld Doppler fetal heart rate device;

44          (8)  Confirmation of a pregnancy can be indicated through the detection of the
45   unborn child's heartbeat, while the absence of a heartbeat can be an indicator of the death
46   of the unborn child if the child has reached the point of development when a heartbeat
47   should be detectable;

48      (9)  Heart rate monitoring during pregnancy and labor is utilized to measure the
49  heart rate and rhythm of the unborn child, at an average rate between one hundred ten
50  and one hundred sixty beats per minute, and helps determine the health of the unborn
51  child;

52      (10)  The Supreme Court in *Roe* discussed "the difficult question of when life
53  begins" and wrote: "[p]hysicians and their scientific colleagues have regarded [quickening]
54  with less interest and have tended to focus either upon conception, upon live birth, or upon
55  the interim point at which the fetus becomes 'viable', that is, potentially able to live outside
56  the mother's womb, albeit with artificial aid". *Roe*, 410 U.S. at 160.  Today, however,
57  physicians' and scientists' interests on life in the womb also focus on other markers of
58  development in the unborn child, including, but not limited to, presence of a heartbeat,
59  brain development, a viable pregnancy or viable intrauterine pregnancy during the first
60  trimester of pregnancy, and the ability to experience pain;

61      (11)  In Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52 (1976),
62  the Supreme Court noted that "we recognized in *Roe* that viability was a matter of medical
63  judgment, skill, and technical ability, and we preserved the flexibility of the term". Id. at
64  64.  Due to advances in medical technology and diagnoses, present-day physicians and
65  scientists now describe the viability of an unborn child in an additional manner, by
66  determining whether there is a viable pregnancy or viable intrauterine pregnancy during
67  the first trimester of pregnancy;

68      (12)  While the overall risk of miscarriage after clinical recognition of pregnancy
69  is twelve to fifteen percent, the incidence decreases significantly if cardiac activity in the
70  unborn child has been confirmed.  The detection of a heartbeat in an unborn child is a
71  reliable indicator of a viable pregnancy and that the unborn child will likely survive to
72  birth, especially if presenting for a prenatal visit at eight weeks gestational age or later.
73  For asymptomatic women attending a first prenatal visit between six and eleven weeks
74  gestational age where a heartbeat was confirmed through an ultrasound, the subsequent
75  risk of miscarriage is one and six-tenths percent.  Although the risk is higher at six weeks
76  gestational age at nine and four-tenths percent, it declines rapidly to one and five-tenths
77  percent at eight weeks gestational age, and less than one percent at nine weeks gestational
78  age or later;

79      (13)  The presence of a heartbeat in an unborn child represents a more definable
80  point of ascertaining survivability than the ambiguous concept of viability that has been
81  adopted by the Supreme Court, especially since if a heartbeat is detected at eight weeks
82  gestational age or later in a normal pregnancy, there is likely to be a viable pregnancy and
83  there is a high probability that the unborn child will survive to birth;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                    9

84          **(14)  The placenta begins developing during the early first trimester of pregnancy**
85  **and performs a respiratory function by making oxygen supply to and carbon dioxide**
86  **removal from the unborn child possible later in the first trimester and throughout the**
87  **second and third trimesters of pregnancy;**

88          **(15)  By the fifth week of gestation, the development of the brain of the unborn child**
89  **is underway.  Brain waves have been measured and recorded as early as the eighth week**
90  **of gestational age in children who were removed during an ectopic pregnancy or**
91  **hysterectomy.  Fetal magnetic resonance imaging (MRI) of an unborn child's brain is used**
92  **during the second and third trimesters of pregnancy and brain activity has been observed**
93  **using MRI;**

94          **(16)  Missouri law identifies the presence of circulation, respiration, and brain**
95  **function as indicia of life under section 194.005, as the presence of circulation, respiration,**
96  **and brain function indicates that such person is not legally dead, but is legally alive;**

97          **(17)  Unborn children at eight weeks gestational age show spontaneous movements,**
98  **such as a twitching of the trunk and developing limbs.  It has been reported that unborn**
99  **children at this stage show reflex responses to touch.  The perioral area is the first part of**
100 **the unborn child's body to respond to touch at about eight weeks gestational age and by**
101 **fourteen weeks gestational age most of the unborn child's body is responsive to touch;**

102         **(18)  Peripheral cutaneous sensory receptors, the receptors that feel pain, develop**
103 **early in the unborn child.  They appear in the perioral cutaneous area at around seven to**
104 **eight weeks gestational age, in the palmar regions at ten to ten and a half weeks gestational**
105 **age, the abdominal wall at fifteen weeks gestational age, and over all of the unborn child's**
106 **body at sixteen weeks gestational age;**

107         **(19)  Substance P, a peptide that functions as a neurotransmitter, especially in the**
108 **transmission of pain, is present in the dorsal horn of the spinal cord of the unborn child**
109 **at eight to ten weeks gestational age.  Enkephalins, peptides that play a role in**
110 **neurotransmission and pain modulation, are present in the dorsal horn at twelve to**
111 **fourteen weeks gestational age;**

112         **(20)  When intrauterine needling is performed on an unborn child at sixteen weeks**
113 **gestational age or later, the reaction to this invasive stimulus is blood flow redistribution**
114 **to the brain.  Increased blood flow to the brain is the same type of stress response seen in**
115 **a born child and an adult;**

116         **(21)  By sixteen weeks gestational age, pain transmission from a peripheral receptor**
117 **to the cortex is possible in the unborn child;**

118         **(22)  Physicians provide anesthesia during in utero treatment of unborn children**
119 **as early as sixteen weeks gestational age for certain procedures, including those to correct**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

120 fetal urinary tract obstruction. Anesthesia is administered by ultrasound-guided injection
121 into the arm or leg of the unborn child;

122     (23) A leading textbook on prenatal development of the human brain states, "It
123 may be concluded that, although nociperception (the actual perception of pain) awaits the
124 appearance of consciousness, nociception (the experience of pain) is present some time
125 before birth. In the absence of disproof, it is merely prudent to assume that pain can be
126 experienced even early in prenatal life (Dr. J. Wisser, Zürich): the fetus should be given
127 the benefit of the doubt". Ronan O'Rahilly & Fabiola Müller. The Embryonic Human
128 Brain: An Atlas of Developmental Stages (3d ed. 2005);

129     (24) By fourteen or fifteen weeks gestational age or later, the predominant abortion
130 method in Missouri is dilation and evacuation (D & E). The D & E abortion method
131 includes the dismemberment, disarticulation, and exsanguination of the unborn child,
132 causing the unborn child's death;

133     (25) The Supreme Court acknowledged in Gonzales v. Carhart, 550 U.S. 124, 160
134 (2007), that "the standard D & E is in some respects as brutal, if not more, than the intact
135 D & E" partial birth abortion method banned by Congress and upheld as facially
136 constitutional by the Supreme Court, even though the federal ban was applicable both
137 before and after viability and had no exception for the health of the mother;

138     (26) Missouri's ban on the partial birth abortion method, section 565.300, is in
139 effect because of Gonzales v. Carhart and the Supreme Court's subsequent decision in
140 Nixon v. Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc.,
141 550 U.S. 901 (2007), to vacate and remand to the appellate court the prior invalidation of
142 section 565.300. Since section 565.300, like Congress' ban on partial birth abortion, is
143 applicable both before and after viability, there is ample precedent for the general
144 assembly to constitutionally prohibit the brutal D & E abortion method at fourteen weeks
145 gestational age or later, even before the unborn child is viable, with a medical emergency
146 exception;

147     (27) In Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court determined that
148 "evolving standards of decency" dictated that a Missouri statute allowing the death
149 penalty for a conviction of murder in the first degree for a person under eighteen years of
150 age when the crime was committed was unconstitutional under the Eighth and Fourteenth
151 Amendments to the United States Constitution because it violated the prohibition against
152 "cruel and unusual punishments";

153     (28) In Bucklew v. Precythe, 139 S. Ct. 1112, 1123 (2019), the Supreme Court noted
154 that "'[d]isgusting' practices" like disemboweling and quartering "readily qualified as

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                   11

155  'cruel and unusual', as a reader at the time of the Eighth Amendment's adoption would
156  have understood those words'';

157      **(29)  Evolving standards of decency dictate that Missouri should prohibit the brutal
158  and painful D & E abortion method at fourteen weeks gestational age or later, with a
159  medical emergency exception, because if a comparable method of killing was used on:**

160      **(a)  A person convicted of murder in the first degree, it would be cruel and unusual
161  punishment; or**

162      **(b)  An animal, it would be unlawful under state law because it would not be a
163  humane method, humane euthanasia, or humane killing of certain animals under chapters
164  273 and 578;**

165      **(30)  In *Roper*, the Supreme Court also found that "[i]t is proper that we
166  acknowledge the overwhelming weight of international opinion against the juvenile death
167  penalty....  The opinion of the world community, while not controlling our outcome, does
168  provide respected and significant confirmation for our own conclusions". *Roper*, 543 U.S.
169  at 578.  In its opinion, the Supreme Court was instructed by "international covenants
170  prohibiting the juvenile death penalty", such as the International Covenant on Civil and
171  Political Rights, 999 U.N.T.S. 171. Id. at 577;**

172      **(31)  The opinion of the world community, reflected in the laws of the United
173  Nation's 193-member states and six other entities, is that in most countries, most abortions
174  are prohibited after twelve weeks gestational age or later;**

175      **(32)  The opinion of the world community is also shared by most Americans, who
176  believe that most abortions in the second and third trimesters of pregnancy should be
177  illegal, based on polling that has remained consistent since 1996;**

178      **(33)  Abortion procedures performed later in pregnancy have a higher medical risk
179  for women.  Compared to an abortion at eight weeks gestational age or earlier, the relative
180  risk increases exponentially at later gestational ages.  The relative risk of death for a
181  pregnant woman who had an abortion performed or induced upon her at:**

182      **(a)  Eleven to twelve weeks gestational age is between three and four times higher
183  than an abortion at eight weeks gestational age or earlier;**

184      **(b)  Thirteen to fifteen weeks gestational age is almost fifteen times higher than an
185  abortion at eight weeks gestational age or earlier;**

186      **(c)  Sixteen to twenty weeks gestational age is almost thirty times higher than an
187  abortion at eight weeks gestational age or earlier; and**

188      **(d)  Twenty-one weeks gestational age or later is more than seventy-five times
189  higher than an abortion at eight weeks gestational age or earlier;**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                      12

190     **(34)  In addition to the short-term risks of an abortion, studies have found that the**
191 **long-term physical and psychological consequences of abortion for women include, but are**
192 **not limited to, an increased risk of preterm birth, low birthweight babies, and placenta**
193 **previa in subsequent pregnancies, as well as serious behavioral health issues.  These risks**
194 **increase as abortions are performed or induced at later gestational ages.   These**
195 **consequences of an abortion have a detrimental effect not only on women, their children,**
196 **and their families, but also on an already burdened health care system, taxpayers, and the**
197 **workforce;**

198     **(35)  A large percentage of women who have an abortion performed or induced**
199 **upon them in Missouri each year are at less than eight weeks gestational age, a large**
200 **majority are at less than fourteen weeks gestational age, a larger majority are at less than**
201 **eighteen weeks gestational age, and an even larger majority are at less than twenty weeks**
202 **gestational age.   A prohibition on performing or inducing an abortion at eight weeks**
203 **gestational age or later, with a medical emergency exception, does not amount to a**
204 **substantial obstacle to a large fraction of women for whom the prohibition is relevant,**
205 **which is pregnant women in Missouri who are seeking an abortion while not experiencing**
206 **a medical emergency.   The burden that a prohibition on performing or inducing an**
207 **abortion at eight, fourteen, eighteen, or twenty weeks gestational age or later, with a**
208 **medical emergency exception, might impose on abortion access, is outweighed by the**
209 **benefits conferred upon the following:**

210     **(a)  Women more advanced in pregnancy who are at greater risk of harm from**
211 **abortion;**

212     **(b)  Unborn children at later stages of development;**

213     **(c)  The medical profession, by preserving its integrity and fulfilling its commitment**
214 **to do no harm; and**

215     **(d)  Society, by fostering respect for human life, born and unborn, at all stages of**
216 **development, and by lessening societal tolerance of violence against innocent human life;**

217     **(36)  In _Webster_, the Supreme Court noted, in upholding a Missouri statute, "that**
218 **there may be a 4-week error in estimating gestational age".  _Webster_, 492 U.S. at 516.**
219 **Thus, an unborn child thought to be eight weeks gestational age might in fact be twelve**
220 **weeks gestational age, when an abortion poses a greater risk to the woman and the unborn**
221 **child is considerably more developed.  An unborn child at fourteen weeks gestational age**
222 **might be eighteen weeks gestational age and an unborn child at eighteen weeks gestational**
223 **age might be twenty-two weeks gestational age, when an abortion poses a greater risk to**
224 **the woman, the unborn child is considerably more developed, the abortion method likely**
225 **to be employed is more brutal, and the risk of pain experienced by the unborn child is**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

226  greater.  An unborn child at twenty weeks gestational age might be twenty-four weeks
227  gestational age, when an abortion poses a greater risk to the woman, the unborn child is
228  considerably more developed, the abortion method likely to be employed is more brutal,
229  the risk of pain experienced by the unborn child is greater, and the unborn child may be
230  viable.

231          3.  The state of Missouri is bound by Article VI, Clause 2 of the Constitution of the
232  United States that "all treaties made, or which shall be made, under the authority of the
233  United States, shall be the supreme law of the land".  One such treaty is the International
234  Covenant on Civil and Political Rights, entered into force on March 23, 1976, and adopted
235  by the United States on September 8, 1992.  In ratifying the Covenant, the United States
236  declared that while the provisions of Articles 1 through 27 of the Covenant are not self-
237  executing, the United States' understanding is that state governments share responsibility
238  with the federal government in implementing the Covenant.

239          4.  Article 6, Paragraph 1, U.N.T.S. at 174, of the International Covenant on Civil
240  and Political Rights states, "Every human being has the inherent right to life.  This right
241  shall be protected by law.  No one shall be arbitrarily deprived of his life".  The state of
242  Missouri takes seriously its obligation to comply with the Covenant and to implement this
243  paragraph as it relates to the inherent right to life of unborn human beings, protecting the
244  rights of unborn human beings by law, and ensuring that such unborn human beings are
245  not arbitrarily deprived of life.  The state of Missouri hereby implements Article 6,
246  Paragraph 1 of the Covenant by the regulation of abortion in this state.

247          5.  The state of Missouri has interests that include, but are not limited to:

248          (1)   Protecting unborn children throughout pregnancy and preserving and
249  promoting their lives from conception to birth;

250          (2)  Encouraging childbirth over abortion;

251          (3)  Ensuring respect for all human life from conception to natural death;

252          (4)   Safeguarding an unborn child from the serious harm of pain by an abortion
253  method that would cause the unborn child to experience pain while she or he is being
254  killed;

255          (5)  Preserving the integrity of the medical profession and regulating and restricting
256  practices that might cause the medical profession or society as a whole to become
257  insensitive, even disdainful, to life.  This includes regulating and restricting abortion
258  methods that are not only brutal and painful, but if allowed to continue, will further
259  coarsen society to the humanity of not only unborn children, but all vulnerable and
260  innocent human life, making it increasingly difficult to protect such life;

SS SCS HB 126                                14

261     **(6)  Ending the incongruities in state law by permitting some unborn children to be**
262 **killed by abortion, while requiring that unborn children be protected in non-abortion**
263 **circumstances through, including, but not limited to, homicide, assault, self-defense, and**
264 **defense of another statutes; laws guaranteeing prenatal health care, emergency care, and**
265 **testing; state-sponsored health insurance for unborn children; the prohibition of restraints**
266 **in correctional institutions to protect pregnant offenders and their unborn children; and**
267 **protecting the interests of unborn children by the appointment of conservators, guardians,**
268 **and representatives;**
269     **(7)  Reducing the risks of harm to pregnant women who obtain abortions later in**
270 **pregnancy; and**
271     **(8)  Avoiding burdens on the health care system, taxpayers, and the workforce**
272 **because of increased preterm births, low birthweight babies, compromised pregnancies,**
273 **extended postpartum recoveries, and behavioral health problems caused by the long-term**
274 **effects of abortions performed or induced later in the pregnancy.**

188.027.  1.  Except in [the case] **cases** of medical emergency, no abortion shall be
2 performed or induced on a woman without her voluntary and informed consent, given freely and
3 without coercion.  Consent to an abortion is voluntary and informed and given freely and without
4 coercion if, and only if, at least seventy-two hours prior to the abortion:
5     (1)  The physician who is to perform or induce the abortion, a qualified professional, or
6 the referring physician has informed the woman orally, reduced to writing, and in person, of the
7 following:
8     (a)  The name of the physician who will perform or induce the abortion;
9     (b)  Medically accurate information that a reasonable patient would consider material to
10 the decision of whether or not to undergo the abortion, including:
11     a.  A description of the proposed abortion method;
12     b.   The immediate and long-term medical risks to the woman associated with the
13 proposed abortion method including, but not limited to, infection, hemorrhage, cervical tear or
14 uterine perforation, harm to subsequent pregnancies or the ability to carry a subsequent child to
15 term, and possible adverse psychological effects associated with the abortion; and
16     c.  The immediate and long-term medical risks to the woman, in light of the anesthesia
17 and medication that is to be administered, the unborn child's gestational age, and the woman's
18 medical history and medical condition;
19     (c)   Alternatives to the abortion which shall include making the woman aware that
20 information and materials shall be provided to her detailing such alternatives to the abortion;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

21      (d)   A statement that the physician performing or inducing the abortion is available for
22  any questions concerning the abortion, together with the telephone number that the physician
23  may be later reached to answer any questions that the woman may have;

24      (e)   The location of the hospital that offers obstetrical or gynecological care located
25  within thirty miles of the location where the abortion is performed or induced and at which the
26  physician performing or inducing the abortion has clinical privileges and where the woman may
27  receive follow-up care by the physician if complications arise;

28      (f)   The gestational age of the unborn child at the time the abortion is to be performed or
29  induced; and

30      (g)   The anatomical and physiological characteristics of the unborn child at the time the
31  abortion is to be performed or induced;

32      (2)   The physician who is to perform or induce the abortion or a qualified professional
33  has presented the woman, in person, printed materials provided by the department, which
34  describe the probable anatomical and physiological characteristics of the unborn child at
35  two-week gestational increments from conception to full term, including color photographs or
36  images of the developing unborn child at two-week gestational increments.  Such descriptions
37  shall include information about brain and heart functions, the presence of external members and
38  internal organs during the applicable stages of development and information on when the unborn
39  child is viable.  The printed materials shall prominently display the following statement:  "The
40  life of each human being begins at conception.  Abortion will terminate the life of a separate,
41  unique, living human being.";

42      (3)   The physician who is to perform or induce the abortion, a qualified professional, or
43  the referring physician has presented the woman, in person, printed materials provided by the
44  department, which describe the various surgical and drug-induced methods of abortion relevant
45  to the stage of pregnancy, as well as the immediate and long-term medical risks commonly
46  associated with each abortion method including, but not limited to, infection, hemorrhage,
47  cervical tear or uterine perforation, harm to subsequent pregnancies or the ability to carry a
48  subsequent child to term, and the possible adverse psychological effects associated with an
49  abortion;

50      (4)   The physician who is to perform or induce the abortion or a qualified professional
51  shall provide the woman with the opportunity to view at least seventy-two hours prior to the
52  abortion an active ultrasound of the unborn child and hear the heartbeat of the unborn child if
53  the heartbeat is audible.  The woman shall be provided with a geographically indexed list
54  maintained by the department of health care providers, facilities, and clinics that perform
55  ultrasounds, including those that offer ultrasound services free of charge.  Such materials shall
56  provide contact information for each provider, facility, or clinic including telephone numbers

SS SCS HB 126                              16

57  and, if available, website addresses.  Should the woman decide to obtain an ultrasound from a
58  provider, facility, or clinic other than the abortion facility, the woman shall be offered a
59  reasonable time to obtain the ultrasound examination before the date and time set for performing
60  or inducing an abortion.  The person conducting the ultrasound shall ensure that the active
61  ultrasound image is of a quality consistent with standard medical practice in the community,
62  contains the dimensions of the unborn child, and accurately portrays the presence of external
63  members and internal organs, if present or viewable, of the unborn child.  The auscultation of
64  fetal heart tone must also be of a quality consistent with standard medical practice in the
65  community.  If the woman chooses to view the ultrasound or hear the heartbeat or both at the
66  abortion facility, the viewing or hearing or both shall be provided to her at the abortion facility
67  at least seventy-two hours prior to the abortion being performed or induced;

68        (5)  [Prior to an abortion being performed or induced on an unborn child of twenty-two
69  weeks gestational age or older, the physician who is to perform or induce the abortion or a
70  qualified professional has presented the woman, in person, printed materials provided by the
71  department that offer information on the possibility of the abortion causing pain to the unborn
72  child.  This information shall include, but need not be limited to, the following:
73            (a)  At least by twenty-two weeks of gestational age, the unborn child possesses all the
74  anatomical structures, including pain receptors, spinal cord, nerve tracts, thalamus, and cortex,
75  that are necessary in order to feel pain;
76            (b)  A description of the actual steps in the abortion procedure to be performed or
77  induced, and at which steps the abortion procedure could be painful to the unborn child;
78            (c)  There is evidence that by twenty-two weeks of gestational age, unborn children seek
79  to evade certain stimuli in a manner that in an infant or an adult would be interpreted as a
80  response to pain;
81            (d)  Anesthesia is given to unborn children who are twenty-two weeks or more gestational
82  age who undergo prenatal surgery;
83            (e)  Anesthesia is given to premature children who are twenty-two weeks or more
84  gestational age who undergo surgery;
85            (f)  Anesthesia or an analgesic is available in order to minimize or alleviate the pain to
86  the unborn child]  **The printed materials provided by the department shall include**
87  **information on the possibility of an abortion causing pain in the unborn child.  This**
88  **information shall include, but need not be limited to, the following:**
89        **(a)  Unborn children as early as eight weeks gestational age start to show**
90  **spontaneous movements and unborn children at this stage in pregnancy show reflex**
91  **responses to touch;**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

92     **(b)  In the unborn child, the area around his or her mouth and lips is the first part**
93  **of the unborn child's body to respond to touch and by fourteen weeks gestational age most**
94  **of the unborn child's body is responsive to touch;**

95     **(c)  Pain receptors on the unborn child's skin develop around his or her mouth at**
96  **around seven to eight weeks gestational age, around the palms of his or her hands at ten**
97  **to ten and a half weeks, on the abdominal wall at fifteen weeks, and over all of his or her**
98  **body at sixteen weeks gestational age;**

99     **(d)  Beginning at sixteen weeks gestational age and later, it is possible for pain to be**
100  **transmitted from receptors to the cortex of the unborn child's brain, where thinking and**
101  **perceiving occur;**

102     **(e)  When a physician performs a life-saving surgery, he or she provides anesthesia**
103  **to unborn children as young as sixteen weeks gestational age in order to alleviate the**
104  **unborn child's pain; and**

105     **(f)  A description of the actual steps in the abortion procedure to be performed or**
106  **induced and at which steps the abortion procedure could be painful to the unborn child**;

107     (6)   The physician who is to perform or induce the abortion or a qualified professional
108  has presented the woman, in person, printed materials provided by the department explaining to
109  the woman alternatives to abortion she may wish to consider.  Such materials shall:

110     (a)   Identify on a geographical basis public and private agencies available to assist a
111  woman in carrying her unborn child to term, and to assist her in caring for her dependent child
112  or  placing her child for adoption, including agencies commonly known and generally referred
113  to as pregnancy resource centers, crisis pregnancy centers, maternity homes, and adoption
114  agencies.  Such materials shall provide a comprehensive list by geographical area of the agencies,
115  a description of the services they offer, and the telephone numbers and addresses of the agencies;
116  provided that such materials shall not include any programs, services, organizations, or affiliates
117  of organizations that perform or induce, or assist in the performing or inducing of, abortions or
118  that refer for abortions;

119     (b)  Explain the Missouri alternatives to abortion services program under section 188.325,
120  and any other programs and services available to pregnant women and mothers of newborn
121  children offered by public or private agencies which assist a woman in carrying her unborn child
122  to term and assist her in caring for her dependent child or placing her child for adoption,
123  including but not limited to prenatal care; maternal health care; newborn or infant care; mental
124  health services; professional counseling services; housing programs; utility assistance;
125  transportation services; food, clothing, and supplies related to pregnancy; parenting skills;
126  educational programs; job training and placement services; drug and alcohol testing and
127  treatment; and adoption assistance;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                    18

128   (c)  Identify the state website for the Missouri alternatives to abortion services program
129   under section 188.325, and any toll-free number established by the state operated in conjunction
130   with the program;
131   (d)  Prominently display the statement:  "There are public and private agencies willing
132   and able to help you carry your child to term, and to assist you and your child after your child is
133   born, whether you choose to keep your child or place him or her for adoption.  The state of
134   Missouri encourages you to contact those agencies before making a final decision about abortion.
135   State law requires that your physician or a qualified professional give you the opportunity to call
136   agencies like these before you undergo an abortion.";
137   (7)  The physician who is to perform or induce the abortion or a qualified professional
138   has presented the woman, in person, printed materials provided by the department explaining that
139   the father of the unborn child is liable to assist in the support of the child, even in instances
140   where he has offered to pay for the abortion.  Such materials shall include information on the
141   legal duties and support obligations of the father of a child, including, but not limited to, child
142   support payments, and the fact that paternity may be established by the father's name on a birth
143   certificate or statement of paternity, or by court action.  Such printed materials shall also state
144   that more information concerning paternity establishment and child support services and
145   enforcement may be obtained by calling the family support division within the Missouri
146   department of social services; and
147   (8)  The physician who is to perform or induce the abortion or a qualified professional
148   shall inform the woman that she is free to withhold or withdraw her consent to the abortion at
149   any time without affecting her right to future care or treatment and without the loss of any state
150   or federally funded benefits to which she might otherwise be entitled.
151   2.  All information required to be provided to a woman considering abortion by
152   subsection 1 of this section shall be presented to the woman individually, in the physical
153   presence of the woman and in a private room, to protect her privacy, to maintain the
154   confidentiality of her decision, to ensure that the information focuses on her individual
155   circumstances, to ensure she has an adequate opportunity to ask questions, and to ensure that she
156   is not a victim of coerced abortion.  Should a woman be unable to read materials provided to her,
157   they shall be read to her.  Should a woman need an interpreter to understand the information
158   presented in the written materials, an interpreter shall be provided to her.  Should a woman ask
159   questions concerning any of the information or materials, answers shall be provided in a
160   language she can understand.
161   3.  No abortion shall be performed or induced unless and until the woman upon whom
162   the abortion is to be performed or induced certifies in writing on a checklist form provided by
163   the department that she has been presented all the information required in subsection 1 of this

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

164  section, that she has been provided the opportunity to view an active ultrasound image of the
165  unborn child and hear the heartbeat of the unborn child if it is audible, and that she further
166  certifies that she gives her voluntary and informed consent, freely and without coercion, to the
167  abortion procedure.

168       4.  [~~No abortion shall be performed or induced on an unborn child of twenty-two weeks~~
169  ~~gestational age or older unless and until the woman upon whom the abortion is to be performed~~
170  ~~or induced has been provided the opportunity to choose to have an anesthetic or analgesic~~
171  ~~administered to eliminate or alleviate pain to the unborn child caused by the particular method~~
172  ~~of abortion to be performed or induced.  The administration of anesthesia or analgesics shall be~~
173  ~~performed in a manner consistent with standard medical practice in the community.~~

174  ~~5.~~]  No physician shall perform or induce an abortion unless and until the physician has
175  obtained from the woman her voluntary and informed consent given freely and without coercion.
176  If the physician has reason to believe that the woman is being coerced into having an abortion,
177  the physician or qualified professional shall inform the woman that services are available for her
178  and shall provide her with private access to a telephone and information about such services,
179  including but not limited to the following:

180       (1)  Rape crisis centers, as defined in section 455.003;

181       (2)  Shelters for victims of domestic violence, as defined in section 455.200; and

182       (3)  Orders of protection, pursuant to chapter 455.

183  [~~6.~~] 5.  The physician who is to perform or induce the abortion shall, at least seventy-two
184  hours prior to such procedure, inform the woman orally and in person of:

185       (1)  The immediate and long-term medical risks to the woman associated with the
186  proposed abortion method including, but not limited to, infection, hemorrhage, cervical tear or
187  uterine perforation, harm to subsequent pregnancies or the ability to carry a subsequent child to
188  term, and possible adverse psychological effects associated with the abortion; and

189       (2)  The immediate and long-term medical risks to the woman, in light of the anesthesia
190  and medication that is to be administered, the unborn child's gestational age, and the woman's
191  medical history and medical conditions.

192  [~~7.~~] 6.  No physician shall perform or induce an abortion unless and until the physician
193  has received and signed a copy of the form prescribed in subsection 3 of this section.  The
194  physician shall retain a copy of the form in the patient's medical record.

195  [~~8.~~] 7.  In the event of a medical emergency [~~as provided by section 188.039~~], the
196  physician who performed or induced the abortion shall clearly certify in writing the nature and
197  circumstances of the medical emergency.  This certification shall be signed by the physician who
198  performed or induced the abortion, and shall be maintained under section 188.060.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

199    [9.] **8.**  No person or entity shall require, obtain, or accept payment for an abortion from
200    or on behalf of a patient until at least seventy-two hours have passed since the time that the
201    information required by subsection 1 of this section has been provided to the patient.  Nothing
202    in this subsection shall prohibit a person or entity from notifying the patient that payment for the
203    abortion will be required after the seventy-two-hour period has expired if she voluntarily chooses
204    to have the abortion.

205    [10.] **9.**  The term "qualified professional" as used in this section shall refer to a
206    physician, physician assistant, registered nurse, licensed practical nurse, psychologist, licensed
207    professional counselor, or licensed social worker, licensed or registered under chapter 334, 335,
208    or 337, acting under the supervision of the physician performing or inducing the abortion, and
209    acting within the course and scope of his or her authority provided by law.  The provisions of this
210    section shall not be construed to in any way expand the authority otherwise provided by law
211    relating to the licensure, registration, or scope of practice of any such qualified professional.

212    [11.] **10.**  By November 30, 2010, the department shall produce the written materials and
213    forms described in this section.  Any written materials produced shall be printed in a typeface
214    large enough to be clearly legible.  All information shall be presented in an objective, unbiased
215    manner designed to convey only accurate scientific and medical information.  The department
216    shall furnish the written materials and forms at no cost and in sufficient quantity to any person
217    who performs or induces abortions, or to any hospital or facility that provides abortions.  The
218    department shall make all information required by subsection 1 of this section available to the
219    public through its department website.  The department shall maintain a toll-free,
220    twenty-four-hour hotline telephone number where a caller can obtain information on a regional
221    basis concerning the agencies and services described in subsection 1 of this section.  No
222    identifying information regarding persons who use the website shall be collected or maintained.
223    The department shall monitor the website on a regular basis to prevent tampering and correct any
224    operational deficiencies.

225    [12.] **11.**  In order to preserve the compelling interest of the state to ensure that the choice
226    to consent to an abortion is voluntary and informed, and given freely and without coercion, the
227    department shall use the procedures for adoption of emergency rules under section 536.025 in
228    order to promulgate all necessary rules, forms, and other necessary material to implement this
229    section by November 30, 2010.

230    [13.] **12.**  If the provisions in subsections 1 and [9] **8** of this section requiring a
231    seventy-two-hour waiting period for an abortion are ever temporarily or permanently restrained
232    or enjoined by judicial order, then the waiting period for an abortion shall be twenty-four hours;
233    provided, however, that if such temporary or permanent restraining order or injunction is stayed

SS SCS HB 126                              21

234  or dissolved, or otherwise ceases to have effect, the waiting period for an abortion shall be
235  seventy-two hours.

188.028.  1.  **Except in the case of a medical emergency,** no person shall knowingly
2    perform **or induce** an abortion upon a pregnant woman under the age of eighteen years unless:
3        (1)  The attending physician has secured the informed written consent of the minor and
4    one parent or guardian**, and the consenting parent or guardian of the minor has notified any**
5    **other custodial parent in writing prior to the securing of the informed written consent of**
6    **the minor and one parent or guardian.  For purposes of this subdivision, "custodial**
7    **parent" shall only mean a parent of a minor who has been awarded joint legal custody or**
8    **joint physical custody of such minor by a court of competent jurisdiction.  Notice shall not**
9    **be required for any parent:**
10       **(a)  Who has been found guilty of any offense in violation of chapter 565, relating**
11   **to offenses against the person; chapter 566, relating to sexual offenses; chapter 567,**
12   **relating to prostitution; chapter 568, relating to offenses against the family; or chapter 573,**
13   **related to pornography and related offenses, if a child was a victim;**
14       **(b)  Who has been found guilty of any offense in any other state or foreign country,**
15   **or under federal, tribal, or military jurisdiction if a child was a victim, which would be a**
16   **violation of chapters 565, 566, 567, 568, or 573 if committed in this state;**
17       **(c)  Who is listed on the sexual offender registry under sections 589.400 to 589.425;**
18       **(d)  Against whom an order of protection has been issued, including a foreign order**
19   **of protection given full faith and credit in this state under section 455.067;**
20       **(e)  Whose custodial, parental, or guardianship rights have been terminated by a**
21   **court of competent jurisdiction; or**
22       **(f)  Whose whereabouts are unknown after reasonable inquiry, who is a fugitive**
23   **from justice, who is habitually in an intoxicated or drugged condition, or who has been**
24   **declared mentally incompetent or incapacitated by a court of competent jurisdiction**; [or]
25       (2)  The minor is emancipated and the attending physician has received the informed
26   written consent of the minor; [or]
27       (3)  The minor has been granted the right to self-consent to the abortion by court order
28   pursuant to subsection 2 of this section, and the attending physician has received the informed
29   written consent of the minor; or
30       (4)  The minor has been granted consent to the abortion by court order, and the court has
31   given its informed written consent in accordance with subsection 2 of this section, and the minor
32   is having the abortion willingly, in compliance with subsection 3 of this section.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                       22

33      2.  The right of a minor to self-consent to an abortion under subdivision (3) of subsection
34   1 of this section or court consent under subdivision (4) of subsection 1 of this section may be
35   granted by a court pursuant to the following procedures:
36      (1)  The minor or next friend shall make an application to the juvenile court which shall
37   assist the minor or next friend in preparing the petition and notices required pursuant to this
38   section.  The minor or the next friend of the minor shall thereafter file a petition setting forth the
39   initials of the minor; the age of the minor; the names and addresses of each parent, guardian, or,
40   if the minor's parents are deceased and no guardian has been appointed, any other person
41   standing in loco parentis of the minor; that the minor has been fully informed of the risks and
42   consequences of the abortion; that the minor is of sound mind and has sufficient intellectual
43   capacity to consent to the abortion; that, if the court does not grant the minor majority rights for
44   the purpose of consent to the abortion, the court should find that the abortion is in the best
45   interest of the minor and give judicial consent to the abortion; that the court should appoint a
46   guardian ad litem of the child; and if the minor does not have private counsel, that the court
47   should appoint counsel.  The petition shall be signed by the minor or the next friend;
48      (2)  A hearing on the merits of the petition, to be held on the record, shall be held as soon
49   as possible within five days of the filing of the petition.  If any party is unable to afford counsel,
50   the court shall appoint counsel at least twenty-four hours before the time of the hearing.  At the
51   hearing, the court shall hear evidence relating to the emotional development, maturity, intellect
52   and understanding of the minor; the nature, possible consequences, and alternatives to the
53   abortion; and any other evidence that the court may find useful in determining whether the minor
54   should be granted majority rights for the purpose of consenting to the abortion or whether the
55   abortion is in the best interests of the minor;
56      (3)  In the decree, the court shall for good cause:
57      (a)  Grant the petition for majority rights for the purpose of consenting to the abortion;
58   [or]
59      (b)  Find the abortion to be in the best interests of the minor and give judicial consent to
60   the abortion, setting forth the grounds for so finding; or
61      (c)  Deny the petition, setting forth the grounds on which the petition is denied;
62      (4)  If the petition is allowed, the informed consent of the minor, pursuant to a court grant
63   of majority rights, or the judicial consent, shall bar an action by the parents or guardian of the
64   minor on the grounds of battery of the minor by those performing **or inducing** the abortion.  The
65   immunity granted shall only extend to the performance **or induction** of the abortion in
66   accordance herewith and any necessary accompanying services which are performed in a
67   competent manner.  The costs of the action shall be borne by the parties;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

68      (5)  An appeal from an order issued under the provisions of this section may be taken to
69  the court of appeals of this state by the minor or by a parent or guardian of the minor.  The notice
70  of intent to appeal shall be given within twenty-four hours from the date of issuance of the order.
71  The record on appeal shall be completed and the appeal shall be perfected within five days from
72  the filing of notice to appeal.  Because time may be of the essence regarding the performance **or**
73  **induction** of the abortion, the supreme court of this state shall, by court rule, provide for
74  expedited appellate review of cases appealed under this section.

75      3.  If a minor desires an abortion, then she shall be orally informed of and, if possible,
76  sign the written consent required [by section 188.039] **under this chapter** in the same manner
77  as an adult person.  No abortion shall be performed **or induced** on any minor against her will,
78  except that an abortion may be performed **or induced** against the will of a minor pursuant to a
79  court order described in subdivision (4) of subsection 1 of this section that the abortion is
80  necessary to preserve the life of the minor.

**188.033.  Whenever an abortion facility or a family planning agency located in this**
2  **state, or any of its agents or employees acting within the scope of his or her authority or**
3  **employment, provides to a woman considering an abortion the name, address, telephone**
4  **number, or website of an abortion provider that is located outside of the state, such**
5  **abortion facility or family planning agency or its agents or employees shall also provide to**
6  **such woman the printed materials produced by the department under section 188.027.  If**
7  **the name, address, telephone number, or website of such abortion provider is not provided**
8  **to such woman in person, such printed materials shall be offered to her, and if she chooses,**
9  **sent to such woman at no cost to her the same day or as soon as possible either**
10 **electronically or by U.S. mail overnight delivery service or by other overnight or same-day**
11 **delivery service to an address of such woman's choosing.  The department shall furnish**
12 **such printed materials at no cost and in sufficient quantities to abortion facilities and**
13 **family planning agencies located within the state.**

**188.038.  1.  The general assembly of this state finds that:**
2  **(1)  Removing vestiges of any past bias or discrimination against pregnant women,**
3  **their partners, and their family members, including their unborn children, is an important**
4  **task for those in the legal, medical, social services, and human services professions;**
5  **(2)  Ending any current bias or discrimination against pregnant women, their**
6  **partners, and their family members, including their unborn children, is a legitimate**
7  **purpose of government in order to guarantee that those who "are endowed by their**
8  **Creator with certain unalienable Rights" can enjoy "Life, Liberty and the pursuit of**
9  **Happiness";**

SS SCS HB 126                                    24

10          **(3)  The historical relationship of bias or discrimination by some family planning**
11    **programs and policies towards poor and minority populations, including, but not limited**
12    **to, the nonconsensual sterilization of mentally ill, poor, minority, and immigrant women**
13    **and other coercive family planning programs and policies, must be rejected;**
14          **(4)  Among Missouri residents, the rate of black or African-American women who**
15    **undergo abortions is significantly higher, about three and a half times higher, than the rate**
16    **of white women who undergo abortions.  Among Missouri residents, the rate of black or**
17    **African-American women who undergo repeat abortions is significantly higher, about one**
18    **and a half times higher, than the rate of white women who undergo repeat abortions;**
19          **(5)  Performing or inducing an abortion because of the sex of the unborn child is**
20    **repugnant to the values of equality of females and males and the same opportunities for**
21    **girls and boys, and furthers a false mindset of female inferiority;**
22          **(6)  Government has a legitimate interest in preventing the abortion of unborn**
23    **children with Down Syndrome because it is a form of bias or disability discrimination and**
24    **victimizes the disabled unborn child at his or her most vulnerable stage.  Eliminating**
25    **unborn children with Down Syndrome raises grave concerns for the lives of those who do**
26    **live with disabilities.  It sends a message of dwindling support for their unique challenges,**
27    **fosters a false sense that disability is something that could have been avoidable, and is**
28    **likely to increase the stigma associated with disability.**
29          **2.  No person shall perform or induce an abortion on a woman if the person knows**
30    **that the woman is seeking the abortion solely because of a prenatal diagnosis, test, or**
31    **screening indicating Down Syndrome or the potential of Down Syndrome in an unborn**
32    **child.**
33          **3.  No person shall perform or induce an abortion on a woman if the person knows**
34    **that the woman is seeking the abortion solely because of the sex or race of the unborn child.**
35          **4.  Any physician or other person who performs or induces or attempts to perform**
36    **or induce an abortion prohibited by this section shall be subject to all applicable civil**
37    **penalties under this chapter including, but not limited to, sections 188.065 and 188.085.**
         188.043.  1.  No person shall perform or induce [~~a surgical or medical~~] **an** abortion **on**
2    **another** unless such person has [~~proof of~~] medical malpractice insurance with coverage amounts
3    of at least [~~five hundred thousand dollars~~] **one million dollars per occurrence and three**
4    **million dollars in the annual aggregate**.
5          2.  For the purpose of this section, "medical malpractice insurance" means insurance
6    coverage against the legal liability of the insured and against loss, damage, or expense incident
7    to a claim arising out of the death or injury of any person as a result of the negligence or
8    malpractice in rendering professional service by any health care provider.

SS SCS HB 126                                           25

9          3.  No abortion facility or hospital shall employ or engage the services of a person to
10   perform [one or more abortions] **or induce an abortion on another** if the person does not have
11   [proof of] medical malpractice insurance pursuant to this section, except **that** the abortion facility
12   or hospital may provide medical malpractice insurance for the services of persons employed or
13   engaged by such facility or hospital **which is no less than the coverage amounts set forth in**
14   **this section**.

15          4.  Notwithstanding the provisions of section 334.100, failure of a person to maintain the
16   medical malpractice insurance required by this section shall be an additional ground for
17   sanctioning of a person's license, certificate, or permit.

**188.044.  1.  When a drug or chemical, or combination thereof, used by a person to**
2   **induce an abortion carries a warning from its manufacturer or distributor, a peer-**
3   **reviewed medical journal article, or a Food and Drug Administration label that its use may**
4   **cause birth defects, disability, or other injury in a child who survives the abortion, then in**
5   **addition to the requirements of section 188.043, such person shall also carry tail insurance**
6   **with coverage amounts of at least one million dollars per occurrence and three million**
7   **dollars in the annual aggregate for personal injury to or death of a child who survives such**
8   **abortion.  Such policy shall be maintained in force or be in effect for a period of twenty-one**
9   **years after the person used the drug or chemical, or combination thereof, to induce the**
10   **abortion.**

11          **2.  For the purpose of this section, "tail insurance" means insurance which covers**
12   **the legal liability of the insured once a medical malpractice insurance policy is cancelled,**
13   **not renewed, or terminated, and covers claims made after such cancellation or termination**
14   **for acts occurring during the period the prior medical malpractice insurance was in effect.**

15          **3.  No abortion facility or hospital shall employ or engage the services of a person**
16   **to induce an abortion on another using any drug or chemical, or combination thereof,**
17   **which may cause birth defects, disability, or other injury in a child who survives the**
18   **abortion, if the person does not have tail insurance pursuant to this section, except that the**
19   **abortion facility or hospital may provide tail insurance for the services of persons**
20   **employed or engaged by such facility or hospital which is no less than the coverage**
21   **amounts and duration set forth in this section.**

22          **4.  Notwithstanding the provisions of section 334.100 to the contrary, failure of a**
23   **person to maintain the tail insurance required by this section shall be an additional ground**
24   **for sanctioning of a person's license, certificate, or permit.**

188.052.  1.  An individual abortion report for each abortion performed or induced upon
2   a woman shall be completed by [her attending] **the** physician **who performed or induced the**
3   **abortion.  Abortion reports shall include, but not be limited to, a certification that the**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                              26

4   **physician does not have any knowledge that the woman sought the abortion solely because**
5   **of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of**
6   **Down Syndrome in the unborn child and a certification that the physician does not have**
7   **any knowledge that the woman sought the abortion solely because of the sex or race of the**
8   **unborn child**.

9        2.  An individual complication report for any post-abortion care performed upon a woman
10  shall be completed by the physician providing such post-abortion care.  This report shall include:
11       (1)  The date of the abortion;
12       (2)  The name and address of the abortion facility or hospital where the abortion was
13  performed **or induced**;
14       (3)  The nature of the abortion complication diagnosed or treated.
15       3.  All abortion reports shall be signed by the attending physician[,] **who performed or**
16  **induced the abortion** and submitted to the [state] department [of health and senior services]
17  within forty-five days from the date of the abortion.  All complication reports shall be signed by
18  the physician providing the post-abortion care and submitted to the department [of health and
19  senior services] within forty-five days from the date of the post-abortion care.
20       4.  A copy of the abortion report shall be made a part of the medical record of the patient
21  of the **abortion** facility or hospital in which the abortion was performed **or induced**.
22       5.  The [state] department [of health and senior services] shall be responsible for
23  collecting all abortion reports and complication reports and collating and evaluating all data
24  gathered therefrom and shall annually publish a statistical report based on such data from
25  abortions performed **or induced** in the previous calendar year.

     **188.056.  1.  Notwithstanding any other provision of law to the contrary, no abortion**
2   **shall be performed or induced upon a woman at eight weeks gestational age or later, except**
3   **in cases of medical emergency.  Any person who knowingly performs or induces an**
4   **abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,**
5   **as well as subject to suspension or revocation of his or her professional license by his or her**
6   **professional licensing board.  A woman upon whom an abortion is performed or induced**
7   **in violation of this subsection shall not be prosecuted for a conspiracy to violate the**
8   **provisions of this section.**
9       **2.  It shall be an affirmative defense for any person alleged to have violated the**
10  **provisions of subsection 1 of this section that the person performed or induced an abortion**
11  **because of a medical emergency.  The defendant shall have the burden of persuasion that**
12  **the defense is more probably true than not.**
13      **3.  Prosecution under this section shall bar prosecution under sections 188.057,**
14  **188.058, or 188.375 if prosecution under such sections would violate the provisions of**

15  Amendment V to the Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.
17      4. If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this section or the application thereof to any person, circumstance, or period of
19  gestational age is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity. The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words
25  of the section, or the application of the section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.

1   188.057. 1. Notwithstanding any other provision of law to the contrary, no abortion
2   shall be performed or induced upon a woman at fourteen weeks gestational age or later,
3   except in cases of medical emergency. Any person who knowingly performs or induces an
4   abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,
5   as well as subject to suspension or revocation of his or her professional license by his or her
6   professional licensing board. A woman upon whom an abortion is performed or induced
7   in violation of this subsection shall not be prosecuted for a conspiracy to violate the
8   provisions of this section.
9       2. It shall be an affirmative defense for any person alleged to have violated the
10  provisions of subsection 1 of this section that the person performed or induced an abortion
11  because of a medical emergency. The defendant shall have the burden of persuasion that
12  the defense is more probably true than not.
13      3. Prosecution under this section shall bar prosecution under sections 188.056,
14  188.058, or 188.375 if prosecution under such sections would violate the provisions of
15  Amendment V to the Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.
17      4. If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this section or the application thereof to any person, circumstance, or period of
19  gestational age is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity. The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

25  of the section, or the application of the section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.

188.058.  1.  Notwithstanding any other provision of law to the contrary, no abortion
2  shall be performed or induced upon a woman at eighteen weeks gestational age or later,
3  except in cases of medical emergency.  Any person who knowingly performs or induces an
4  abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,
5  as well as subject to suspension or revocation of his or her professional license by his or her
6  professional licensing board.  A woman upon whom an abortion is performed or induced
7  in violation of this section shall not be prosecuted for a conspiracy to violate the provisions
8  of this section.
9      2.  It shall be an affirmative defense for any person alleged to have violated the
10  provisions of subsection 1 of this section that the person performed or induced an abortion
11  because of a medical emergency.  The defendant shall have the burden of persuasion that
12  the defense is more probably true than not.
13      3.  Prosecution under this section shall bar prosecution under sections 188.056,
14  188.057, or 188.375 if prosecution under such sections would violate the provisions of
15  Amendment V to the Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.
17      4. If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this section or the application thereof to any person, circumstance, or period of
19  gestational age is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity. The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words
25  of the section, or the application of the section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.

188.375.  1.  This section shall be known and may be cited as the "Late-Term Pain-
2  Capable Unborn Child Protection Act".
3      2.  As used in this section, the phrase "late-term pain-capable unborn child" shall
4  mean an unborn child at twenty weeks gestational age or later.
5      3.  Notwithstanding any other provision of law to the contrary, no abortion shall be
6  performed or induced upon a woman carrying a late-term pain-capable unborn child,
7  except in cases of medical emergency.  Any person who knowingly performs or induces an
8  abortion of a late-term pain-capable unborn child in violation of this subsection shall be

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

SS SCS HB 126                                      29

9   guilty of a class B felony, as well as subject to suspension or revocation of his or her
10  professional license by his or her professional licensing board.  A woman upon whom an
11  abortion is performed or induced in violation of this subsection shall not be prosecuted for
12  a conspiracy to violate the provisions of this subsection.
13         4.  It shall be an affirmative defense for any person alleged to have violated the
14  provisions of subsection 3 of this section that the person performed or induced an abortion
15  because of a medical emergency.  The defendant shall have the burden of persuasion that
16  the defense is more probably true than not.
17         5.  Prosecution under subsection 3 of this section shall bar prosecution under
18  sections 188.056, 188.057, or 188.058 if prosecution under such sections would violate the
19  provisions of Amendment V to the Constitution of the United States or article I, section 19
20  of the Constitution of Missouri.
21         6.  When in cases of medical emergency a physician performs or induces an abortion
22  upon a woman in her third trimester carrying a late-term pain-capable unborn child, the
23  physician shall utilize the available method or technique of abortion most likely to preserve
24  the life or health of the unborn child.  In cases where the method or technique of abortion
25  most likely to preserve the life or health of the unborn child would present a greater risk
26  to the life or health of the woman than another legally permitted and available method or
27  technique, the physician may utilize such other method or technique.  In all cases where
28  the physician performs or induces an abortion upon a woman during her third trimester
29  carrying a late-term pain-capable unborn child, the physician shall certify in writing the
30  available method or techniques considered and the reasons for choosing the method or
31  technique employed.
32         7.  When in cases of medical emergency a physician performs or induces an abortion
33  upon a woman during her third trimester carrying a late-term pain-capable unborn child,
34  there shall be in attendance a physician other than the physician performing or inducing
35  the abortion who shall take control of and provide immediate medical care for a child born
36  as a result of the abortion.
37         8.  Any physician who knowingly violates any of the provisions of subsections 6 or
38  7 of this section shall be guilty of a class D felony, as well as subject to suspension or
39  revocation of his or her professional license by his or her professional licensing board.  A
40  woman upon whom an abortion is performed or induced in violation of subsections 6 or
41  7 of this section shall not be prosecuted for a conspiracy to violate the provisions of those
42  subsections.
43         9.  If any one or more provisions, subsections, sentences, clauses, phrases, or words
44  of this section or the application thereof to any person, circumstance, or period of

SS SCS HB 126                                      30

45   **gestational age is found to be unenforceable, unconstitutional, or invalid by a court of**
46   **competent jurisdiction, the same is hereby declared to be severable and the balance of the**
47   **section shall remain effective notwithstanding such unenforceability, unconstitutionality,**
48   **or invalidity.  The general assembly hereby declares that it would have passed this section,**
49   **and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of**
50   **the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words**
51   **of the section, or the application of the section to any person, circumstance, or period of**
52   **gestational age, would be declared unenforceable, unconstitutional, or invalid.**

Section B.  The enactment of section 188.017 of this act shall only become effective upon
2   notification to the revisor of statutes by an opinion by the attorney general of Missouri, a
3   proclamation by the governor of Missouri, or the adoption of a concurrent resolution by the
4   Missouri general assembly that:

5   (1)  The United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*,
6   410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate
7   abortion to the extent set forth in section 188.017, and that as a result, it is reasonably probable
8   that section 188.017 of this act would be upheld by the court as constitutional;

9   (2)  An amendment to the Constitution of the United States has been adopted that has the
10  effect of restoring or granting to the state of Missouri the authority to regulate abortion to the
11  extent set forth in section 188.017; or

12  (3)  The United States Congress has enacted a law that has the effect of restoring or
13  granting to the state of Missouri the authority to regulate abortion to the extent set forth in
14  section 188.017.

Section C.  Because of the need to protect the health and safety of women and their
2   children, both unborn and born, the repeal and reenactment of section 188.028 of this act is
3   deemed necessary for the immediate preservation of the public health, welfare, peace and safety,
4   and is hereby declared to be an emergency act within the meaning of the constitution, and the
5   repeal and reenactment of section 188.028 of this act shall be in full force and effect upon its
6   passage and approval.

✓

**2222-CC08920**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM



ATTORNEY GENERAL OF MISSOURI
ERIC SCHMITT

June 24, 2022

**VIA EMAIL AND HAND DELIVERY**

OPINION LETTER NO. 22-2022

To:   Revisor of Statutes
State Capitol Building
201 W. Capitol Avenue, Room 117A
Jefferson City, Missouri 65101-1556
(573) 751-4223
revision@lr.mo.gov

From: Eric S. Schmitt, Attorney General of Missouri

Re:   **Immediate Efficacy of Section 188.017, RSMo**

Section 188.017, RSMo, known as the "Right to Life of the Unborn Child Act,"
prohibits abortion except in cases of medical emergency.  The statute provides:

> Notwithstanding any other provision of law to the contrary, no abortion shall
> be performed or induced upon a woman, except in cases of medical emergency.
> Any person who knowingly performs or induces an abortion of an unborn child
> in violation of this subsection shall be guilty of a class B felony, as well as
> subject to suspension or revocation of his or her professional license by his or
> her professional licensing board.   A woman upon whom an abortion is
> performed or induced in violation of this subsection shall not be prosecuted for
> a conspiracy to violate the provisions of this subsection.

§ 188.017.2, RSMo.  The statute further provides that "[i]t shall be an affirmative
defense for any person alleged to have violated the provisions of subsection 2 of this
section that the person performed or induced an abortion because of a medical
emergency.  The defendant shall have the burden of persuasion that the defense is
more probably true than not." § 188.017.3, RSMo.

This law was passed with a contingent effective date.  Section B of House Bill
126 (2019), which is codified at § 188.017.4, RSMo, provides as follows:

Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-0774
www.ago.mo.gov

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

4.  The enactment of this section shall only become effective upon notification to the revisor of statutes by an opinion by the attorney general of Missouri, a proclamation by the governor of Missouri, or the adoption of a concurrent resolution by the Missouri general assembly that:

(1)  The United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section, and that as a result, it is reasonably probable that this section would be upheld by the court as constitutional;

(2)  An amendment to the Constitution of the United States has been adopted that has the effect of restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section; or

(3)  The United States Congress has enacted a law that has the effect of restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section.

§ 188.017.4, RSMo.

By issuing this Attorney General Opinion and providing it directly to you, I hereby provide notification to the Revisor of Statutes, pursuant to § 188.017.4(1), that the United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in § 188.017, RSMo, and that as a result, it is reasonably probable that § 188.017 would be upheld by the court as constitutional.

The Supreme Court's then-controlling plurality opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), stated that the "central holding" of *Roe v. Wade*, 410 U.S. 113 (1973), was "that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions." *Casey*, 505 U.S. at 860. *Casey* described this statement as *Roe*'s "central holding," "central principle," and/or "essential holding," at least nine times. *Id.* at 860, 861, 864, 865, 870, 871, 873, 879. *Casey* stated that it was declining to overrule that "central holding" of *Roe v. Wade*. But today, in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (U.S.), the Supreme Court has overruled both *Roe* and *Casey*.

I therefore conclude that "[t]he United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973)," and in doing so, the Supreme Court has "restor[ed] or grant[ed] to the state of Missouri the authority to regulate abortion to the extent set forth in this section." § 188.017.4(1), RSMo. I further conclude that, "as a result, it is reasonably probable that [§ 188.017, RSMo] would be upheld by the [U.S. Supreme Court] as constitutional." *Id. Dobbs* has overruled and fatally undermined both *Roe* and *Casey*. There is no jurisprudential basis for any further application of those defunct precedents.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

This opinion immediately restores Missouri's deeply rooted history and proud tradition of respecting, protecting, and promoting the life of the unborn. Missouri has been a national leader in the pro-life movement, and this leadership is reflected in its laws. Missouri was among the first States to comprehensively prohibit abortion in 1825, and respect for the life of the unborn has been consistently reflected in its statutes for the past 200 years. Just a few months before *Roe v. Wade* was decided, the Supreme Court of Missouri upheld Missouri's statute prohibiting abortion, and it stated that "unborn children have all the qualities and attributes of adult human persons differing only in age or maturity. Medically, human life is a continuum from conception to death." *Rodgers v. Danforth*, 486 S.W.2d 258, 259 (Mo. banc 1972). This decision reaffirmed the Supreme Court of Missouri's previous decisions, which had long recognized that "[b]iologically speaking, the life of a human being begins at the moment of conception in the mother's womb," and that "[f]rom the viewpoint of the civil law and the law of property," an unborn child "is not only regarded as human being, but as such from the moment of conception—which it is in fact." *Steggall v. Morris*, 258 S.W.2d 577, 579 (Mo. banc 1953).

Even after *Roe* was decided, Missouri's laws continued to provide the highest possible level of protection to the unborn. Among many other examples, Section 1.205, enacted in 1986, provides that: "(1) The life of each human being begins at conception; (2) Unborn children have protectable interests in life, health, and well-being; [and] (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child." § 1.205.1, RSMo. It also provides that "the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state." § 1.205.2, RSMo. Section 188.010, enacted in 2019, provides: "In recognition that Almighty God is the author of life, that all men and women are 'endowed by their Creator with certain unalienable Rights, that among these are Life,' and that Article I, Section 2 of the Constitution of Missouri provides that all persons have a natural right to life, it is the intention of the general assembly of the state of Missouri to: (1) Defend the right to life of all humans, born and unborn; (2) Declare that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children; and (3) Regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes." § 188.010, RSMo.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

Today, the overruling of *Roe* and *Casey* permits Missouri to renew its proud pro-life traditions and restore basic legal protection for the most fundamental of human rights—the right to life.

Very truly yours,

Eric S. Schmitt
Attorney General of Missouri

2222-CC08920

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

## RESOLUTION NUMBER 141
## DECLARATION OF OUR FUNDAMENTAL REPRODUCTIVE FREEDOMS

**WHEREAS**, we are experiencing unprecedented attacks on Reproductive autonomy, Freedom, and Justice at both the federal and state levels of government; and

**WHEREAS**, the Supreme Court of the United States established in 1973 the constitutional right to make informed, private medical decisions with the landmark *Roe v. Wade* decision; and

**WHEREAS**, the Supreme Court of the United States is in 2022 deciding whether to uphold the Roe v. Wade decision, and could end the legal right to abortion in the United States; and

**WHEREAS**, Missouri's so-called "trigger ban" law could outlaw abortion in the state as soon as *Roe v. Wade* is overturned; and

**WHEREAS**, in addition to the Mississippi abortion ban being considered by the Supreme Court, there are currently 15 abortion cases one step from the Supreme Court; and

**WHEREAS**, the State of Missouri has a documented history of infringing on individual's reproductive decision-making, including restricting people's access to their health care providers of choice; and

**WHEREAS**, our ability to access sexual and reproductive health care and resources directly impacts our emotional, physical, and socioeconomic stability and safety; and

**WHEREAS**, the City of St. Louis Board of Aldermen share a commitment to preserving and expanding opportunities for all St. Louisans to thrive; and

**WHEREAS**, the right to maintain personal bodily autonomy is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to make personal decisions about if, when, and how to establish a family, including decisions about abortion, is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to access medically accurate information about all of our health care options, without judgement, harassment, or coercion is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to have a safe and healthy pregnancy on our own terms is fundamental to our future and our collective Reproductive Freedom; and

**WHEREAS**, the ability to live and raise children in healthy, safe communities with the support we need to thrive is fundamental to our Reproductive Freedom.

**NOW THEREFORE BE IT RESOLVED**, by this Honorable Board of Aldermen of the City of St. Louis that we pause in our deliberations to declare the City of Saint Louis a sexual and reproductive health care safe zone, ensuring the people's rights to Reproductive Freedom, and naming these rights as fundamental to the policies

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

and practices of this body. We further direct the Clerk of this Board to spread a copy of this Resolution across the minutes of these proceedings.

**Introduced this 23rd day of November, 2021 by:**
**The Honorable Bill Stephens, Alderman 12th Ward**
**The Honorable Christine Ingrassia, Alderwoman 6th Ward**
**The Honorable Annie Rice, Alderwoman 8th Ward**
**The Honorable Anne Schweitzer, Alderwoman 13th Ward**
**The Honorable Dan Guenther, Alderman 9th Ward**
**The Honorable Tina Pihl, Alderwoman 17th Ward**
**The Honorable Sharon Tyus, Alderwoman 1st Ward**
**The Honorable Shane Cohn, Alderman 25th Ward**
**The Honorable Marlene Davis, Alderwoman 19th Ward**
**The Honorable James Page, Alderman 5th Ward**
**The Honorable Dwinderlin Evans, Alderwoman 4th Ward**
**The Honorable Megan Green, Alderwoman 15th Ward**
**The Honorable Lisa Middlebrook, Alderwoman 2nd Ward**
**The Honorable Jesse Todd, Alderman 18th Ward**
**The Honorable Pamela Boyd, Alderwoman 27th Ward**

**Adopted this 3rd day of December, 2021 as attested by:**


_____                                _____
**Terry Kennedy**                                      **Lewis Reed**
**Clerk, Board of Aldermen**                           **President, Board of Aldermen**

2222-CC08920

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

**Summary**
**Board Bill Number 61**
**Committee Substitute**
**Introduced by Alderwoman Annie Rice**
**June 24, 2022**

An Ordinance recommended by the Board of Estimate and Apportionment appropriating a portion of funds received under the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901 (March 4, 2021) (ARPA) to the St. Louis Department of Health for a new Reproductive Equity Fund and COVID-19 testing, treatment, and vaccination, authorizing contracts to expend the funds, to the extent received; containing a severability clause; and containing an emergency clause.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

**BOARD BILL NUMBER 61 COMMITTEE SUBSTITUTE INTRODUCED BY ALDERWOMAN ANNIE RICE/ ALDERWOMAN TINA PIHL/ ALDERWOMAN SHAMEEM CLARK-HUBBARD/ ALDERWOMAN CHRISTINE INGRASSIA/ ALDERMAN JOHN COATAR/ ALDERWOMAN MEGAN GREEN/ ALDERWOMAN ANNE SCHWEITZER/ALDERMAN DAN GUENTHER/ALDERMAN JESSE TODD/ ALDERMAN SHANE COHN/ALDERMAN MICHAEL GRAS**

1    An Ordinance recommended by the Board of Estimate and Apportionment appropriating

2    a portion of funds received under the American Rescue Plan Act of 2021, Pub. L. No. 117-2, §

3    9901 (March 4, 2021) (ARPA) to the St. Louis Department of Health, authorizing contracts to

4    expend the funds, to the extent received; containing a severability clause; and containing an

5    emergency clause.

6    **WHEREAS**, the City received Two Hundred Forty-Nine Million Thirty-Eight Thousand

7    Twenty-Seven Dollars ($249,038,027.00) in 2021 from the Coronavirus Local Fiscal Recovery

8    Fund under ARPA and Two Hundred Forty-Nine Million Thirty-Eight Thousand Twenty-Seven

9    Dollars $249,038,027.00 from such fund  in the calendar year 2022 (collectively, the "ARPA

10   Funds");

11   **WHEREAS**, the City previously has appropriated $249,038,027.00 of the ARPA Funds;

12   **WHEREAS**, ARPA Funds may be used "to respond to the public health emergency with

13   respect to the Coronavirus Disease 2019 (COVID 19) or its negative economic impacts;"

14   **WHEREAS**, the COVID-19 pandemic has strained access to comprehensive

15   reproductive healthcare;

16   **WHEREAS**, the St. Louis Board of Aldermen passed a resolution affirming that every

17   individual living in St. Louis' rights to maintain personal bodily autonomy, make personal

**Page 1 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

1  decisions about if, when, and how to establish a family, including decisions about abortion,  to

2  access medically accurate information about all of our health care options, without judgement,

3  harassment, or coercion, and to have safe and healthy pregnancy on our own terms so that we

4  can raise our families in healthy, safe communities with the support we need to thrive;

5       **WHEREAS**,  more than one in four people living in St. Louis City are surviving

6  economic insecurity below the federal poverty line and that approximately one in five people

7  living in St. Louis City are not covered by health insurance.

8       **WHEREAS**, the COVID-19 public health crisis exacerbated existing social and

9  economic inequities and Women, Black women, and mothers are at the lowest workforce

10  participation rate in 30 years;

11       **WHEREAS**, COVID-19 precautions have disrupted how individuals access reproductive

12  healthcare including birth control, annual exams, and family planning services;

13       **WHEREAS**, the Missouri Pregnancy-Associated Mortality Review 2018 Report,

14  published in 2021, found that for Missourians who choose to continue their pregnancies, the

15  pregnancy-related mortality ratio (PRMR) is one of the highest in the country and four times

16  greater for Black women than white women at 87.6 per 100,000 live births;

17       **WHEREAS**, St. Louisans have identified the need for culturally-competent and trauma-

18  informed care, specifically naming the need for doulas and health advocates to support

19  navigating the medical system; and

**Page 2 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

1    **WHEREAS**, doula and lactation support are proven measures to improve outcomes for

2    pregnant people;

3    **WHEREAS**, the COVID-19 pandemic is ongoing and has significant negative impacts

4    for individuals;

5    **WHEREAS**, the Health Resources and Services Administration has recently ended its

6    program for the testing, vaccination, and treatment of individuals without insurance,

7    **BE IT ORDAINED BY THE CITY OF ST. LOUIS AS FOLLOWS:**

8    **SECTION ONE**. There is hereby appropriated the sum of One Million Dollars ($1,000,000) of

9    the ARPA Funds appropriated to the City to the St. Louis Department of Health. The Department

10   of Health will establish a process to allocate the funds to community partners through grants as

11   part of a new Reproductive Equity Fund dedicated to logistical support. These grants will not be

12   used to fund or assist abortion procedures nor shall funds be used to encourage or counsel an

13   individual to have an abortion. Grant funds will be used to provide access to abortion through

14   logistical support including but not limited to the funding of childcare, transportation, and other

15   logistical support needs. The Director of the Department of Health is  authorized to make,

16   negotiate, and execute any and all contracts or other documents on behalf of the City to expend

17   such funds and to expend such funds on behalf of the City for the purposes described on **Exhibit**

18   **A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury for

19   payment of all expenditures authorized in this Section provided that such warrants do not exceed

20   the total amount of funds appropriated by this Section.

**Page 3 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

1    **SECTION TWO**. There is hereby appropriated the sum of Five Hundred Thousand Dollars

2    ($500,000) of the ARPA Funds appropriated to the City to the St. Louis Department of Health.

3    The Department of Health will establish a process to allocate the funds to community partners

4    through grants as part of a Reproductive Equity Fund dedicated to community needs. Allocations

5    through this fund will support infrastructure and operations for organizations already providing

6    direct services to support reproductive healthcare access in the region including access to doulas

7    and lactation support. The Director of the Department of Health is authorized to make, negotiate,

8    and execute any and all contracts or other documents on behalf of the City to expend such funds

9    and to expend such funds on behalf of the City for the purposes described on **Exhibit A**.  The

10   Comptroller is authorized and directed to issue warrants upon the City Treasury for payment of

11   all expenditures authorized in this Section provided that such warrants do not exceed the total

12   amount of funds appropriated by this Section.

13   **SECTION THREE.** There is hereby appropriated the sum of Two Hundred and Fifty Thousand

14   Dollars ($250,000) of the ARPA Funds appropriated to the City to the St. Louis Department of

15   Health. These funds will be used to provide administrative oversight and evaluation for the

16   Reproductive Equity Program and Fund. The Director of the Department of Health is authorized

17   to make, negotiate, and execute any and all contracts or other documents on behalf of the City to

18   expend such funds and to expend such funds on behalf of the City for the purposes described on

19   **Exhibit A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury

20   for payment of all expenditures authorized in this Section provided that such warrants do not

21   exceed the total amount of funds appropriated by this Section.

**Page 4 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

1    **SECTION FOUR.** There is hereby appropriated the sum of One Million Six Hundred and

2    Thirty Six Thousand Dollars ($1,636,000) of the ARPA Funds appropriated to the City to the St.

3    Louis Department of Health. These funds will be used to provide testing, treatment, and

4    vaccination for COVID-19. The Director of the Department of Health is authorized to make,

5    negotiate, and execute any and all contracts or other documents on behalf of the City to expend

6    such funds and to expend such funds on behalf of the City for the purposes described on **Exhibit**

7    **A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury for

8    payment of all expenditures authorized in this Section provided that such warrants do not exceed

9    the total amount of funds appropriated by this Section.

10    SECTION FIVE. There is hereby appropriated the sum of Five Hundred Thousand Dollars

11    ($500,000) of the ARPA Funds appropriated to the City to the St. Louis Department of Health.

12    These funds will be used to incentive cards to support COVID-19 vaccination. The Director of

13    the Department of Health is authorized to make, negotiate, and execute any and all contracts or

14    other documents on behalf of the City to expend such funds and to expend such funds on behalf

15    of the City for the purposes described on **Exhibit A**.  The Comptroller is authorized and directed

16    to issue warrants upon the City Treasury for payment of all expenditures authorized in this

17    Section provided that such warrants do not exceed the total amount of funds appropriated by this

18    Section.

19    **SECTION SIX.** Severability Clause. It is hereby declared to be the intention of the Board of

20    Aldermen that each and every part, section and subsection of this Ordinance shall be separate

21    and severable from each and every other part, section and subsection hereof and that the Board

**Page 5 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

1   of Aldermen intends to adopt each said part, section and subsection separately and independently

2   of any other part, section and subsection. In the event that any part, section or  subsection of this

3   Ordinance shall be determined to be or to have been unlawful or unconstitutional, the remaining

4   parts, sections and subsections shall be and remain in full force and effect, unless the court

5   making such finding shall determine that the valid portions standing alone are incomplete and are

6   incapable of being executed in accord with the legislative intent.

7   **SECTION SEVEN.** Emergency Clause. Delay in receipt and appropriation of these monies  will

8   increase threats to the public health and welfare by causing delay in responding to the fiscal  and

9   other impacts caused by the COVID-19 crisis. This being an ordinance appropriated for

10  emergency funding for current expenses of the City government, it is hereby declared to be an

11  emergency measure within the meaning of Sections 19 and 20 of Article IV of the Charter of the

12  City of St. Louis and shall become effective immediately upon its passage and approval by the

13  Mayor.

**Page 6 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:13 PM

**Board Bill Number 61**
**Committee Substitute**

**Exhibit A**

| Department of Health | Reproductive Equity Fund, logistical support | $1,000,000 |
|---|---|---|
| Department of Health | Reproductive Equity Fund, community needs | $500,000 |
| Department of Health | Program support and evaluation | $250,000 |
| Department of Health | Testing, treatment, and vaccination for COVID-19 | $1,636,000 |
| Department of Health | incentive cards to support COVID-19 vaccination. | $500,000 |
| | **Total** | **$3,886,000** |

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**THE CIRCUIT COURT OF ST. LOUIS CITY**
**TWENTY-SECOND JUDICIAL CIRCUIT OF MISSOURI**

| | |
|---|---|
| THE STATE OF MISSOURI ex rel. ERIC S. SCHMITT; <br><br> *Plaintiff*, <br><br> v. <br><br> THE CITY OF ST. LOUIS; ADAM L. LAYNE, TREASURER OF ST. LOUIS CITY; DARLENE GREEN, COMPTROLLER OF ST. LOUIS CITY; and DR. MATI HLATSHWAYO DAVIS, DIRECTOR OF HEALTH OF ST. LOUIS CITY, <br><br> *Defendants*. | Case No. 2222-CC08920 |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

## INTRODUCTION

The Missouri General Assembly has long prohibited the use of taxpayer-funded resources to support abortion.  In particular, sections 188.205, 188.210, and 188.215 of the Missouri Revised Statutes, enacted in 1986, prohibit cities from using public funds, public employees, and public facilities to support, encourage, or assist abortions.  Other provisions of the Missouri Revised Statutes establish Missouri's fundamental policies of defending the lives of the unborn and protecting the right to life.  Notwithstanding these provisions, the City of St. Louis ("City") enacted Board Bill 61 ("BB61") to use public funds, employees, and facilities to provide "logistical support" for abortions and to encourage and assist abortions, in direct contravention of Missouri law.  This Court should enjoin the City from implementing that unlawful ordinance.

## LEGAL AND FACTUAL BACKGROUND

Missouri has authority to regulate abortion "in accordance with the view of its citizens." *Dobbs v. Jackson Women's Health Organization*, No. 19-1392, 597 U.S. __ (2022), slip op. at 9. Missouri has often enacted laws advancing its fundamental policy that unborn children have a right to life and abortion should be minimized in Missouri.  In particular, in 1986, the General Assembly passed House Bill 1596.  H.B. 1596, 83rd Gen. Assembly, 2d Reg. Sess. (Mo. 1986).  HB 1596 prohibits the use of public funds, public employees, and/or public facilities to perform or assist abortions or to encourage or counsel a woman to have an abortion not necessary to save her life. §§ 188.205, 188.210, 188.215, RSMo.  HB 1596 also enacted Section 1.205, RSMo.  Section 1.205.1 provides that "[t]he life of each human being begins at conception," and that "[u]nborn children have protectable interests in life, health, and well-being."  § 1.205.1(1)-(2), RSMo. Section 1.205.2 provides that "the laws of this state shall be interpreted and construed to

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state." § 1.205.2, RSMo.

In 2019, the General Assembly passed House Bill 126 ("HB 126").  HB 126 contains the Right to Life of the Unborn Child Act (the "Act"), which prohibits performing or inducing abortions except in cases of medical emergency, with a contingent effective date.  § 188.017.2. HB 126 also enacted § 188.010, RSMo, which reaffirms that "all men and women are 'endowed by their Creator with certain unalienable Rights, that among these are Life,' and that Article I, Section 2 of the Constitution of Missouri provides that all persons have a natural right to life…." § 188.010, RSMo.  In light of these principles, the General Assembly declared that it is Missouri's fundamental policy to "[d]efend the right to life of all humans, born and unborn;" and "[d]eclare that the state and *all of its political subdivisions* are a 'sanctuary of life' that protects pregnant women and their unborn children." *Id.* (emphasis added).

On June 24, 2022, the U.S. Supreme Court decided *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 597 U.S. __ (2022).  *Dobbs* overruled the right to abortion recognized in *Roe v. Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*.  *Dobbs*, Slip op., at 5. The Court stated: "It is time to heed the Constitution and return the issue of abortion to the people's elected representatives…. That is what the Constitution and the rule of law demand." *Id.* at 6.

Soon after the *Dobbs* decision, the City's Board of Aldermen voted to pass Board Bill 61 ("BB 61") on July 15, 2022.  On July 21, 2022, the City's Mayor, Tishaura Jones, signed BB 61. Under BB 61, the City will take $1.5 million from the Coronavirus Local Fiscal Recovery Fund and place it into a Reproductive Equity Fund ("Fund").  Ex. D at 2-4.  One million dollars of the Fund will provide "logistical support" for abortion, such as "childcare, transportation, and other logistical support needs."  *Id*. at 4.  This $1 million is specifically earmarked for "logistical

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

support" for abortion.  The Fund also allocates an additional $500,000 for "community needs."  *Id.* This amorphous category "will support infrastructure and operations for organizations already providing direct services to support *reproductive healthcare access* in the region …." *Id.* (emphasis added).  Further, BB 61 allocates $250,000 of ARPA funds for "administrative oversight and evaluation" of the Reproductive Equity Fund.  *Id.* § 3. BB 61 thus explicitly provides that public funds, public employees, and public facilities will be used to encourage abortion and assist women in obtaining abortions.  It is plainly illegal under Sections 188.205, 188.210, and 188.215 of Missouri's Revised Statutes.

## ANALYSIS

Missouri Supreme Court Rule 92.02 governs the issuance of preliminary injunctions. A preliminary injunction "merely seek[s] to maintain the status quo between the parties."  *Salau v. Deaton*, 433 S.W.3d 449, 453 (Mo. App. 2014) (quoting *Pomirko v. Sayad*, 693 S.W.2d 323, 324 (Mo. App. 1985)); *see also State v. Am. Ins. Co.*, 173 S.W.2d 51, 53 (Mo. 1943) ("[T]he purpose of a temporary injunction is to preserve the subject matter of the controversy in its then condition"). A preliminary injunction should be granted when "the probability of success on the merits and irreparable harm decidedly outweigh any potential harm to the other party or to the public interest." *State ex rel. Dir. of Revenue v. Gabbert*, 925 S.W.2d 838, 840 (Mo. banc 1996).  When considering whether to provide preliminary injunctive relief, Missouri courts "should weigh '[1] the movant's probability of success on the merits, [2] the threat of irreparable harm to the movant absent the injunction, [3] the balance between this harm and the injury that the injunction's issuance would inflict on other interested parties, and [4] the public interest.'"  *Gabbert*, 925 S.W.2d at 839 (quotation omitted). "The likelihood of success on the merits is '[t]he most important of the[se] factors.'" *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam) (quoting *Shrink Mo.*

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

*Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998)).  Here, all four factors favor the State, and the Court should issue a preliminary injunction.

**I.      The first and most important preliminary-injunction factor—probability of success—favors Missouri.**

The first preliminary injunction factor, probability of success, favors Missouri because Missouri is likely to succeed in establishing that the City is violating sections 188.205 and 188.210, and 188.215, RSMo.

**a.   Using public funds to encourage or assist abortion violates § 188.205.**

The City violates § 188.205 when it provides public funds to assist women to obtain abortions.  That section prohibits public funds from being expended "for the purpose of … assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging … a woman to have an abortion not necessary to save her life."  § 188.205.  It thus prohibits the use of public funds to "encourage" or "assist" abortion.  *Id.*  The statute defines public funds as "any funds received or controlled by this state or any agency or political subdivision thereof, including, but not limited to, funds derived from federal, state or local taxes, gifts or grants from any source, public or private, federal grants or payments, or intergovernmental transfers."  § 188.200.

BB 61 violates the plain meaning of this statute.  Neither section 188.205 nor chapter 188 defines the terms "assisting" or "encouraging."  "When a term is not defined by statute, [courts] will give the term its 'plain and ordinary meaning as derived from the dictionary.'"  *Hegger v. Valley Farm Diary Co.*, 596 S.W.3d 128, 131–32 (Mo. banc 2020) (citation omitted).  "If the language of a statute is plain and unambiguous, this Court is bound to apply that language as written and may not resort to canons of construction to arrive at a different result."  *State ex rel. Hillman v. Beger*, 566 S.W.3d 600, 605 (Mo. banc 2019).  "Assist" is a broad term meaning "to give *support* or aid."  *Assist*, Webster's Third New International Dictionary 132 (2002) (emphasis

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

added).  To "support" includes to "actively promote the interests or cause of" and to "argue in favor of."  *Support*, Webster's Third New International Dictionary (2002).

Here, the City violates section 188.205 by allocating funds from its American Rescue Plan Act ("ARPA") federal grant to the Reproductive Equity Fund.  Because ARPA Funds are public funds, section 188.205 governs how the City may lawfully use them.  Section 188.205 instructs the City not to use public funds for the purpose of assisting abortions.  But through BB 61, the City has allocated $1 million to provide "logistical *support*" for abortions. Ex. D at 4 (emphasis added).  As noted above, to "assist" is to "*support* or give aid." Webster's Third, at 132.  Thus, to provide "logistical *support*" for abortion is to "assist" abortion, under the plain meaning of § 188.205.

BB 61 has also allocated an additional $500,000 to "support infrastructure and operations for organizations already providing direct services to support *reproductive healthcare access*." *Id.* at 5 (emphasis added).  BB 61's monetary support for abortion in § 1 expressly directs the City to provide monetary assistance for abortions by funding women on the basis that they seek or have sought abortions.  BB 61's monetary support for "infrastructure and operations for organizations already providing direct services to support reproductive healthcare access in the region including access to doulas and lactation support" encompasses monetary assistance for abortions or logistical support for abortions.  The phrase "reproductive healthcare access" is undoubtedly a euphemism for abortion.  And, for similar reasons, BB 61's allocation of $250,000 to provide "administrative oversight" for the City's actions in encouraging and assisting abortion likewise violates the plain meaning of the statute.

BB 61 also violates § 188.205 because it uses public funds to "encourage" abortion.  To "encourage" means "to spur on: stimulate" or "to give help or patronage to: foster." *Encourage*,

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

Webster's Third New International Dictionary 747 (2002).  Providing "logistical support" for abortion, including "the funding of childcare, transportation, and other logistical support needs," Pet. Ex. D § 1, unquestionably constitutes a manner of "spurring on" or "stimulating" abortion, "giving help or patronage to" abortion, and "fostering" abortion.  *See id.*  Likewise, to spend public funds to "support infrastructure and operations for organizations already providing direct services to support *reproductive healthcare access*," constitutes "encouraging" abortion, where "reproductive healthcare access" includes abortion (as BB 61 evidently contemplates).  Using $250,000 to provide administrative oversight and support for these unlawful activities is unlawful for the same reasons.  Thus, BB 61 is unlawful on this ground as well, and its implementation should be enjoined.

### b.  Using public employees to assist abortion violates Section 188.210.

The City also violates section 188.210 by using public employees, acting within the scope of public employment, to negotiate contracts to provide abortion-related services and take other actions to assist abortion under BB 61.  Under section 188.210, "It shall be unlawful for any public employee within the scope of his employment to … assist an abortion, not necessary to save the life of the mother."  Section 188.210 also prohibits "a doctor, nurse or other healthcare personnel ... who is a public employee within the scope of his public employment to encourage … a woman to have an abortion not necessary to save her life."  A "public employee" is defined as "any person employed by this state or any agency or political subdivision thereof."  § 188.200(1).

BB 61 violates section 188.210's prohibition against public employees assisting abortion because it authorizes and directs City employees to do so.  For instance, BB 61 authorizes the City's Director of the Department of Health "to make, negotiate, and execute" contracts to support abortion-related services. Ex. D at 4.  Additionally, the City's Comptroller is "directed to issue warrants upon the City Treasury for payment" of those contracts.  *Id.*  Both are public employees,

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

and their actions are part of the City's system for expending public funds to support abortions for City residents. Their actions to negotiate, to execute, and to pay for these services violates section 188.210 by assisting and supporting abortions.

In addition, because the Director of the Department of Health is also a medical doctor, she is prohibited from "encourag[ing] . . . a woman to have an abortion not necessary to save her life." § 188.210. As noted above, to "encourage" means "to spur on: stimulate" or "to give help or patronage to: foster." *Encourage*, Webster's Third New International Dictionary 747 (2002). By making, negotiating, and executing contracts to support abortion-related services and subsidizing abortion-related childcare, travel, and other expenses—and taking other actions to implement the "Reproductive Equity Fund"—the Director of the Department of Health will necessarily "encourage" women to have elective abortions. Indeed, BB 61 provides far fewer funds that *could be used* for pregnancy-related healthcare expenses than funds that *must be spent* assisting women to seek abortions. *Compare* Petition Exhibit C, BB 61, § 1 *with id*. § 2. BB 61's "encouragement" of abortion is very clear.

BB 61's language directing public employees to negotiate with entities to provide abortion-enabling services also violates section 188.205 because those public employees are "assisting" abortions by "actively promot[ing] the interests or cause of" women who seek them and "argu[ing] in favor of" providing them. *Support*, Webster's Third, at 132.

**c. Using public facilities to encourage or assist abortion violates Section 188.215.**

For similar reasons, BB 61 violates § 188.215 because it provides for public facilities to be used for purpose of assisting and encouraging abortion. Section 188.215 provides: "It shall be unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

woman to have an abortion not necessary to save her life." § 188.215, RSMo.  The statute defines "public facility" to mean "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof." § 188.200(2), RSMo.  The City will necessarily implement BB 61 by using City-owned computers, buildings, bank accounts, and other assets.  All of these are "public facilities" under the statutory definition.  *Id.*  Accordingly, BB 61 runs afoul of § 188.215, as well.

**d. The statutory context confirms that BB61 is manifestly unlawful.**

Even if more confirmation were needed beyond the statutes' plain and unambiguous meaning, the statutory context strongly confirms that BB61 violates the prohibitions in §§ 188.205, 188.210, and 188.215.  When it comes to statutory interpretation, the Supreme Court of Missouri has emphasized that "to determine a statute's plain and ordinary meaning, the Court looks to a word's usage in the context of the entire statute."  *Gross v. Parson*, 624 S.W.3d 877, 885 (Mo. 2021).  Here, the statute's context includes the provisions enacted in HB 1596 and HB 126, which express the State of Missouri's fundamental policy of defending the right to life of the unborn and promoting childbirth.  As noted above, section 1.205, enacted in 1986 along with §§ 188.205, 188.210, and 188.215, provides that "[t]he life of each human being begins at conception," that "[u]nborn children have protectable interests in life, health, and well-being," and that "the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state."  § 1.205.1(1)-(2), .2, RSMo.  This principle receives further confirmation with the enactment of § 188.010 in 2019, which provides that Missouri shall "[d]efend the right to life of all humans, born and unborn," and "that the state and *all of its political subdivisions* are a 'sanctuary of life' that protects pregnant women and their unborn children."  *Id.*

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

(emphasis added).  The prohibitions on taxpayer-funded assistance, support, and encouragement for abortion in §§ 188.205, 188.210, and 188.215 should be interpreted broadly in light of this fundamental policy, stated and reaffirmed across decades in Missouri's duly enacted statutes. Indeed, the City's aggressive attempt to use taxpayer funds and resources to support and encourage abortion is directly at odds with Missouri law, which provides that the City, as a "political subdivision[]," is to be "a 'sanctuary of life' that protects pregnant women and their unborn children." *Id.*

## II.     The second preliminary injunction factor—threat of irreparable harm—favors Missouri.

The second preliminary injunction factor, threat of irreparable harm, favors Missouri because the City's defiance of State law thwarts the efficacy of duly enacted State policy, and so imposes irreparable harm on Missouri. "Any time" the State is prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).  When a state cannot effectuate the policies embodied in its laws, it "necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

Missouri, through its General Assembly, has identified its interests in protecting unborn children, pregnant women, and medical professionals. § 188.026.5.   Its interests include encouraging childbirth over abortion, respecting all human life from contraception to natural death,

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

and protecting unborn children from harm.  §§ 188.010, 1.205, RSMo.  *Id.*  The City's ordinance irreparably harms the State's interests by undermining the State's enacted policy.

The State also has a compelling interest in protecting the life of unborn children. Even in *Roe v. Wade*, the U.S. Supreme Court acknowledged that states have "an important and legitimate interest in protecting the potentiality of human life."  410 U.S. 113, 162 (1973), *overruled by Dobbs*, No. 19-1392, 597 U.S. ___.  And in *Planned Parenthood of Southeast Pennsylvania v. Casey*, the U.S. Supreme Court acknowledged that the State has an interest in protecting "the health of the woman and the life of the fetus" from the outset of the pregnancy.  505 U.S. 833, 846 (1992), *overruled by Dobbs*, No. 19-1392, 597 U.S. __.  *Dobbs* authorizes States like Missouri to advance that interest by all legitimate means at their disposal.  Missouri has done so, and the City's ordinance irreparably harms Missouri's legitimate interest in protecting unborn human life by using taxpayer-funded resources to encourage, advocate, support, and assist in taking unborn life.

## III.   The third and fourth preliminary injunction factors—(3) the balance between the harm to Missouri and the harm to the City and (4) the public interest—favor Missouri.

The third and fourth preliminary-injunction factors favor Missouri because the balance of harms weighs in favor of the State and because the Attorney General is advancing the interests of the public.  The third preliminary-injunction factor asks the Court to compare the harm to Missouri if the preliminary injunction does not issue with the harm to the City if it does.  This balancing decisively favors the State.  The State has an interest in enforcing its laws and protecting unborn life, and failure to procure preliminary injunctive relief means that persons will lose their lives. *See State v. Knapp*, 843 S.W.2d 345, 347–48 (Mo. banc 1992) (unborn children are "persons" under involuntary manslaughter statute).  The City has passed local laws that contradict State law and subsidize people for exposing unborn children to imminent, fatal harm.  The State's interests in enforcing the law are greater than the City's interest in violating it.  In fact, the City has *no*

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

legitimate interest in enforcing or implementing an illegal or unconstitutional ordinance, so there is nothing on the City's side of the balance here. *See, e.g.*, *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir.2003) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law." (internal quotation marks omitted)); *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (same).

The fourth preliminary-injunction factor asks the Court to determine whether issuing a preliminary injunction is in the public interest. As duly enacted statutes of the State of Missouri, the provisions of Chapter 188 are themselves a powerful expression of the public interest in Missouri. *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (holding that a duly enacted law "is in itself a declaration of public interest and policy"). The Attorney General, not the City, protects the public interest under Missouri's Constitution and laws. *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 135 (Mo. banc 2000) ("[I]t is the role of the attorney general to protect the public interest."). That duty, on its own, weighs in favor of an injunction here. Further, the General Assembly intentionally gave the Attorney General the right to protect the public interest when it gave him express statutory authority to enforce chapter 188 and bring this action. § 188.075. Thus, the Attorney General's enforcement of Chapter 188 is in the public interest. *Accord State ex rel. Hutcherson*, 96 S.W.3d 81, 84 (Mo. banc 2003) (citing *German Evangelical St. Marcus Congregation of St. Louis v. Archambault*, 404 S.W.2d 705, 706 (Mo. 1966)). There is no public interest in allowing the City to violate lawful statutes passed by the General Assembly.

## **CONCLUSION**

Missouri respectfully requests that this Court issue a preliminary injunction to enjoin the City from implementing Sections 1, 2, and 3 of BB 61, and from taking any action that involves

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

the use of public funds, public employees, and/or public facilities to support, encourage, or assist abortions.

Dated: July 21, 2022

Respectfully submitted,

**ERIC S. SCHMITT**
Missouri Attorney General

/s/ *D. John Sauer*
D. John Sauer, #58721
    *Solicitor General*
Maria A. Lanahan, #65956
    *Deputy Solicitor General*
Office of the Attorney General
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
(573) 751-0774 (fax)
John.Sauer@ago.mo.gov
Maria.Lanahan@ago.mo.gov

*Counsel for Petitioner/Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 21, 2022, a true and correct copy of the foregoing was filed with the Court's electronic filing system to be served by electronic methods on counsel for all parties entered in the case, and that a true and correct copy was also served by electronic mail and first-class mail upon counsel for Defendants.

/s/    *D. John Sauer*

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**TWENTY-SECOND JUDICIAL CIRCUIT OF MISSOURI**

| | |
|---|---|
| THE STATE OF MISSOURI ex rel. ERIC S. SCHMITT; | |
| *Plaintiff*, | |
| v. | Case No. 2222-CC08920 |
| THE CITY OF ST. LOUIS; ADAM L. LAYNE, et al., | |
| *Defendants*. | |

**AFFIDAVIT OF TAMMY GLENN IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**AFFIDAVIT OF TAMMY GLENN**

1. My name is Tammy Glenn. I am over 18 years of age and competent to testify about the matters asserted herein. I work as a paralegal in the Missouri Attorney General's Office.

2. The information listed below is available to the public via the internet. I voluntarily downloaded the information listed below and have provided true and correct copies as Exhibits to this Affidavit.

3. **Exhibit A** is a true and correct copy of the truly agreed and finally passed substitute for House Bill 126. The PDF of House Bill 126 was downloaded from the Missouri House of Representatives' website at:

   https://house.mo.gov/Bill.aspx?bill=HB126&year=2019&code=R

4. **Exhibit B** is a true and correct copy of Missouri Attorney General Opinion Letter No. 22-2022, which can be downloaded from the Attorney General Office's website at:

   https://ago.mo.gov/home/news/2022/06/24/missouri-attorney-general-eric-schmitt-becomes-first-to-issue-opinion-following-scotus-opinion-in-dobbs-effectively-ending-abortion-in-missouri

5. **Exhibit C** is a true and correct copy of Resolution 141, passed by the St. Louis Board of Aldermen on December 3, 2021.  The text of the resolution can be downloaded from St. Louis's website at:

   https://www.stlouis-mo.gov/government/city-laws/upload/legislative/resolutions/introduced/Res141%20Reprod%20Freedoms%20Stephens%20Updated%205.pdf

6. **Exhibit D** is a true and correct copy of Board Bill 61 as passed on July 15, 2022.  The exhibit was downloaded from City of St. Louis's website at:

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

https://www.stlouis-mo.gov/government/city-laws/upload/legislative/boardbills/committe

e-amended/BB61CS%20Combined%20Final%204.pdf

7.  On July 21, 2022, Mayor Tishaura Jones held a televised press conference discussing

Board Bill 61.  Mayor Tishaura Jones signed Board Bill 61 at the end of the press

conference.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

DATED this 21st day of July, 2022.

_Affiant_

State of                      Missouri

County (or City) of      St. Louis

Subscribed and sworn to before me this 21st day of July, 2022.

_Notary Public_

BARBARA ANN FOWLER
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis City
Commission Expires: March 17, 2026
Commission Number: 22628997

My Commission expires: 3/17/26

2

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

FIRST REGULAR SESSION

[TRULY AGREED TO AND FINALLY PASSED]

SENATE SUBSTITUTE FOR

SENATE COMMITTEE SUBSTITUTE FOR

# HOUSE BILL NO. 126

## 100TH GENERAL ASSEMBLY

0461S.18T                                              2019

## AN ACT

To repeal sections 135.630, 188.010, 188.015, 188.027, 188.028, 188.043, and 188.052, RSMo, and to enact in lieu thereof seventeen new sections relating to abortion, with penalty provisions, a contingent effective date for a certain section, and an emergency clause for a certain section.

*Be it enacted by the General Assembly of the state of Missouri, as follows:*

Section A.   Sections 135.630, 188.010, 188.015, 188.027, 188.028, 188.043, and
2  188.052, RSMo, are repealed and seventeen new sections enacted in lieu thereof, to be known
3  as sections 135.630, 188.010, 188.015, 188.017, 188.018, 188.026, 188.027, 188.028, 188.033,
4  188.038, 188.043, 188.044, 188.052, 188.056, 188.057, 188.058, and 188.375, to read as
5  follows:

135.630. 1. As used in this section, the following terms mean:
2  (1)  "Contribution", a donation of cash, stock, bonds, or other marketable securities, or
3  real property;
4  (2) "Director", the director of the department of social services;
5  (3) "Pregnancy resource center", a nonresidential facility located in this state:
6  (a)  Established and operating primarily to provide assistance to women **and families**
7  with crisis pregnancies or unplanned pregnancies by offering pregnancy testing, counseling,
8  emotional and material support, and other similar services **or by offering services as described**

EXPLANATION —   Matter enclosed in bold-faced brackets **[thus]** in the above bill is not enacted and is intended to be omitted from the law. Matter in **bold-face** type in the above bill is proposed language.

EXHIBIT A

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                   2

9   **under subsection 2 of section 188.325,** to encourage and assist such women **and families** in
10  carrying their pregnancies to term; and
11         (b)  Where childbirths are not performed; and
12         (c)  Which does not perform, induce, or refer for abortions and which does not hold itself
13  out as performing, inducing, or referring for abortions; and
14         (d)  Which provides direct client services at the facility, as opposed to merely providing
15  counseling or referral services by telephone; and
16         (e)  Which provides its services at no cost to its clients; and
17         (f)  When providing medical services, such medical services must be performed in
18  accordance with Missouri statute; and
19         (g)  Which is exempt from income taxation pursuant to the Internal Revenue Code of
20  1986, as amended;
21         (4)  "State tax liability", in the case of a business taxpayer, any liability incurred by such
22  taxpayer pursuant to the provisions of chapters 143, 147, 148, and 153, excluding sections
23  143.191 to 143.265 and related provisions, and in the case of an individual taxpayer, any liability
24  incurred by such taxpayer pursuant to the provisions of chapter 143, excluding sections 143.191
25  to 143.265 and related provisions;
26         (5)  "Taxpayer", a person, firm, a partner in a firm, corporation, or a shareholder in an S
27  corporation doing business in the state of Missouri and subject to the state income tax imposed
28  by the provisions of chapter 143, or a corporation subject to the annual corporation franchise tax
29  imposed by the provisions of chapter 147, or an insurance company paying an annual tax on its
30  gross premium receipts in this state, or other financial institution paying taxes to the state of
31  Missouri or any political subdivision of this state pursuant to the provisions of chapter 148, or
32  an express company which pays an annual tax on its gross receipts in this state pursuant to
33  chapter 153, or an individual subject to the state income tax imposed by the provisions of chapter
34  143, or any charitable organization which is exempt from federal income tax and whose Missouri
35  unrelated business taxable income, if any, would be subject to the state income tax imposed
36  under chapter 143.
37         2.  (1)  Beginning on March 29, 2013, any contribution to a pregnancy resource center
38  made on or after January 1, 2013, shall be eligible for tax credits as provided by this section.
39         (2)  For all tax years beginning on or after January 1, 2007, **and ending on or before**
40  **December 31, 2020,** a taxpayer shall be allowed to claim a tax credit against the taxpayer's state
41  tax liability in an amount equal to fifty percent of the amount such taxpayer contributed to a
42  pregnancy resource center. **For all tax years beginning on or after January 1, 2021, a**
43  **taxpayer shall be allowed to claim a tax credit against the taxpayer's state tax liability in**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                              3

44   **an amount equal to seventy percent of the amount such taxpayer contributed to a**
45   **pregnancy resource center.**

46          3.  The amount of the tax credit claimed shall not exceed the amount of the taxpayer's
47   state tax liability for the tax year for which the credit is claimed, and such taxpayer shall not be
48   allowed to claim a tax credit in excess of fifty thousand dollars per tax year.  However, any tax
49   credit that cannot be claimed in the tax year the contribution was made may be carried over only
50   to the next succeeding tax year.  No tax credit issued under this section shall be assigned,
51   transferred, or sold.

52          4.  Except for any excess credit which is carried over pursuant to subsection 3 of this
53   section, a taxpayer shall not be allowed to claim a tax credit unless the total amount of such
54   taxpayer's contribution or contributions to a pregnancy resource center or centers in such
55   taxpayer's tax year has a value of at least one hundred dollars.

56          5.  The director shall determine, at least annually, which facilities in this state may be
57   classified as pregnancy resource centers.  The director may require of a facility seeking to be
58   classified as a pregnancy resource center whatever information which is reasonably necessary
59   to make such a determination.  The director shall classify a facility as a pregnancy resource
60   center if such facility meets the definition set forth in subsection 1 of this section.

61          6.  The director shall establish a procedure by which a taxpayer can determine if a facility
62   has been classified as a pregnancy resource center.  Pregnancy resource centers shall be permitted
63   to decline a contribution from a taxpayer.  The cumulative amount of tax credits which may be
64   claimed by all the taxpayers contributing to pregnancy resource centers in any one fiscal year
65   shall not exceed two million dollars for all fiscal years ending on or before June 30, 2014, and
66   two million five hundred thousand dollars for all fiscal years beginning on or after July 1, 2014,
67   and ending on or before June 30, 2019, and three million five hundred thousand dollars for all
68   fiscal years beginning on or after July 1, 2019, **and ending on or before June 30, 2021.  For**
69   **all fiscal years beginning on or after July 1, 2021, there shall be no limit imposed on the**
70   **cumulative amount of tax credits that may be claimed by all taxpayers contributing to**
71   **pregnancy resource centers under the provisions of this section**.  Tax credits shall be issued
72   in the order contributions are received.  If the amount of tax credits redeemed in a fiscal year is
73   less than the cumulative amount authorized under this subsection, the difference shall be carried
74   over to a subsequent fiscal year or years and shall be added to the cumulative amount of tax
75   credits that may be authorized in that fiscal year or years.

76          7.  **For all fiscal years ending on or before June 30, 2021,** the director shall establish
77   a procedure by which, from the beginning of the fiscal year until some point in time later in the
78   fiscal year to be determined by the director, the cumulative amount of tax credits are equally
79   apportioned among all facilities classified as pregnancy resource centers.  If a pregnancy resource

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                   4

80  center fails to use all, or some percentage to be determined by the director, of its apportioned tax
81  credits during this predetermined period of time, the director may reapportion these unused tax
82  credits to those pregnancy resource centers that have used all, or some percentage to be
83  determined by the director, of their apportioned tax credits during this predetermined period of
84  time. The director may establish more than one period of time and reapportion more than once
85  during each fiscal year.   To the maximum extent possible, the director shall establish the
86  procedure described in this subsection in such a manner as to ensure that taxpayers can claim all
87  the tax credits possible up to the cumulative amount of tax credits available for the fiscal year.
88          8.  Each pregnancy resource center shall provide information to the director concerning
89  the identity of each taxpayer making a contribution to the pregnancy resource center who is
90  claiming a tax credit pursuant to this section and the amount of the contribution.  The director
91  shall provide the information to the director of revenue.  The director shall be subject to the
92  confidentiality and penalty provisions of section 32.057 relating to the disclosure of tax
93  information.
94          9.  [Under section 23.253 of the Missouri sunset act:
95          (1)  The provisions of the program authorized under this section shall automatically
96  sunset on December thirty-first six years after August 28, 2018, unless reauthorized by an act of
97  the general assembly;
98          (2)  If such program is reauthorized, the program authorized under this section shall
99  automatically sunset on December thirty-first six years after the effective date of the
100  reauthorization of this section;
101          (3)  This section shall terminate on September first of the calendar year immediately
102  following the calendar year in which a program authorized under this section is sunset; and
103          (4)  The provisions of this subsection shall not be construed to limit or in any way impair
104  the department's ability to issue tax credits authorized on or before the date the program
105  authorized under this section expires or a taxpayer's ability to redeem such tax credits.] **The**
106  **provisions of section 23.253 shall not apply to this section.**

         188.010.  **In recognition that Almighty God is the author of life, that all men and**
2  **women are "endowed by their Creator with certain unalienable Rights, that among these**
3  **are Life", and that article I, section 2 of the Constitution of Missouri provides that all**
4  **persons have a natural right to life,** it is the intention of the general assembly of the state of
5  Missouri to [grant]:
6          **(1)  Defend** the right to life [to] **of** all humans, born and unborn[, and to]**;**
7          **(2)  Declare that the state and all of its political subdivisions are a "sanctuary of**
8  **life" that protects pregnant women and their unborn children; and**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                5

9      **(3)**   Regulate abortion to the full extent permitted by the Constitution of the United
10  States, decisions of the United States Supreme Court, and federal statutes.

188.015.  As used in this chapter, the following terms mean:

2      (1)  "Abortion":

3      (a)   The act of using or prescribing any instrument, device, medicine, drug, or any other
4  means or substance with the intent to destroy the life of an embryo or fetus in his or her mother's
5  womb; or

6      (b)   The intentional termination of the pregnancy of a mother by using or prescribing any
7  instrument, device, medicine, drug, or other means or substance with an intention other than to
8  increase the probability of a live birth or to remove a dead [or dying] unborn child;

9      (2)   "Abortion facility", a clinic, physician's office, or any other place or facility in which
10  abortions are performed or induced other than a hospital;

11      (3)  "Conception", the fertilization of the ovum of a female by a sperm of a male;

12      (4)  "Department", the department of health and senior services;

13      (5)  **"Down Syndrome", the same meaning as defined in section 191.923;**

14      **(6)**   "Gestational age", length of pregnancy as measured from the first day of the woman's
15  last menstrual period;

16      [(6)] **(7)**   "Medical emergency", a condition which, based on reasonable medical
17  judgment, so complicates the medical condition of a pregnant woman as to necessitate the
18  immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a
19  delay will create a serious risk of substantial and irreversible physical impairment of a major
20  bodily function of the pregnant woman;

21      [(7)] **(8)**   "Physician", any person licensed to practice medicine in this state by the state
22  board of registration for the healing arts;

23      [(8)] **(9)**   "Reasonable medical judgment", a medical judgment that would be made by a
24  reasonably prudent physician, knowledgeable about the case and the treatment possibilities with
25  respect to the medical conditions involved;

26      [(9)] **(10)**   "Unborn child", the offspring of human beings from the moment of conception
27  until birth and at every stage of its biological development, including the human conceptus,
28  zygote, morula, blastocyst, embryo, and fetus;

29      [(10)] **(11)**   "Viability" or "viable", that stage of fetal development when the life of the
30  unborn child may be continued indefinitely outside the womb by natural or artificial life-
31  supportive systems**;**

32      **(12)  "Viable pregnancy" or "viable intrauterine pregnancy", in the first trimester
33  of pregnancy, an intrauterine pregnancy that can potentially result in a liveborn baby**.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**188.017.  1.  This section shall be known and may be cited as the "Right to Life of**
2  **the Unborn Child Act".**

3       **2.  Notwithstanding any other provision of law to the contrary, no abortion shall be**
4  **performed or induced upon a woman, except in cases of medical emergency.  Any person**
5  **who knowingly performs or induces an abortion of an unborn child in violation of this**
6  **subsection shall be guilty of a class B felony, as well as subject to suspension or revocation**
7  **of his or her professional license by his or her professional licensing board.  A woman upon**
8  **whom an abortion is performed or induced in violation of this subsection shall not be**
9  **prosecuted for a conspiracy to violate the provisions of this subsection.**

10       **3.  It shall be an affirmative defense for any person alleged to have violated the**
11  **provisions of subsection 2 of this section that the person performed or induced an abortion**
12  **because of a medical emergency.  The defendant shall have the burden of persuasion that**
13  **the defense is more probably true than not.**

**188.018.  If any one or more provisions, sections, subsections, sentences, clauses,**
2  **phrases, or words of this chapter or the application thereof to any person, circumstance,**
3  **or period of gestational age is found to be unenforceable, unconstitutional, or invalid by**
4  **a court of competent jurisdiction, the same is hereby declared to be severable and the**
5  **balance of this chapter shall remain effective notwithstanding such unenforceability,**
6  **unconstitutionality, or invalidity.  The general assembly hereby declares that it would have**
7  **passed each provision, section, subsection, sentence, clause, phrase, or word thereof,**
8  **irrespective of the fact that any one or more provisions, sections, subsections, sentences,**
9  **clauses, phrases, or words of this chapter, or the application of this chapter to any person,**
10  **circumstance, or period of gestational age, would be declared unenforceable,**
11  **unconstitutional, or invalid.**

**188.026.  1.  This section and sections 188.056, 188.057, and 188.058 shall be known**
2  **and may be cited as the "Missouri Stands for the Unborn Act".**

3       **2.  In Roe v. Wade, 410 U.S. 113 (1973), certain information about the development**
4  **of the unborn child, human pregnancy, and the effects of abortion was either not part of**
5  **the record or was not available at the time.  Since 1973, advances in medical and scientific**
6  **technology have greatly expanded our knowledge of prenatal life and the effects of**
7  **abortion on women.  The general assembly of this state finds:**

8       **(1)  At conception, a new genetically distinct human being is formed;**

9       **(2)  The fact that the life of an individual human being begins at conception has long**
10  **been recognized in Missouri law: "[T]he child is, in truth, alive from the moment of**
11  **conception".  State v. Emerich, 13 Mo. App. 492, 495 (1883), affirmed, 87 Mo. 110 (1885).**
12  **Under section 1.205, the general assembly has recognized that the life of each human being**

13  begins at conception and that unborn children have protectable interests in life, health, and
14  well-being;

15      (3)  The first prohibition of abortion in Missouri was enacted in 1825.  Since then,
16  the repeal and reenactment of prohibitions of abortion have made distinctions with respect
17  to penalties for performing or inducing abortion on the basis of "quickening"; however,
18  the unborn child was still protected from conception onward;

19      (4)  In ruling that Missouri's prohibition on abortion was constitutional in 1972, the
20  Missouri supreme court accepted as a stipulation of the parties that "'[i]nfant Doe,
21  Intervenor Defendant in this case, and all other unborn children have all the qualities and
22  attributes of adult human persons differing only in age or maturity.  Medically, human life
23  is a continuum from conception to death.'"  Rodgers v. Danforth, 486 S.W.2d 258, 259
24  (1972);

25      (5)  In Webster v. Reproductive Health Services, 492 U.S. 490 (1989), the Supreme
26  Court, while considering the "preamble" that set forth "findings" in section 1.205, stated:
27  "We think the extent to which the preamble's language might be used to interpret other
28  state statutes or regulations is something that only the courts of Missouri can definitively
29  decide.  State law has offered protections to unborn children in tort and probate law". Id.
30  at 506. Since Webster, Missouri courts have construed section 1.205 and have consistently
31  found that an unborn child is a person for purposes of Missouri's homicide and assault
32  laws when the unborn child's mother was killed or assaulted by another person.  Section
33  1.205 has even been found applicable to the manslaughter of an unborn child who was
34  eight weeks gestational age or earlier.  State v. Harrison, 390 S.W.3d 927 (Mo. Ct. App.
35  2013);

36      (6)  In medicine, a special emphasis is placed on the heartbeat.  The heartbeat is a
37  discernible sign of life at every stage of human existence.  During the fifth week of
38  gestational age, an unborn child's heart begins to beat and blood flow begins during the
39  sixth week;

40      (7)  Depending on the ultrasound equipment being used, the unborn child's
41  heartbeat can be visually detected as early as six to eight weeks gestational age.  By about
42  twelve weeks gestational age, the unborn child's heartbeat can consistently be made
43  audible through the use of a handheld Doppler fetal heart rate device;

44      (8)  Confirmation of a pregnancy can be indicated through the detection of the
45  unborn child's heartbeat, while the absence of a heartbeat can be an indicator of the death
46  of the unborn child if the child has reached the point of development when a heartbeat
47  should be detectable;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126          8

48      **(9)  Heart rate monitoring during pregnancy and labor is utilized to measure the**
49   **heart rate and rhythm of the unborn child, at an average rate between one hundred ten**
50   **and one hundred sixty beats per minute, and helps determine the health of the unborn**
51   **child;**

52      **(10)  The Supreme Court in** *Roe* **discussed "the difficult question of when life**
53   **begins" and wrote: "[p]hysicians and their scientific colleagues have regarded [quickening]**
54   **with less interest and have tended to focus either upon conception, upon live birth, or upon**
55   **the interim point at which the fetus becomes 'viable', that is, potentially able to live outside**
56   **the mother's womb, albeit with artificial aid".** *Roe,* **410 U.S. at 160.  Today, however,**
57   **physicians' and scientists' interests on life in the womb also focus on other markers of**
58   **development in the unborn child, including, but not limited to, presence of a heartbeat,**
59   **brain development, a viable pregnancy or viable intrauterine pregnancy during the first**
60   **trimester of pregnancy, and the ability to experience pain;**

61      **(11)  In Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52 (1976),**
62   **the Supreme Court noted that "we recognized in** *Roe* **that viability was a matter of medical**
63   **judgment, skill, and technical ability, and we preserved the flexibility of the term". Id. at**
64   **64.  Due to advances in medical technology and diagnoses, present-day physicians and**
65   **scientists now describe the viability of an unborn child in an additional manner, by**
66   **determining whether there is a viable pregnancy or viable intrauterine pregnancy during**
67   **the first trimester of pregnancy;**

68      **(12)  While the overall risk of miscarriage after clinical recognition of pregnancy**
69   **is twelve to fifteen percent, the incidence decreases significantly if cardiac activity in the**
70   **unborn child has been confirmed.  The detection of a heartbeat in an unborn child is a**
71   **reliable indicator of a viable pregnancy and that the unborn child will likely survive to**
72   **birth, especially if presenting for a prenatal visit at eight weeks gestational age or later.**
73   **For asymptomatic women attending a first prenatal visit between six and eleven weeks**
74   **gestational age where a heartbeat was confirmed through an ultrasound, the subsequent**
75   **risk of miscarriage is one and six-tenths percent.  Although the risk is higher at six weeks**
76   **gestational age at nine and four-tenths percent, it declines rapidly to one and five-tenths**
77   **percent at eight weeks gestational age, and less than one percent at nine weeks gestational**
78   **age or later;**

79      **(13)  The presence of a heartbeat in an unborn child represents a more definable**
80   **point of ascertaining survivability than the ambiguous concept of viability that has been**
81   **adopted by the Supreme Court, especially since if a heartbeat is detected at eight weeks**
82   **gestational age or later in a normal pregnancy, there is likely to be a viable pregnancy and**
83   **there is a high probability that the unborn child will survive to birth;**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                        9

84      **(14)  The placenta begins developing during the early first trimester of pregnancy**
85  **and performs a respiratory function by making oxygen supply to and carbon dioxide**
86  **removal from the unborn child possible later in the first trimester and throughout the**
87  **second and third trimesters of pregnancy;**

88      **(15)  By the fifth week of gestation, the development of the brain of the unborn child**
89  **is underway.  Brain waves have been measured and recorded as early as the eighth week**
90  **of gestational age in children who were removed during an ectopic pregnancy or**
91  **hysterectomy.  Fetal magnetic resonance imaging (MRI) of an unborn child's brain is used**
92  **during the second and third trimesters of pregnancy and brain activity has been observed**
93  **using MRI;**

94      **(16)  Missouri law identifies the presence of circulation, respiration, and brain**
95  **function as indicia of life under section 194.005, as the presence of circulation, respiration,**
96  **and brain function indicates that such person is not legally dead, but is legally alive;**

97      **(17)  Unborn children at eight weeks gestational age show spontaneous movements,**
98  **such as a twitching of the trunk and developing limbs.  It has been reported that unborn**
99  **children at this stage show reflex responses to touch.  The perioral area is the first part of**
100  **the unborn child's body to respond to touch at about eight weeks gestational age and by**
101  **fourteen weeks gestational age most of the unborn child's body is responsive to touch;**

102      **(18)  Peripheral cutaneous sensory receptors, the receptors that feel pain, develop**
103  **early in the unborn child.  They appear in the perioral cutaneous area at around seven to**
104  **eight weeks gestational age, in the palmar regions at ten to ten and a half weeks gestational**
105  **age, the abdominal wall at fifteen weeks gestational age, and over all of the unborn child's**
106  **body at sixteen weeks gestational age;**

107      **(19)  Substance P, a peptide that functions as a neurotransmitter, especially in the**
108  **transmission of pain, is present in the dorsal horn of the spinal cord of the unborn child**
109  **at eight to ten weeks gestational age.  Enkephalins, peptides that play a role in**
110  **neurotransmission and pain modulation, are present in the dorsal horn at twelve to**
111  **fourteen weeks gestational age;**

112      **(20)  When intrauterine needling is performed on an unborn child at sixteen weeks**
113  **gestational age or later, the reaction to this invasive stimulus is blood flow redistribution**
114  **to the brain.  Increased blood flow to the brain is the same type of stress response seen in**
115  **a born child and an adult;**

116      **(21)  By sixteen weeks gestational age, pain transmission from a peripheral receptor**
117  **to the cortex is possible in the unborn child;**

118      **(22)  Physicians provide anesthesia during in utero treatment of unborn children**
119  **as early as sixteen weeks gestational age for certain procedures, including those to correct**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                     10

120  fetal urinary tract obstruction.  Anesthesia is administered by ultrasound-guided injection
121  into the arm or leg of the unborn child;

122        (23)  A leading textbook on prenatal development of the human brain states, "It
123  may be concluded that, although nociperception (the actual perception of pain) awaits the
124  appearance of consciousness, nociception (the experience of pain) is present some time
125  before birth.  In the absence of disproof, it is merely prudent to assume that pain can be
126  experienced even early in prenatal life (Dr. J. Wisser, Zürich): the fetus should be given
127  the benefit of the doubt".  Ronan O'Rahilly & Fabiola Müller.  The Embryonic Human
128  Brain:  An Atlas of Developmental Stages (3d ed. 2005);

129        (24)  By fourteen or fifteen weeks gestational age or later, the predominant abortion
130  method in Missouri is dilation and evacuation (D & E).  The D & E abortion method
131  includes the dismemberment, disarticulation, and exsanguination of the unborn child,
132  causing the unborn child's death;

133        (25)  The Supreme Court acknowledged in Gonzales v. Carhart, 550 U.S. 124, 160
134  (2007), that "the standard D & E is in some respects as brutal, if not more, than the intact
135  D & E" partial birth abortion method banned by Congress and upheld as facially
136  constitutional by the Supreme Court, even though the federal ban was applicable both
137  before and after viability and had no exception for the health of the mother;

138        (26)  Missouri's ban on the partial birth abortion method, section 565.300, is in
139  effect because of Gonzales v. Carhart and the Supreme Court's subsequent decision in
140  Nixon v. Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc.,
141  550 U.S. 901 (2007), to vacate and remand to the appellate court the prior invalidation of
142  section 565.300.  Since section 565.300, like Congress' ban on partial birth abortion, is
143  applicable both before and after viability, there is ample precedent for the general
144  assembly to constitutionally prohibit the brutal D & E abortion method at fourteen weeks
145  gestational age or later, even before the unborn child is viable, with a medical emergency
146  exception;

147        (27)  In Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court determined that
148  "evolving standards of decency" dictated that a Missouri statute allowing the death
149  penalty for a conviction of murder in the first degree for a person under eighteen years of
150  age when the crime was committed was unconstitutional under the Eighth and Fourteenth
151  Amendments to the United States Constitution because it violated the prohibition against
152  "cruel and unusual punishments";

153        (28)  In Bucklew v. Precythe, 139 S. Ct. 1112, 1123 (2019), the Supreme Court noted
154  that "'[d]isgusting' practices" like disemboweling and quartering "readily qualified as

155  'cruel and unusual', as a reader at the time of the Eighth Amendment's adoption would
156  have understood those words";

157     **(29)  Evolving standards of decency dictate that Missouri should prohibit the brutal**
158  **and painful D & E abortion method at fourteen weeks gestational age or later, with a**
159  **medical emergency exception, because if a comparable method of killing was used on:**

160     **(a)  A person convicted of murder in the first degree, it would be cruel and unusual**
161  **punishment; or**

162     **(b)  An animal, it would be unlawful under state law because it would not be a**
163  **humane method, humane euthanasia, or humane killing of certain animals under chapters**
164  **273 and 578;**

165     **(30)  In** *Roper*, **the Supreme Court also found that "[i]t is proper that we**
166  **acknowledge the overwhelming weight of international opinion against the juvenile death**
167  **penalty....  The opinion of the world community, while not controlling our outcome, does**
168  **provide respected and significant confirmation for our own conclusions".** *Roper*, **543 U.S.**
169  **at 578.  In its opinion, the Supreme Court was instructed by "international covenants**
170  **prohibiting the juvenile death penalty", such as the International Covenant on Civil and**
171  **Political Rights, 999 U.N.T.S. 171. Id. at 577;**

172     **(31)  The opinion of the world community, reflected in the laws of the United**
173  **Nation's 193-member states and six other entities, is that in most countries, most abortions**
174  **are prohibited after twelve weeks gestational age or later;**

175     **(32)  The opinion of the world community is also shared by most Americans, who**
176  **believe that most abortions in the second and third trimesters of pregnancy should be**
177  **illegal, based on polling that has remained consistent since 1996;**

178     **(33)  Abortion procedures performed later in pregnancy have a higher medical risk**
179  **for women.  Compared to an abortion at eight weeks gestational age or earlier, the relative**
180  **risk increases exponentially at later gestational ages.  The relative risk of death for a**
181  **pregnant woman who had an abortion performed or induced upon her at:**

182     **(a)  Eleven to twelve weeks gestational age is between three and four times higher**
183  **than an abortion at eight weeks gestational age or earlier;**

184     **(b)  Thirteen to fifteen weeks gestational age is almost fifteen times higher than an**
185  **abortion at eight weeks gestational age or earlier;**

186     **(c)  Sixteen to twenty weeks gestational age is almost thirty times higher than an**
187  **abortion at eight weeks gestational age or earlier; and**

188     **(d)  Twenty-one weeks gestational age or later is more than seventy-five times**
189  **higher than an abortion at eight weeks gestational age or earlier;**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

190     **(34)  In addition to the short-term risks of an abortion, studies have found that the**
191 **long-term physical and psychological consequences of abortion for women include, but are**
192 **not limited to, an increased risk of preterm birth, low birthweight babies, and placenta**
193 **previa in subsequent pregnancies, as well as serious behavioral health issues.  These risks**
194 **increase as abortions are performed or induced at later gestational ages.   These**
195 **consequences of an abortion have a detrimental effect not only on women, their children,**
196 **and their families, but also on an already burdened health care system, taxpayers, and the**
197 **workforce;**

198     **(35)  A large percentage of women who have an abortion performed or induced**
199 **upon them in Missouri each year are at less than eight weeks gestational age, a large**
200 **majority are at less than fourteen weeks gestational age, a larger majority are at less than**
201 **eighteen weeks gestational age, and an even larger majority are at less than twenty weeks**
202 **gestational age.  A prohibition on performing or inducing an abortion at eight weeks**
203 **gestational age or later, with a medical emergency exception, does not amount to a**
204 **substantial obstacle to a large fraction of women for whom the prohibition is relevant,**
205 **which is pregnant women in Missouri who are seeking an abortion while not experiencing**
206 **a medical emergency.  The burden that a prohibition on performing or inducing an**
207 **abortion at eight, fourteen, eighteen, or twenty weeks gestational age or later, with a**
208 **medical emergency exception, might impose on abortion access, is outweighed by the**
209 **benefits conferred upon the following:**

210     **(a)  Women more advanced in pregnancy who are at greater risk of harm from**
211 **abortion;**

212     **(b)  Unborn children at later stages of development;**

213     **(c)  The medical profession, by preserving its integrity and fulfilling its commitment**
214 **to do no harm; and**

215     **(d)  Society, by fostering respect for human life, born and unborn, at all stages of**
216 **development, and by lessening societal tolerance of violence against innocent human life;**

217     **(36)  In *Webster*, the Supreme Court noted, in upholding a Missouri statute, "that**
218 **there may be a 4-week error in estimating gestational age".  *Webster*, 492 U.S. at 516.**
219 **Thus, an unborn child thought to be eight weeks gestational age might in fact be twelve**
220 **weeks gestational age, when an abortion poses a greater risk to the woman and the unborn**
221 **child is considerably more developed.  An unborn child at fourteen weeks gestational age**
222 **might be eighteen weeks gestational age and an unborn child at eighteen weeks gestational**
223 **age might be twenty-two weeks gestational age, when an abortion poses a greater risk to**
224 **the woman, the unborn child is considerably more developed, the abortion method likely**
225 **to be employed is more brutal, and the risk of pain experienced by the unborn child is**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                13

226 greater.  An unborn child at twenty weeks gestational age might be twenty-four weeks
227 gestational age, when an abortion poses a greater risk to the woman, the unborn child is
228 considerably more developed, the abortion method likely to be employed is more brutal,
229 the risk of pain experienced by the unborn child is greater, and the unborn child may be
230 viable.

231        3.  The state of Missouri is bound by Article VI, Clause 2 of the Constitution of the
232 United States that "all treaties made, or which shall be made, under the authority of the
233 United States, shall be the supreme law of the land".  One such treaty is the International
234 Covenant on Civil and Political Rights, entered into force on March 23, 1976, and adopted
235 by the United States on September 8, 1992.  In ratifying the Covenant, the United States
236 declared that while the provisions of Articles 1 through 27 of the Covenant are not self-
237 executing, the United States' understanding is that state governments share responsibility
238 with the federal government in implementing the Covenant.

239        4.  Article 6, Paragraph 1, U.N.T.S. at 174, of the International Covenant on Civil
240 and Political Rights states, "Every human being has the inherent right to life.  This right
241 shall be protected by law.  No one shall be arbitrarily deprived of his life".  The state of
242 Missouri takes seriously its obligation to comply with the Covenant and to implement this
243 paragraph as it relates to the inherent right to life of unborn human beings, protecting the
244 rights of unborn human beings by law, and ensuring that such unborn human beings are
245 not arbitrarily deprived of life.  The state of Missouri hereby implements Article 6,
246 Paragraph 1 of the Covenant by the regulation of abortion in this state.

247        5.  The state of Missouri has interests that include, but are not limited to:

248        (1)   Protecting unborn children throughout pregnancy and preserving and
249 promoting their lives from conception to birth;

250        (2)  Encouraging childbirth over abortion;

251        (3)  Ensuring respect for all human life from conception to natural death;

252        (4)   Safeguarding an unborn child from the serious harm of pain by an abortion
253 method that would cause the unborn child to experience pain while she or he is being
254 killed;

255        (5)  Preserving the integrity of the medical profession and regulating and restricting
256 practices that might cause the medical profession or society as a whole to become
257 insensitive, even disdainful, to life.  This includes regulating and restricting abortion
258 methods that are not only brutal and painful, but if allowed to continue, will further
259 coarsen society to the humanity of not only unborn children, but all vulnerable and
260 innocent human life, making it increasingly difficult to protect such life;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                    14

261    **(6)  Ending the incongruities in state law by permitting some unborn children to be**
262    **killed by abortion, while requiring that unborn children be protected in non-abortion**
263    **circumstances through, including, but not limited to, homicide, assault, self-defense, and**
264    **defense of another statutes; laws guaranteeing prenatal health care, emergency care, and**
265    **testing; state-sponsored health insurance for unborn children; the prohibition of restraints**
266    **in correctional institutions to protect pregnant offenders and their unborn children; and**
267    **protecting the interests of unborn children by the appointment of conservators, guardians,**
268    **and representatives;**
269    **(7)  Reducing the risks of harm to pregnant women who obtain abortions later in**
270    **pregnancy; and**
271    **(8)  Avoiding burdens on the health care system, taxpayers, and the workforce**
272    **because of increased preterm births, low birthweight babies, compromised pregnancies,**
273    **extended postpartum recoveries, and behavioral health problems caused by the long-term**
274    **effects of abortions performed or induced later in the pregnancy.**

188.027.  1.  Except in [the case] **cases** of medical emergency, no abortion shall be
2    performed or induced on a woman without her voluntary and informed consent, given freely and
3    without coercion.  Consent to an abortion is voluntary and informed and given freely and without
4    coercion if, and only if, at least seventy-two hours prior to the abortion:
5    (1)  The physician who is to perform or induce the abortion, a qualified professional, or
6    the referring physician has informed the woman orally, reduced to writing, and in person, of the
7    following:
8    (a)  The name of the physician who will perform or induce the abortion;
9    (b)  Medically accurate information that a reasonable patient would consider material to
10    the decision of whether or not to undergo the abortion, including:
11    a.  A description of the proposed abortion method;
12    b.  The immediate and long-term medical risks to the woman associated with the
13    proposed abortion method including, but not limited to, infection, hemorrhage, cervical tear or
14    uterine perforation, harm to subsequent pregnancies or the ability to carry a subsequent child to
15    term, and possible adverse psychological effects associated with the abortion; and
16    c.  The immediate and long-term medical risks to the woman, in light of the anesthesia
17    and medication that is to be administered, the unborn child's gestational age, and the woman's
18    medical history and medical condition;
19    (c)  Alternatives to the abortion which shall include making the woman aware that
20    information and materials shall be provided to her detailing such alternatives to the abortion;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                   15

21      (d)   A statement that the physician performing or inducing the abortion is available for
22  any questions concerning the abortion, together with the telephone number that the physician
23  may be later reached to answer any questions that the woman may have;
24      (e)   The location of the hospital that offers obstetrical or gynecological care located
25  within thirty miles of the location where the abortion is performed or induced and at which the
26  physician performing or inducing the abortion has clinical privileges and where the woman may
27  receive follow-up care by the physician if complications arise;
28      (f)  The gestational age of the unborn child at the time the abortion is to be performed or
29  induced; and
30      (g)   The anatomical and physiological characteristics of the unborn child at the time the
31  abortion is to be performed or induced;
32      (2)   The physician who is to perform or induce the abortion or a qualified professional
33  has presented the woman, in person, printed materials provided by the department, which
34  describe the probable anatomical and physiological characteristics of the unborn child at
35  two-week gestational increments from conception to full term, including color photographs or
36  images of the developing unborn child at two-week gestational increments.  Such descriptions
37  shall include information about brain and heart functions, the presence of external members and
38  internal organs during the applicable stages of development and information on when the unborn
39  child is viable.  The printed materials shall prominently display the following statement:  "The
40  life of each human being begins at conception.  Abortion will terminate the life of a separate,
41  unique, living human being.";
42      (3)   The physician who is to perform or induce the abortion, a qualified professional, or
43  the referring physician has presented the woman, in person, printed materials provided by the
44  department, which describe the various surgical and drug-induced methods of abortion relevant
45  to the stage of pregnancy, as well as the immediate and long-term medical risks commonly
46  associated with each abortion method including, but not limited to, infection, hemorrhage,
47  cervical tear or uterine perforation, harm to subsequent pregnancies or the ability to carry a
48  subsequent child to term, and the possible adverse psychological effects associated with an
49  abortion;
50      (4)   The physician who is to perform or induce the abortion or a qualified professional
51  shall provide the woman with the opportunity to view at least seventy-two hours prior to the
52  abortion an active ultrasound of the unborn child and hear the heartbeat of the unborn child if
53  the heartbeat is audible.  The woman shall be provided with a geographically indexed list
54  maintained by the department of health care providers, facilities, and clinics that perform
55  ultrasounds, including those that offer ultrasound services free of charge.  Such materials shall
56  provide contact information for each provider, facility, or clinic including telephone numbers

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

57  and, if available, website addresses.  Should the woman decide to obtain an ultrasound from a
58  provider, facility, or clinic other than the abortion facility, the woman shall be offered a
59  reasonable time to obtain the ultrasound examination before the date and time set for performing
60  or inducing an abortion.  The person conducting the ultrasound shall ensure that the active
61  ultrasound image is of a quality consistent with standard medical practice in the community,
62  contains the dimensions of the unborn child, and accurately portrays the presence of external
63  members and internal organs, if present or viewable, of the unborn child.  The auscultation of
64  fetal heart tone must also be of a quality consistent with standard medical practice in the
65  community.  If the woman chooses to view the ultrasound or hear the heartbeat or both at the
66  abortion facility, the viewing or hearing or both shall be provided to her at the abortion facility
67  at least seventy-two hours prior to the abortion being performed or induced;

68      (5)  **[**Prior to an abortion being performed or induced on an unborn child of twenty-two
69  weeks gestational age or older, the physician who is to perform or induce the abortion or a
70  qualified professional has presented the woman, in person, printed materials provided by the
71  department that offer information on the possibility of the abortion causing pain to the unborn
72  child.  This information shall include, but need not be limited to, the following:
73          (a)  At least by twenty-two weeks of gestational age, the unborn child possesses all the
74  anatomical structures, including pain receptors, spinal cord, nerve tracts, thalamus, and cortex,
75  that are necessary in order to feel pain;
76          (b)  A description of the actual steps in the abortion procedure to be performed or
77  induced, and at which steps the abortion procedure could be painful to the unborn child;
78          (c)  There is evidence that by twenty-two weeks of gestational age, unborn children seek
79  to evade certain stimuli in a manner that in an infant or an adult would be interpreted as a
80  response to pain;
81          (d)  Anesthesia is given to unborn children who are twenty-two weeks or more gestational
82  age who undergo prenatal surgery;
83          (e)  Anesthesia is given to premature children who are twenty-two weeks or more
84  gestational age who undergo surgery;
85          (f)  Anesthesia or an analgesic is available in order to minimize or alleviate the pain to
86  the unborn child**]** **The printed materials provided by the department shall include**
87  **information on the possibility of an abortion causing pain in the unborn child.  This**
88  **information shall include, but need not be limited to, the following:**
89      **(a)  Unborn children as early as eight weeks gestational age start to show**
90  **spontaneous movements and unborn children at this stage in pregnancy show reflex**
91  **responses to touch;**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    17

92    **(b)  In the unborn child, the area around his or her mouth and lips is the first part**
93 **of the unborn child's body to respond to touch and by fourteen weeks gestational age most**
94 **of the unborn child's body is responsive to touch;**
95    **(c)  Pain receptors on the unborn child's skin develop around his or her mouth at**
96 **around seven to eight weeks gestational age, around the palms of his or her hands at ten**
97 **to ten and a half weeks, on the abdominal wall at fifteen weeks, and over all of his or her**
98 **body at sixteen weeks gestational age;**
99    **(d)  Beginning at sixteen weeks gestational age and later, it is possible for pain to be**
100 **transmitted from receptors to the cortex of the unborn child's brain, where thinking and**
101 **perceiving occur;**
102    **(e)  When a physician performs a life-saving surgery, he or she provides anesthesia**
103 **to unborn children as young as sixteen weeks gestational age in order to alleviate the**
104 **unborn child's pain; and**
105    **(f)  A description of the actual steps in the abortion procedure to be performed or**
106 **induced and at which steps the abortion procedure could be painful to the unborn child**;
107    (6)   The physician who is to perform or induce the abortion or a qualified professional
108 has presented the woman, in person, printed materials provided by the department explaining to
109 the woman alternatives to abortion she may wish to consider.  Such materials shall:
110    (a)   Identify on a geographical basis public and private agencies available to assist a
111 woman in carrying her unborn child to term, and to assist her in caring for her dependent child
112 or placing her child for adoption, including agencies commonly known and generally referred
113 to as pregnancy resource centers, crisis pregnancy centers, maternity homes, and adoption
114 agencies.  Such materials shall provide a comprehensive list by geographical area of the agencies,
115 a description of the services they offer, and the telephone numbers and addresses of the agencies;
116 provided that such materials shall not include any programs, services, organizations, or affiliates
117 of organizations that perform or induce, or assist in the performing or inducing of, abortions or
118 that refer for abortions;
119    (b)  Explain the Missouri alternatives to abortion services program under section 188.325,
120 and any other programs and services available to pregnant women and mothers of newborn
121 children offered by public or private agencies which assist a woman in carrying her unborn child
122 to term and assist her in caring for her dependent child or placing her child for adoption,
123 including but not limited to prenatal care; maternal health care; newborn or infant care; mental
124 health services; professional counseling services; housing programs; utility assistance;
125 transportation services; food, clothing, and supplies related to pregnancy; parenting skills;
126 educational programs; job training and placement services; drug and alcohol testing and
127 treatment; and adoption assistance;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    18

128     (c)  Identify the state website for the Missouri alternatives to abortion services program
129 under section 188.325, and any toll-free number established by the state operated in conjunction
130 with the program;

131     (d)  Prominently display the statement:  "There are public and private agencies willing
132 and able to help you carry your child to term, and to assist you and your child after your child is
133 born, whether you choose to keep your child or place him or her for adoption.  The state of
134 Missouri encourages you to contact those agencies before making a final decision about abortion.
135 State law requires that your physician or a qualified professional give you the opportunity to call
136 agencies like these before you undergo an abortion.";

137     (7)  The physician who is to perform or induce the abortion or a qualified professional
138 has presented the woman, in person, printed materials provided by the department explaining that
139 the father of the unborn child is liable to assist in the support of the child, even in instances
140 where he has offered to pay for the abortion.  Such materials shall include information on the
141 legal duties and support obligations of the father of a child, including, but not limited to, child
142 support payments, and the fact that paternity may be established by the father's name on a birth
143 certificate or statement of paternity, or by court action.  Such printed materials shall also state
144 that more information concerning paternity establishment and child support services and
145 enforcement may be obtained by calling the family support division within the Missouri
146 department of social services; and

147     (8)  The physician who is to perform or induce the abortion or a qualified professional
148 shall inform the woman that she is free to withhold or withdraw her consent to the abortion at
149 any time without affecting her right to future care or treatment and without the loss of any state
150 or federally funded benefits to which she might otherwise be entitled.

151     2.  All information required to be provided to a woman considering abortion by
152 subsection 1 of this section shall be presented to the woman individually, in the physical
153 presence of the woman and in a private room, to protect her privacy, to maintain the
154 confidentiality of her decision, to ensure that the information focuses on her individual
155 circumstances, to ensure she has an adequate opportunity to ask questions, and to ensure that she
156 is not a victim of coerced abortion.  Should a woman be unable to read materials provided to her,
157 they shall be read to her.  Should a woman need an interpreter to understand the information
158 presented in the written materials, an interpreter shall be provided to her.  Should a woman ask
159 questions concerning any of the information or materials, answers shall be provided in a
160 language she can understand.

161     3.  No abortion shall be performed or induced unless and until the woman upon whom
162 the abortion is to be performed or induced certifies in writing on a checklist form provided by
163 the department that she has been presented all the information required in subsection 1 of this

SS SCS HB 126                                      19

164   section, that she has been provided the opportunity to view an active ultrasound image of the
165   unborn child and hear the heartbeat of the unborn child if it is audible, and that she further
166   certifies that she gives her voluntary and informed consent, freely and without coercion, to the
167   abortion procedure.

168        4.  [No abortion shall be performed or induced on an unborn child of twenty-two weeks
169   gestational age or older unless and until the woman upon whom the abortion is to be performed
170   or induced has been provided the opportunity to choose to have an anesthetic or analgesic
171   administered to eliminate or alleviate pain to the unborn child caused by the particular method
172   of abortion to be performed or induced.  The administration of anesthesia or analgesics shall be
173   performed in a manner consistent with standard medical practice in the community.

174        5.]  No physician shall perform or induce an abortion unless and until the physician has
175   obtained from the woman her voluntary and informed consent given freely and without coercion.
176   If the physician has reason to believe that the woman is being coerced into having an abortion,
177   the physician or qualified professional shall inform the woman that services are available for her
178   and shall provide her with private access to a telephone and information about such services,
179   including but not limited to the following:

180        (1)  Rape crisis centers, as defined in section 455.003;

181        (2)  Shelters for victims of domestic violence, as defined in section 455.200; and

182        (3)  Orders of protection, pursuant to chapter 455.

183   [6.] 5.  The physician who is to perform or induce the abortion shall, at least seventy-two
184   hours prior to such procedure, inform the woman orally and in person of:

185        (1)  The immediate and long-term medical risks to the woman associated with the
186   proposed abortion method including, but not limited to, infection, hemorrhage, cervical tear or
187   uterine perforation, harm to subsequent pregnancies or the ability to carry a subsequent child to
188   term, and possible adverse psychological effects associated with the abortion; and

189        (2)  The immediate and long-term medical risks to the woman, in light of the anesthesia
190   and medication that is to be administered, the unborn child's gestational age, and the woman's
191   medical history and medical conditions.

192   [7.] 6.  No physician shall perform or induce an abortion unless and until the physician
193   has received and signed a copy of the form prescribed in subsection 3 of this section.  The
194   physician shall retain a copy of the form in the patient's medical record.

195   [8.] 7.  In the event of a medical emergency [as provided by section 188.039], the
196   physician who performed or induced the abortion shall clearly certify in writing the nature and
197   circumstances of the medical emergency.  This certification shall be signed by the physician who
198   performed or induced the abortion, and shall be maintained under section 188.060.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    20

199    [9.] **8.**  No person or entity shall require, obtain, or accept payment for an abortion from
200    or on behalf of a patient until at least seventy-two hours have passed since the time that the
201    information required by subsection 1 of this section has been provided to the patient.  Nothing
202    in this subsection shall prohibit a person or entity from notifying the patient that payment for the
203    abortion will be required after the seventy-two-hour period has expired if she voluntarily chooses
204    to have the abortion.

205    [10.] **9.**  The term "qualified professional" as used in this section shall refer to a
206    physician, physician assistant, registered nurse, licensed practical nurse, psychologist, licensed
207    professional counselor, or licensed social worker, licensed or registered under chapter 334, 335,
208    or 337, acting under the supervision of the physician performing or inducing the abortion, and
209    acting within the course and scope of his or her authority provided by law.  The provisions of this
210    section shall not be construed to in any way expand the authority otherwise provided by law
211    relating to the licensure, registration, or scope of practice of any such qualified professional.

212    [11.] **10.**  By November 30, 2010, the department shall produce the written materials and
213    forms described in this section.  Any written materials produced shall be printed in a typeface
214    large enough to be clearly legible.  All information shall be presented in an objective, unbiased
215    manner designed to convey only accurate scientific and medical information.  The department
216    shall furnish the written materials and forms at no cost and in sufficient quantity to any person
217    who performs or induces abortions, or to any hospital or facility that provides abortions.  The
218    department shall make all information required by subsection 1 of this section available to the
219    public through its department website.  The department shall maintain a toll-free,
220    twenty-four-hour hotline telephone number where a caller can obtain information on a regional
221    basis concerning the agencies and services described in subsection 1 of this section.  No
222    identifying information regarding persons who use the website shall be collected or maintained.
223    The department shall monitor the website on a regular basis to prevent tampering and correct any
224    operational deficiencies.

225    [12.] **11.**  In order to preserve the compelling interest of the state to ensure that the choice
226    to consent to an abortion is voluntary and informed, and given freely and without coercion, the
227    department shall use the procedures for adoption of emergency rules under section 536.025 in
228    order to promulgate all necessary rules, forms, and other necessary material to implement this
229    section by November 30, 2010.

230    [13.] **12.**  If the provisions in subsections 1 and [9] **8** of this section requiring a
231    seventy-two-hour waiting period for an abortion are ever temporarily or permanently restrained
232    or enjoined by judicial order, then the waiting period for an abortion shall be twenty-four hours;
233    provided, however, that if such temporary or permanent restraining order or injunction is stayed

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                           21

234 or dissolved, or otherwise ceases to have effect, the waiting period for an abortion shall be
235 seventy-two hours.

188.028.  1.  **Except in the case of a medical emergency,** no person shall knowingly
2 perform **or induce** an abortion upon a pregnant woman under the age of eighteen years unless:
3      (1)  The attending physician has secured the informed written consent of the minor and
4 one parent or guardian**, and the consenting parent or guardian of the minor has notified any**
5 **other custodial parent in writing prior to the securing of the informed written consent of**
6 **the minor and one parent or guardian.  For purposes of this subdivision, "custodial**
7 **parent" shall only mean a parent of a minor who has been awarded joint legal custody or**
8 **joint physical custody of such minor by a court of competent jurisdiction.  Notice shall not**
9 **be required for any parent:**
10     **(a)  Who has been found guilty of any offense in violation of chapter 565, relating**
11 **to offenses against the person; chapter 566, relating to sexual offenses; chapter 567,**
12 **relating to prostitution; chapter 568, relating to offenses against the family; or chapter 573,**
13 **related to pornography and related offenses, if a child was a victim;**
14     **(b)  Who has been found guilty of any offense in any other state or foreign country,**
15 **or under federal, tribal, or military jurisdiction if a child was a victim, which would be a**
16 **violation of chapters 565, 566, 567, 568, or 573 if committed in this state;**
17     **(c)  Who is listed on the sexual offender registry under sections 589.400 to 589.425;**
18     **(d)  Against whom an order of protection has been issued, including a foreign order**
19 **of protection given full faith and credit in this state under section 455.067;**
20     **(e)  Whose custodial, parental, or guardianship rights have been terminated by a**
21 **court of competent jurisdiction; or**
22     **(f)  Whose whereabouts are unknown after reasonable inquiry, who is a fugitive**
23 **from justice, who is habitually in an intoxicated or drugged condition, or who has been**
24 **declared mentally incompetent or incapacitated by a court of competent jurisdiction; [or]**
25     (2)  The minor is emancipated and the attending physician has received the informed
26 written consent of the minor; **[or]**
27     (3)  The minor has been granted the right to self-consent to the abortion by court order
28 pursuant to subsection 2 of this section, and the attending physician has received the informed
29 written consent of the minor; or
30     (4)  The minor has been granted consent to the abortion by court order, and the court has
31 given its informed written consent in accordance with subsection 2 of this section, and the minor
32 is having the abortion willingly, in compliance with subsection 3 of this section.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                   22

33       2.  The right of a minor to self-consent to an abortion under subdivision (3) of subsection
34  1 of this section or court consent under subdivision (4) of subsection 1 of this section may be
35  granted by a court pursuant to the following procedures:

36       (1)  The minor or next friend shall make an application to the juvenile court which shall
37  assist the minor or next friend in preparing the petition and notices required pursuant to this
38  section.  The minor or the next friend of the minor shall thereafter file a petition setting forth the
39  initials of the minor; the age of the minor; the names and addresses of each parent, guardian, or,
40  if the minor's parents are deceased and no guardian has been appointed, any other person
41  standing in loco parentis of the minor; that the minor has been fully informed of the risks and
42  consequences of the abortion; that the minor is of sound mind and has sufficient intellectual
43  capacity to consent to the abortion; that, if the court does not grant the minor majority rights for
44  the purpose of consent to the abortion, the court should find that the abortion is in the best
45  interest of the minor and give judicial consent to the abortion; that the court should appoint a
46  guardian ad litem of the child; and if the minor does not have private counsel, that the court
47  should appoint counsel.  The petition shall be signed by the minor or the next friend;

48       (2)  A hearing on the merits of the petition, to be held on the record, shall be held as soon
49  as possible within five days of the filing of the petition.  If any party is unable to afford counsel,
50  the court shall appoint counsel at least twenty-four hours before the time of the hearing.  At the
51  hearing, the court shall hear evidence relating to the emotional development, maturity, intellect
52  and understanding of the minor; the nature, possible consequences, and alternatives to the
53  abortion; and any other evidence that the court may find useful in determining whether the minor
54  should be granted majority rights for the purpose of consenting to the abortion or whether the
55  abortion is in the best interests of the minor;

56       (3)  In the decree, the court shall for good cause:

57       (a)   Grant the petition for majority rights for the purpose of consenting to the abortion;
58  [or]

59       (b)  Find the abortion to be in the best interests of the minor and give judicial consent to
60  the abortion, setting forth the grounds for so finding; or

61       (c)  Deny the petition, setting forth the grounds on which the petition is denied;

62       (4)  If the petition is allowed, the informed consent of the minor, pursuant to a court grant
63  of majority rights, or the judicial consent, shall bar an action by the parents or guardian of the
64  minor on the grounds of battery of the minor by those performing **or inducing** the abortion.  The
65  immunity granted shall only extend to the performance **or induction** of the abortion in
66  accordance herewith and any necessary accompanying services which are performed in a
67  competent manner.  The costs of the action shall be borne by the parties;

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                  23

68      (5)  An appeal from an order issued under the provisions of this section may be taken to
69  the court of appeals of this state by the minor or by a parent or guardian of the minor.  The notice
70  of intent to appeal shall be given within twenty-four hours from the date of issuance of the order.
71  The record on appeal shall be completed and the appeal shall be perfected within five days from
72  the filing of notice to appeal.  Because time may be of the essence regarding the performance **or**
73  **induction** of the abortion, the supreme court of this state shall, by court rule, provide for
74  expedited appellate review of cases appealed under this section.

75      3.  If a minor desires an abortion, then she shall be orally informed of and, if possible,
76  sign the written consent required [by section 188.039] **under this chapter** in the same manner
77  as an adult person.  No abortion shall be performed **or induced** on any minor against her will,
78  except that an abortion may be performed **or induced** against the will of a minor pursuant to a
79  court order described in subdivision (4) of subsection 1 of this section that the abortion is
80  necessary to preserve the life of the minor.

    **188.033.  Whenever an abortion facility or a family planning agency located in this**
2  **state, or any of its agents or employees acting within the scope of his or her authority or**
3  **employment, provides to a woman considering an abortion the name, address, telephone**
4  **number, or website of an abortion provider that is located outside of the state, such**
5  **abortion facility or family planning agency or its agents or employees shall also provide to**
6  **such woman the printed materials produced by the department under section 188.027.  If**
7  **the name, address, telephone number, or website of such abortion provider is not provided**
8  **to such woman in person, such printed materials shall be offered to her, and if she chooses,**
9  **sent to such woman at no cost to her the same day or as soon as possible either**
10 **electronically or by U.S. mail overnight delivery service or by other overnight or same-day**
11 **delivery service to an address of such woman's choosing.  The department shall furnish**
12 **such printed materials at no cost and in sufficient quantities to abortion facilities and**
13 **family planning agencies located within the state.**

    **188.038.  1.  The general assembly of this state finds that:**

2      **(1)  Removing vestiges of any past bias or discrimination against pregnant women,**
3  **their partners, and their family members, including their unborn children, is an important**
4  **task for those in the legal, medical, social services, and human services professions;**

5      **(2)  Ending any current bias or discrimination against pregnant women, their**
6  **partners, and their family members, including their unborn children, is a legitimate**
7  **purpose of government in order to guarantee that those who "are endowed by their**
8  **Creator with certain unalienable Rights" can enjoy "Life, Liberty and the pursuit of**
9  **Happiness";**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    24

10      **(3)  The historical relationship of bias or discrimination by some family planning**
11  **programs and policies towards poor and minority populations, including, but not limited**
12  **to, the nonconsensual sterilization of mentally ill, poor, minority, and immigrant women**
13  **and other coercive family planning programs and policies, must be rejected;**
14      **(4)  Among Missouri residents, the rate of black or African-American women who**
15  **undergo abortions is significantly higher, about three and a half times higher, than the rate**
16  **of white women who undergo abortions.  Among Missouri residents, the rate of black or**
17  **African-American women who undergo repeat abortions is significantly higher, about one**
18  **and a half times higher, than the rate of white women who undergo repeat abortions;**
19      **(5)  Performing or inducing an abortion because of the sex of the unborn child is**
20  **repugnant to the values of equality of females and males and the same opportunities for**
21  **girls and boys, and furthers a false mindset of female inferiority;**
22      **(6)  Government has a legitimate interest in preventing the abortion of unborn**
23  **children with Down Syndrome because it is a form of bias or disability discrimination and**
24  **victimizes the disabled unborn child at his or her most vulnerable stage.  Eliminating**
25  **unborn children with Down Syndrome raises grave concerns for the lives of those who do**
26  **live with disabilities.  It sends a message of dwindling support for their unique challenges,**
27  **fosters a false sense that disability is something that could have been avoidable, and is**
28  **likely to increase the stigma associated with disability.**
29      **2.  No person shall perform or induce an abortion on a woman if the person knows**
30  **that the woman is seeking the abortion solely because of a prenatal diagnosis, test, or**
31  **screening indicating Down Syndrome or the potential of Down Syndrome in an unborn**
32  **child.**
33      **3. No person shall perform or induce an abortion on a woman if the person knows**
34  **that the woman is seeking the abortion solely because of the sex or race of the unborn child.**
35      **4.  Any physician or other person who performs or induces or attempts to perform**
36  **or induce an abortion prohibited by this section shall be subject to all applicable civil**
37  **penalties under this chapter including, but not limited to, sections 188.065 and 188.085.**
        188.043.  1.  No person shall perform or induce [a surgical or medical] **an** abortion **on**
2  **another** unless such person has [proof of] medical malpractice insurance with coverage amounts
3  of at least [five hundred thousand dollars] **one million dollars per occurrence and three**
4  **million dollars in the annual aggregate**.
5      2.  For the purpose of this section, "medical malpractice insurance" means insurance
6  coverage against the legal liability of the insured and against loss, damage, or expense incident
7  to a claim arising out of the death or injury of any person as a result of the negligence or
8  malpractice in rendering professional service by any health care provider.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    25

9      3.  No abortion facility or hospital shall employ or engage the services of a person to
10 perform [one or more abortions] **or induce an abortion on another** if the person does not have
11 [**proof of**] medical malpractice insurance pursuant to this section, except **that** the abortion facility
12 or hospital may provide medical malpractice insurance for the services of persons employed or
13 engaged by such facility or hospital **which is no less than the coverage amounts set forth in**
14 **this section**.
15      4.  Notwithstanding the provisions of section 334.100, failure of a person to maintain the
16 medical malpractice insurance required by this section shall be an additional ground for
17 sanctioning of a person's license, certificate, or permit.

     **188.044.  1.  When a drug or chemical, or combination thereof, used by a person to**
2 **induce an abortion carries a warning from its manufacturer or distributor, a peer-**
3 **reviewed medical journal article, or a Food and Drug Administration label that its use may**
4 **cause birth defects, disability, or other injury in a child who survives the abortion, then in**
5 **addition to the requirements of section 188.043, such person shall also carry tail insurance**
6 **with coverage amounts of at least one million dollars per occurrence and three million**
7 **dollars in the annual aggregate for personal injury to or death of a child who survives such**
8 **abortion.  Such policy shall be maintained in force or be in effect for a period of twenty-one**
9 **years after the person used the drug or chemical, or combination thereof, to induce the**
10 **abortion.**
11      **2.  For the purpose of this section, "tail insurance" means insurance which covers**
12 **the legal liability of the insured once a medical malpractice insurance policy is cancelled,**
13 **not renewed, or terminated, and covers claims made after such cancellation or termination**
14 **for acts occurring during the period the prior medical malpractice insurance was in effect.**
15      **3.  No abortion facility or hospital shall employ or engage the services of a person**
16 **to induce an abortion on another using any drug or chemical, or combination thereof,**
17 **which may cause birth defects, disability, or other injury in a child who survives the**
18 **abortion, if the person does not have tail insurance pursuant to this section, except that the**
19 **abortion facility or hospital may provide tail insurance for the services of persons**
20 **employed or engaged by such facility or hospital which is no less than the coverage**
21 **amounts and duration set forth in this section.**
22      **4.  Notwithstanding the provisions of section 334.100 to the contrary, failure of a**
23 **person to maintain the tail insurance required by this section shall be an additional ground**
24 **for sanctioning of a person's license, certificate, or permit.**

     188.052.  1.  An individual abortion report for each abortion performed or induced upon
2 a woman shall be completed by [her attending] the physician **who performed or induced the**
3 **abortion.  Abortion reports shall include, but not be limited to, a certification that the**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                      26

4   **physician does not have any knowledge that the woman sought the abortion solely because**
5   **of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of**
6   **Down Syndrome in the unborn child and a certification that the physician does not have**
7   **any knowledge that the woman sought the abortion solely because of the sex or race of the**
8   **unborn child.**

9       2.  An individual complication report for any post-abortion care performed upon a woman
10  shall be completed by the physician providing such post-abortion care.  This report shall include:

11      (1)  The date of the abortion;

12      (2)  The name and address of the abortion facility or hospital where the abortion was
13  performed **or induced**;

14      (3)  The nature of the abortion complication diagnosed or treated.

15      3.  All abortion reports shall be signed by the attending physician[,] **who performed or**
16  **induced the abortion** and submitted to the [state] department [of health and senior services]
17  within forty-five days from the date of the abortion.  All complication reports shall be signed by
18  the physician providing the post-abortion care and submitted to the department [of health and
19  senior services] within forty-five days from the date of the post-abortion care.

20      4.  A copy of the abortion report shall be made a part of the medical record of the patient
21  of the **abortion** facility or hospital in which the abortion was performed **or induced**.

22      5.  The [state] department [of health and senior services] shall be responsible for
23  collecting all abortion reports and complication reports and collating and evaluating all data
24  gathered therefrom and shall annually publish a statistical report based on such data from
25  abortions performed **or induced** in the previous calendar year.

    **188.056.  1.  Notwithstanding any other provision of law to the contrary, no abortion**
2   **shall be performed or induced upon a woman at eight weeks gestational age or later, except**
3   **in cases of medical emergency.  Any person who knowingly performs or induces an**
4   **abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,**
5   **as well as subject to suspension or revocation of his or her professional license by his or her**
6   **professional licensing board.  A woman upon whom an abortion is performed or induced**
7   **in violation of this subsection shall not be prosecuted for a conspiracy to violate the**
8   **provisions of this section.**

9       **2.  It shall be an affirmative defense for any person alleged to have violated the**
10  **provisions of subsection 1 of this section that the person performed or induced an abortion**
11  **because of a medical emergency.  The defendant shall have the burden of persuasion that**
12  **the defense is more probably true than not.**

13      **3.  Prosecution under this section shall bar prosecution under sections 188.057,**
14  **188.058, or 188.375 if prosecution under such sections would violate the provisions of**

15  Amendment V to the  Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.
17        4. If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this  section or the application thereof to any person, circumstance, or period of
19  gestational age  is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity.  The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words
25  of the section, or the application of the  section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.
        188.057.  1.  Notwithstanding any other provision of law to the contrary, no abortion
2  shall be performed or induced upon a woman at fourteen weeks gestational age or later,
3  except in cases of medical emergency.  Any person who knowingly performs or induces an
4  abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,
5  as well as subject to suspension or revocation of his or her professional license by his or her
6  professional licensing board.  A woman upon whom an abortion is performed or induced
7  in violation of this subsection shall not be prosecuted for a conspiracy to violate the
8  provisions of this section.
9        2.  It shall be an affirmative defense for any person alleged to have violated the
10  provisions of subsection 1 of this section that the person performed or induced an abortion
11  because of a medical emergency.  The defendant shall have the burden of persuasion that
12  the defense is more probably true than not.
13        3.  Prosecution  under this section shall bar prosecution under sections 188.056,
14  188.058, or 188.375 if prosecution under such sections would violate the provisions of
15  Amendment V to the  Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.
17        4.  If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this  section or the application thereof to any person, circumstance, or period of
19  gestational age is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity.  The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

25  of the section, or the application of the section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.

188.058.  1.  Notwithstanding any other provision of law to the contrary, no abortion
2  shall be performed or induced upon a woman at eighteen weeks gestational age or later,
3  except in cases of medical emergency.  Any person who knowingly performs or induces an
4  abortion of an unborn child in violation of this subsection shall be guilty of a class B felony,
5  as well as subject to suspension or revocation of his or her professional license by his or her
6  professional licensing board.  A woman upon whom an abortion is performed or induced
7  in violation of this section shall not be prosecuted for a conspiracy to violate the provisions
8  of this section.

9  2.  It shall be an affirmative defense for any person alleged to have violated the
10  provisions of subsection 1 of this section that the person performed or induced an abortion
11  because of a medical emergency.  The defendant shall have the burden of persuasion that
12  the defense is more probably true than not.

13  3.  Prosecution under this section shall bar prosecution under sections 188.056,
14  188.057, or 188.375 if prosecution under such sections would violate the provisions of
15  Amendment V to the Constitution of the United States or article I, section 19 of the
16  Constitution of Missouri.

17  4. If any one or more provisions, subsections, sentences, clauses, phrases, or words
18  of this section or the application thereof to any person, circumstance, or period of
19  gestational age is found to be unenforceable, unconstitutional, or invalid by a court of
20  competent jurisdiction, the same is hereby declared to be severable and the balance of the
21  section shall remain effective notwithstanding such unenforceability, unconstitutionality,
22  or invalidity. The general assembly hereby declares that it would have passed this section,
23  and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of
24  the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words
25  of the section, or the application of the section to any person, circumstance, or period of
26  gestational age, would be declared unenforceable, unconstitutional, or invalid.

188.375.  1.  This section shall be known and may be cited as the "Late-Term Pain-
2  Capable Unborn Child Protection Act".

3  2.  As used in this section, the phrase "late-term pain-capable unborn child" shall
4  mean an unborn child at twenty weeks gestational age or later.

5  3.  Notwithstanding any other provision of law to the contrary, no abortion shall be
6  performed or induced upon a woman carrying a late-term pain-capable unborn child,
7  except in cases of medical emergency.  Any person who knowingly performs or induces an
8  abortion of a late-term pain-capable unborn child in violation of this subsection shall be

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                    29

9   guilty of a class B felony, as well as subject to suspension or revocation of his or her
10  professional license by his or her professional licensing board.  A woman upon whom an
11  abortion is performed or induced in violation of this subsection shall not be prosecuted for
12  a conspiracy to violate the provisions of this subsection.
13      4.  It shall be an affirmative defense for any person alleged to have violated the
14  provisions of subsection 3 of this section that the person performed or induced an abortion
15  because of a medical emergency.  The defendant shall have the burden of persuasion that
16  the defense is more probably true than not.
17      5.  Prosecution under subsection 3 of this section shall bar prosecution under
18  sections 188.056, 188.057, or 188.058 if prosecution under such sections would violate the
19  provisions of Amendment V to the Constitution of the United States or article I, section 19
20  of the Constitution of Missouri.
21      6.  When in cases of medical emergency a physician performs or induces an abortion
22  upon a woman in her third trimester carrying a late-term pain-capable unborn child, the
23  physician shall utilize the available method or technique of abortion most likely to preserve
24  the life or health of the unborn child.  In cases where the method or technique of abortion
25  most likely to preserve the life or health of the unborn child would present a greater risk
26  to the life or health of the woman than another legally permitted and available method or
27  technique, the physician may utilize such other method or technique.  In all cases where
28  the physician performs or induces an abortion upon a woman during her third trimester
29  carrying a late-term pain-capable unborn child, the physician shall certify in writing the
30  available method or techniques considered and the reasons for choosing the method or
31  technique employed.
32      7.  When in cases of medical emergency a physician performs or induces an abortion
33  upon a woman during her third trimester carrying a late-term pain-capable unborn child,
34  there shall be in attendance a physician other than the physician performing or inducing
35  the abortion who shall take control of and provide immediate medical care for a child born
36  as a result of the abortion.
37      8.  Any physician who knowingly violates any of the provisions of subsections 6 or
38  7 of this section shall be guilty of a class D felony, as well as subject to suspension or
39  revocation of his or her professional license by his or her professional licensing board.  A
40  woman upon whom an abortion is performed or induced in violation of subsections 6 or
41  7 of this section shall not be prosecuted for a conspiracy to violate the provisions of those
42  subsections.
43      9.  If any one or more provisions, subsections, sentences, clauses, phrases, or words
44  of this section or the application thereof to any person, circumstance, or period of

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

SS SCS HB 126                                  30

45  **gestational age is found to be unenforceable, unconstitutional, or invalid by a court of**
46  **competent jurisdiction, the same is hereby declared to be severable and the balance of the**
47  **section shall remain effective notwithstanding such unenforceability, unconstitutionality,**
48  **or invalidity.  The general assembly hereby declares that it would have passed this section,**
49  **and each provision, subsection, sentence, clause, phrase, or word thereof, irrespective of**
50  **the fact that any one or more provisions, subsections, sentences, clauses, phrases, or words**
51  **of the section, or the application of the section to any person, circumstance, or period of**
52  **gestational age, would be declared unenforceable, unconstitutional, or invalid.**

Section B.  The enactment of section 188.017 of this act shall only become effective upon
2  notification to the revisor of statutes by an opinion by the attorney general of Missouri, a
3  proclamation by the governor of Missouri, or the adoption of a concurrent resolution by the
4  Missouri general assembly that:

5  (1)  The United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*,
6  410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate
7  abortion to the extent set forth in section 188.017, and that as a result, it is reasonably probable
8  that section 188.017 of this act would be upheld by the court as constitutional;

9  (2)  An amendment to the Constitution of the United States has been adopted that has the
10  effect of restoring or granting to the state of Missouri the authority to regulate abortion to the
11  extent set forth in section 188.017; or

12  (3)  The United States Congress has enacted a law that has the effect of restoring or
13  granting to the state of Missouri the authority to regulate abortion to the extent set forth in
14  section 188.017.

Section C.  Because of the need to protect the health and safety of women and their
2  children, both unborn and born, the repeal and reenactment of section 188.028 of this act is
3  deemed necessary for the immediate preservation of the public health, welfare, peace and safety,
4  and is hereby declared to be an emergency act within the meaning of the constitution, and the
5  repeal and reenactment of section 188.028 of this act shall be in full force and effect upon its
6  passage and approval.

✓

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM



## ATTORNEY GENERAL OF MISSOURI
## ERIC SCHMITT

June 24, 2022

**VIA EMAIL AND HAND DELIVERY**

OPINION LETTER NO. 22-2022

To:   Revisor of Statutes
      State Capitol Building
      201 W. Capitol Avenue, Room 117A
      Jefferson City, Missouri 65101-1556
      (573) 751-4223
      revision@lr.mo.gov

From: Eric S. Schmitt, Attorney General of Missouri

Re:   **Immediate Efficacy of Section 188.017, RSMo**

Section 188.017, RSMo, known as the "Right to Life of the Unborn Child Act," prohibits abortion except in cases of medical emergency.  The statute provides:

> Notwithstanding any other provision of law to the contrary, no abortion shall be performed or induced upon a woman, except in cases of medical emergency. Any person who knowingly performs or induces an abortion of an unborn child in violation of this subsection shall be guilty of a class B felony, as well as subject to suspension or revocation of his or her professional license by his or her professional licensing board.  A woman upon whom an abortion is performed or induced in violation of this subsection shall not be prosecuted for a conspiracy to violate the provisions of this subsection.

§ 188.017.2, RSMo.  The statute further provides that "[i]t shall be an affirmative defense for any person alleged to have violated the provisions of subsection 2 of this section that the person performed or induced an abortion because of a medical emergency.  The defendant shall have the burden of persuasion that the defense is more probably true than not."  § 188.017.3, RSMo.

This law was passed with a contingent effective date.  Section B of House Bill 126 (2019), which is codified at § 188.017.4, RSMo, provides as follows:

**Supreme Court Building**
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-0774
www.ago.mo.gov

EXHIBIT B

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

4.  The enactment of this section shall only become effective upon notification to the revisor of statutes by an opinion by the attorney general of Missouri, a proclamation by the governor of Missouri, or the adoption of a concurrent resolution by the Missouri general assembly that:

(1)  The United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section, and that as a result, it is reasonably probable that this section would be upheld by the court as constitutional;

(2)  An amendment to the Constitution of the United States has been adopted that has the effect of restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section; or

(3)  The United States Congress has enacted a law that has the effect of restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in this section.

§ 188.017.4, RSMo.

By issuing this Attorney General Opinion and providing it directly to you, I hereby provide notification to the Revisor of Statutes, pursuant to § 188.017.4(1), that the United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate abortion to the extent set forth in § 188.017, RSMo, and that as a result, it is reasonably probable that § 188.017 would be upheld by the court as constitutional.

The Supreme Court's then-controlling plurality opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), stated that the "central holding" of *Roe v. Wade*, 410 U.S. 113 (1973), was "that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions." *Casey*, 505 U.S. at 860. *Casey* described this statement as *Roe*'s "central holding," "central principle," and/or "essential holding," at least nine times. *Id.* at 860, 861, 864, 865, 870, 871, 873, 879. *Casey* stated that it was declining to overrule that "central holding" of *Roe v. Wade*. But today, in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (U.S.), the Supreme Court has overruled both *Roe* and *Casey*.

I therefore conclude that "[t]he United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973)," and in doing so, the Supreme Court has "restor[ed] or grant[ed] to the state of Missouri the authority to regulate abortion to the extent set forth in this section." § 188.017.4(1), RSMo. I further conclude that, "as a result, it is reasonably probable that [§ 188.017, RSMo] would be upheld by the [U.S. Supreme Court] as constitutional." *Id.* *Dobbs* has overruled and fatally undermined both *Roe* and *Casey*. There is no jurisprudential basis for any further application of those defunct precedents.

2

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

This opinion immediately restores Missouri's deeply rooted history and proud tradition of respecting, protecting, and promoting the life of the unborn. Missouri has been a national leader in the pro-life movement, and this leadership is reflected in its laws. Missouri was among the first States to comprehensively prohibit abortion in 1825, and respect for the life of the unborn has been consistently reflected in its statutes for the past 200 years. Just a few months before *Roe v. Wade* was decided, the Supreme Court of Missouri upheld Missouri's statute prohibiting abortion, and it stated that "unborn children have all the qualities and attributes of adult human persons differing only in age or maturity. Medically, human life is a continuum from conception to death." *Rodgers v. Danforth*, 486 S.W.2d 258, 259 (Mo. banc 1972). This decision reaffirmed the Supreme Court of Missouri's previous decisions, which had long recognized that "[b]iologically speaking, the life of a human being begins at the moment of conception in the mother's womb," and that "[f]rom the viewpoint of the civil law and the law of property," an unborn child "is not only regarded as human being, but as such from the moment of conception—which it is in fact." *Steggall v. Morris*, 258 S.W.2d 577, 579 (Mo. banc 1953).

Even after *Roe* was decided, Missouri's laws continued to provide the highest possible level of protection to the unborn. Among many other examples, Section 1.205, enacted in 1986, provides that: "(1) The life of each human being begins at conception; (2) Unborn children have protectable interests in life, health, and well-being; [and] (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child." § 1.205.1, RSMo. It also provides that "the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state." § 1.205.2, RSMo. Section 188.010, enacted in 2019, provides: "In recognition that Almighty God is the author of life, that all men and women are 'endowed by their Creator with certain unalienable Rights, that among these are Life,' and that Article I, Section 2 of the Constitution of Missouri provides that all persons have a natural right to life, it is the intention of the general assembly of the state of Missouri to: (1) Defend the right to life of all humans, born and unborn; (2) Declare that the state and all of its political subdivisions are a 'sanctuary of life' that protects pregnant women and their unborn children; and (3) Regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes." § 188.010, RSMo.

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

Today, the overruling of *Roe* and *Casey* permits Missouri to renew its proud pro-life traditions and restore basic legal protection for the most fundamental of human rights—the right to life.

Very truly yours,

Eric S. Schmitt
Attorney General of Missouri

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

## RESOLUTION NUMBER 141
## DECLARATION OF OUR FUNDAMENTAL REPRODUCTIVE FREEDOMS

**WHEREAS**, we are experiencing unprecedented attacks on Reproductive autonomy, Freedom, and Justice at both the federal and state levels of government; and

**WHEREAS**, the Supreme Court of the United States established in 1973 the constitutional right to make informed, private medical decisions with the landmark *Roe v. Wade* decision; and

**WHEREAS**, the Supreme Court of the United States is in 2022 deciding whether to uphold the Roe v. Wade decision, and could end the legal right to abortion in the United States; and

**WHEREAS**, Missouri's so-called "trigger ban" law could outlaw abortion in the state as soon as *Roe v. Wade* is overturned; and

**WHEREAS**, in addition to the Mississippi abortion ban being considered by the Supreme Court, there are currently 15 abortion cases one step from the Supreme Court; and

**WHEREAS**, the State of Missouri has a documented history of infringing on individual's reproductive decision-making, including restricting people's access to their health care providers of choice; and

**WHEREAS**, our ability to access sexual and reproductive health care and resources directly impacts our emotional, physical, and socioeconomic stability and safety; and

**WHEREAS**, the City of St. Louis Board of Aldermen share a commitment to preserving and expanding opportunities for all St. Louisans to thrive; and

**WHEREAS**, the right to maintain personal bodily autonomy is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to make personal decisions about if, when, and how to establish a family, including decisions about abortion, is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to access medically accurate information about all of our health care options, without judgement, harassment, or coercion is fundamental to our Reproductive Freedom; and

**WHEREAS**, the ability to have a safe and healthy pregnancy on our own terms is fundamental to our future and our collective Reproductive Freedom; and

**WHEREAS**, the ability to live and raise children in healthy, safe communities with the support we need to thrive is fundamental to our Reproductive Freedom.

**NOW THEREFORE BE IT RESOLVED**, by this Honorable Board of Aldermen of the City of St. Louis that we pause in our deliberations to declare the City of Saint Louis a sexual and reproductive health care safe zone, ensuring the people's rights to Reproductive Freedom, and naming these rights as fundamental to the policies

EXHIBIT C

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

and practices of this body. We further direct the Clerk of this Board to spread a copy of this Resolution across the minutes of these proceedings.

**Introduced this 23rd day of November, 2021 by:**
**The Honorable Bill Stephens, Alderman 12th Ward**
**The Honorable Christine Ingrassia, Alderwoman 6th Ward**
**The Honorable Annie Rice, Alderwoman 8th Ward**
**The Honorable Anne Schweitzer, Alderwoman 13th Ward**
**The Honorable Dan Guenther, Alderman 9th Ward**
**The Honorable Tina Pihl, Alderwoman 17th Ward**
**The Honorable Sharon Tyus, Alderwoman 1st Ward**
**The Honorable Shane Cohn, Alderman 25th Ward**
**The Honorable Marlene Davis, Alderwoman 19th Ward**
**The Honorable James Page, Alderman 5th Ward**
**The Honorable Dwinderlin Evans, Alderwoman 4th Ward**
**The Honorable Megan Green, Alderwoman 15th Ward**
**The Honorable Lisa Middlebrook, Alderwoman 2nd Ward**
**The Honorable Jesse Todd, Alderman 18th Ward**
**The Honorable Pamela Boyd, Alderwoman 27th Ward**

**Adopted this 3rd day of December, 2021 as attested by:**


**_____**                    **_____**
**Terry Kennedy**                                               **Lewis Reed**
**Clerk, Board of Aldermen**                            **President, Board of Aldermen**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**Summary**
**Board Bill Number 61**
**Committee Substitute**
**Introduced by Alderwoman Annie Rice**
**June 24, 2022**

An Ordinance recommended by the Board of Estimate and Apportionment appropriating a portion of funds received under the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901 (March 4, 2021) (ARPA) to the St. Louis Department of Health for a new Reproductive Equity Fund and COVID-19 testing, treatment, and vaccination, authorizing contracts to expend the funds, to the extent received; containing a severability clause; and containing an emergency clause.

EXHIBIT D

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**BOARD BILL NUMBER 61 COMMITTEE SUBSTITUTE INTRODUCED BY ALDERWOMAN ANNIE RICE/ ALDERWOMAN TINA PIHL/ ALDERWOMAN SHAMEEM CLARK-HUBBARD/ ALDERWOMAN CHRISTINE INGRASSIA/ ALDERMAN JOHN COATAR/ ALDERWOMAN MEGAN GREEN/ ALDERWOMAN ANNE SCHWEITZER/ALDERMAN DAN GUENTHER/ALDERMAN JESSE TODD/ ALDERMAN SHANE COHN/ALDERMAN MICHAEL GRAS**

1   An Ordinance recommended by the Board of Estimate and Apportionment appropriating

2   a portion of funds received under the American Rescue Plan Act of 2021, Pub. L. No. 117-2, §

3   9901 (March 4, 2021) (ARPA) to the St. Louis Department of Health, authorizing contracts to

4   expend the funds, to the extent received; containing a severability clause; and containing an

5   emergency clause.

6   **WHEREAS**, the City received Two Hundred Forty-Nine Million Thirty-Eight Thousand

7   Twenty-Seven Dollars ($249,038,027.00) in 2021 from the Coronavirus Local Fiscal Recovery

8   Fund under ARPA and Two Hundred Forty-Nine Million Thirty-Eight Thousand Twenty-Seven

9   Dollars $249,038,027.00 from such fund  in the calendar year 2022 (collectively, the "ARPA

10  Funds");

11  **WHEREAS**, the City previously has appropriated $249,038,027.00 of the ARPA Funds;

12  **WHEREAS**, ARPA Funds may be used "to respond to the public health emergency with

13  respect to the Coronavirus Disease 2019 (COVID 19) or its negative economic impacts;"

14  **WHEREAS**, the COVID-19 pandemic has strained access to comprehensive

15  reproductive healthcare;

16  **WHEREAS**, the St. Louis Board of Aldermen passed a resolution affirming that every

17  individual living in St. Louis' rights to maintain personal bodily autonomy, make personal

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

1   decisions about if, when, and how to establish a family, including decisions about abortion,  to

2   access medically accurate information about all of our health care options, without judgement,

3   harassment, or coercion, and to have safe and healthy pregnancy on our own terms so that we

4   can raise our families in healthy, safe communities with the support we need to thrive;

5   **WHEREAS**,  more than one in four people living in St. Louis City are surviving

6   economic insecurity below the federal poverty line and that approximately one in five people

7   living in St. Louis City are not covered by health insurance.

8   **WHEREAS**, the COVID-19 public health crisis exacerbated existing social and

9   economic inequities and Women, Black women, and mothers are at the lowest workforce

10   participation rate in 30 years;

11   **WHEREAS**, COVID-19 precautions have disrupted how individuals access reproductive

12   healthcare including birth control, annual exams, and family planning services;

13   **WHEREAS**, the Missouri Pregnancy-Associated Mortality Review 2018 Report,

14   published in 2021, found that for Missourians who choose to continue their pregnancies, the

15   pregnancy-related mortality ratio (PRMR) is one of the highest in the country and four times

16   greater for Black women than white women at 87.6 per 100,000 live births;

17   **WHEREAS**, St. Louisans have identified the need for culturally-competent and trauma-

18   informed care, specifically naming the need for doulas and health advocates to support

19   navigating the medical system; and

**Page 2 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

1      **WHEREAS**, doula and lactation support are proven measures to improve outcomes for

2    pregnant people;

3      **WHEREAS**, the COVID-19 pandemic is ongoing and has significant negative impacts

4    for individuals;

5      **WHEREAS**, the Health Resources and Services Administration has recently ended its

6    program for the testing, vaccination, and treatment of individuals without insurance,

7    **BE IT ORDAINED BY THE CITY OF ST. LOUIS AS FOLLOWS:**

8    **SECTION ONE**. There is hereby appropriated the sum of One Million Dollars ($1,000,000) of

9    the ARPA Funds appropriated to the City to the St. Louis Department of Health. The Department

10    of Health will establish a process to allocate the funds to community partners through grants as

11    part of a new Reproductive Equity Fund dedicated to logistical support. These grants will not be

12    used to fund or assist abortion procedures nor shall funds be used to encourage or counsel an

13    individual to have an abortion. Grant funds will be used to provide access to abortion through

14    logistical support including but not limited to the funding of childcare, transportation, and other

15    logistical support needs. The Director of the Department of Health is  authorized to make,

16    negotiate, and execute any and all contracts or other documents on behalf of the City to expend

17    such funds and to expend such funds on behalf of the City for the purposes described on **Exhibit**

18    **A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury for

19    payment of all expenditures authorized in this Section provided that such warrants do not exceed

20    the total amount of funds appropriated by this Section.

**Page 3 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

1    **SECTION TWO**. There is hereby appropriated the sum of Five Hundred Thousand Dollars

2    ($500,000) of the ARPA Funds appropriated to the City to the St. Louis Department of Health.

3    The Department of Health will establish a process to allocate the funds to community partners

4    through grants as part of a Reproductive Equity Fund dedicated to community needs. Allocations

5    through this fund will support infrastructure and operations for organizations already providing

6    direct services to support reproductive healthcare access in the region including access to doulas

7    and lactation support. The Director of the Department of Health is authorized to make, negotiate,

8    and execute any and all contracts or other documents on behalf of the City to expend such funds

9    and to expend such funds on behalf of the City for the purposes described on **Exhibit A**.  The

10   Comptroller is authorized and directed to issue warrants upon the City Treasury for payment of

11   all expenditures authorized in this Section provided that such warrants do not exceed the total

12   amount of funds appropriated by this Section.

13   **SECTION THREE.** There is hereby appropriated the sum of Two Hundred and Fifty Thousand

14   Dollars ($250,000) of the ARPA Funds appropriated to the City to the St. Louis Department of

15   Health. These funds will be used to provide administrative oversight and evaluation for the

16   Reproductive Equity Program and Fund. The Director of the Department of Health is authorized

17   to make, negotiate, and execute any and all contracts or other documents on behalf of the City to

18   expend such funds and to expend such funds on behalf of the City for the purposes described on

19   **Exhibit A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury

20   for payment of all expenditures authorized in this Section provided that such warrants do not

21   exceed the total amount of funds appropriated by this Section.

**Page 4 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

1   **SECTION FOUR.** There is hereby appropriated the sum of One Million Six Hundred and

2   Thirty Six Thousand Dollars ($1,636,000) of the ARPA Funds appropriated to the City to the St.

3   Louis Department of Health. These funds will be used to provide testing, treatment, and

4   vaccination for COVID-19. The Director of the Department of Health is authorized to make,

5   negotiate, and execute any and all contracts or other documents on behalf of the City to expend

6   such funds and to expend such funds on behalf of the City for the purposes described on **Exhibit**

7   **A**.  The Comptroller is authorized and directed to issue warrants upon the City Treasury for

8   payment of all expenditures authorized in this Section provided that such warrants do not exceed

9   the total amount of funds appropriated by this Section.

10   SECTION FIVE. There is hereby appropriated the sum of Five Hundred Thousand Dollars

11   ($500,000) of the ARPA Funds appropriated to the City to the St. Louis Department of Health.

12   These funds will be used to incentive cards to support COVID-19 vaccination. The Director of

13   the Department of Health is authorized to make, negotiate, and execute any and all contracts or

14   other documents on behalf of the City to expend such funds and to expend such funds on behalf

15   of the City for the purposes described on **Exhibit A**.  The Comptroller is authorized and directed

16   to issue warrants upon the City Treasury for payment of all expenditures authorized in this

17   Section provided that such warrants do not exceed the total amount of funds appropriated by this

18   Section.

19   **SECTION SIX.** Severability Clause. It is hereby declared to be the intention of the Board of

20   Aldermen that each and every part, section and subsection of this Ordinance shall be separate

21   and severable from each and every other part, section and subsection hereof and that the Board

**Page 5 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

1   of Aldermen intends to adopt each said part, section and subsection separately and independently

2   of any other part, section and subsection. In the event that any part, section or  subsection of this

3   Ordinance shall be determined to be or to have been unlawful or unconstitutional, the remaining

4   parts, sections and subsections shall be and remain in full force and effect, unless the court

5   making such finding shall determine that the valid portions standing alone are incomplete and are

6   incapable of being executed in accord with the legislative intent.

7   **SECTION SEVEN.** Emergency Clause. Delay in receipt and appropriation of these monies  will

8   increase threats to the public health and welfare by causing delay in responding to the fiscal  and

9   other impacts caused by the COVID-19 crisis. This being an ordinance appropriated for

10  emergency funding for current expenses of the City government, it is hereby declared to be an

11  emergency measure within the meaning of Sections 19 and 20 of Article IV of the Charter of the

12  City of St. Louis and shall become effective immediately upon its passage and approval by the

13  Mayor.

**Page 6 of 6**
**Board Bill Number 61**
**Committee Substitute**
**Rice**
**June 24, 2022**

Electronically Filed - City of St. Louis - July 21, 2022 - 02:54 PM

**Board Bill Number 61**
**Committee Substitute**

**Exhibit A**

| | | |
|---|---|---|
| Department of Health | Reproductive Equity Fund, logistical support | $1,000,000 |
| Department of Health | Reproductive Equity Fund, community needs | $500,000 |
| Department of Health | Program support and evaluation | $250,000 |
| Department of Health | Testing, treatment, and vaccination for COVID-19 | $1,636,000 |
| Department of Health | incentive cards to support COVID-19 vaccination. | $500,000 |
| | **Total** | **$3,886,000** |

Electronically Filed - City of St. Louis - July 25, 2022 - 02:01 PM

In the
# CIRCUIT COURT
### City of St. Louis, Missouri

The State of Missouri ex rel. Eric S. Schmitt;
_____
Plaintiff/Petitioner

vs.

The City of St. Louis, et al.
_____
Defendant/Respondent

For File Stamp Only

July 25, 2022
_____
Date

2222-CC08920
_____
Case number

18
_____
Division

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  the State of Missouri ex rel. Eric S. Schmitt, Plaintiff _____, pursuant
Requesting Party
to Local Rule 14, requests the appointment by the Circuit Clerk of

| Jose Pineiro | 1430 Washington Ave. St. Louis 63103 | (314) 825-5512 |
|---|---|---|
| Name of Process Server | Address | Telephone |
| Missouri Process Serving | 1430 Washington Ave. St. Louis 63103 | (314) 825-5512 |
| Name of Process Server | Address | Telephone |
|  |  |  |
| Name of Process Server | Address | Telephone |

to serve the summons and petition in this cause on the below named parties.

SERVE:
City of St. Louis
_____
Name
1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Adam L. Layne, Treasurer City of St. Louis
_____
Name
Room 220 City Hall, 1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Darlene Green, Comptroller City of St. Louis
_____
Name
Room 212 City Hall, 1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Dr. Mati Hlatshwayo Davis
_____
Name
Room 4027, 1520 Market
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

Appointed as requested:
**TOM KLOEPPINGER,** Circuit Clerk

By_____
Deputy Clerk

_____
Date

/s/ D. John Sauer
_____
Attorney/Plaintiff/Petitioner
58721
_____
Bar No.
P.O. Box 899, Jefferson City, MO 65102
_____
Address
(573) 751-8870
_____
Phone No.

Electronically Filed - City of St. Louis - July 25, 2022 - 02:01 PM

**RULE 14 SPECIAL PROCESS SERVERS**

1. Any person appointed by the Court or the Circuit Clerk to serve process must have a license issued pursuant to this rule to serve process.

2. Licenses to serve process shall be issued by the Sheriff of the City of St. Louis if the applicant has met the following qualifications:

   a. Is twenty-one years of age or older;

   b. Has a high school diploma or an equivalent level of education;

   c. Has insurance coverage for any errors or omissions occurring in the service of process;

   d. Has not been convicted, pleaded guilty to or been found guilty of any felony, or of any misdemeanor involving moral turpitude; and,

   e. Has passed a training course for the service of process which shall be administered by the Sheriff of the City of St. Louis.

3. Each applicant for a process server license under the provisions of this rule shall provide an affidavit setting forth such person's legal name, current address, any other occupations and current telephone numbers.  Licensed process servers shall immediately notify the Sheriff of the City of St. Louis of any change in the above information, and the failure to do so shall constitute good cause for the revocation of such person's license.

4. The Sheriff of the City of St. Louis shall maintain a list of persons licensed to serve process pursuant to this rule, and shall make such list available to litigants upon request.

5. A photo identification card designed by the Sheriff of the City of St. Louis shall be issued in addition to the license.  No other identification will be allowed.  All licenses must be signed and approved by the Sheriff of the City of St. Louis and the Presiding Judge or his designee.

6. A license fee recommended by the Sheriff and approved by the Court En Banc shall be charged to cover the costs of compiling and maintaining the list of process servers and for the training of such process servers.  The license fees shall be made payable to the Sheriff of the City of St. Louis.

Electronically Filed - City of St. Louis - July 25, 2022 - 02:01 PM

7. A license for service of process issued under this rule may be revoked by the Sheriff with the approval of the Presiding Judge or his designee, for any of the following reasons:

   a. Misrepresentation of duty or authority;

   b. Conviction, guilty plea or finding of guilty of any state or federal felony, or a misdemeanor involving moral turpitude;

   c. Improper use of the license;

   d. Making a false return; or

   e. Any other good cause.

   Provided, no service of process made by an appointed process server with a revoked license shall be void if the Court or Circuit Clerk made the appointment in good faith without knowledge of the license revocation.

8. Any person authorized to serve process may carry a concealed firearm as allowed by Section 506.145, RSMo, only while actually engaged in the service of process and only if the person has passed a firearms qualification test approved by a law enforcement agency; provided, however, that any licensed special process server may file a written waiver of the right to carry a concealed firearm and thereby avoid the requirements of firearm training and testing.  Any violation of this section shall be considered beyond the scope of the privilege to carry a concealed weapon that is granted by the appointment, and shall constitute good cause for the revocation of the license.

9. Applications for the appointment of a special process server shall be made on forms available in the offices of the Sheriff and Circuit Clerk.  Orders Appointing special process servers may list more than one licensed server as alternatives.

10. The licenses granted pursuant to this rule shall be good for two years.  Each person granted a license shall be required to reapply at the expiration of the license and shall be required to provide all the information required in the initial application, including a current police record check.

(Approved 9/28/92; amended 11/23/92; 5/31/95; 12/17/07)



# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>JASON MARK SENGHEISER | Case Number:  2222-CC08920 | |
|---|---|---|
| Plaintiff/Petitioner:<br> STATE OF MISSOURI<br><br><div align="right">vs.</div> | Plaintiff's/Petitioner's Attorney/Address<br>DEAN JOHN SAUER<br>MISSOURI ATTORNEY<br>GENERAL OFFICE<br>PO BOX 899<br>JEFFERSON CITY, MO  65102 | |
| Defendant/Respondent:<br> THE CITY OF ST LOUIS | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Injunction | Please see the attached information for appearing via WebEx.  WebEx connection information may also be found at<br>**http://www.stlcitycircuitcourt.com/** | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  THE CITY OF ST LOUIS
<div align="center">Alias:</div>

1200 MARKET STREET ROOM 200
SAINT LOUIS, MO  63102

<div align="right">

**SPECIAL PROCESS SERVER**

</div>

*COURT SEAL OF*



*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

   ***Due to COVID19 challenges, virtual appearances by Webex.com are also required until further order of this Court. ***

If you have a disability requiring special assistance for your court appearance, please contact the court at least 48 hours in advance of scheduled hearing.

<div align="center">

**July 26, 2022**                                        *Thomas Kloeppinger*

</div>

_____                    _____
<div align="center">Date                                                        Clerk</div>

Further Information:

**Sheriff's or Server's Return**

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
          Printed Name of Sheriff or Server                          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                              Date                                    Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $\_\_\_\_10.00\_\_\_\_\_ |
| Mileage | $_____ (\_\_\_\_\_ miles @ $.\_\_\_\_\_ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.



# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>JASON MARK SENGHEISER | Case Number: 2222-CC08920 | |
|---|---|---|
| Plaintiff/Petitioner:<br> STATE OF MISSOURI | Plaintiff's/Petitioner's Attorney/Address<br>DEAN JOHN SAUER<br>MISSOURI ATTORNEY<br>GENERAL OFFICE<br>PO BOX 899<br>JEFFERSON CITY, MO  65102 | |
| vs. | | |
| Defendant/Respondent:<br> THE CITY OF ST LOUIS | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Injunction | Please see the attached information for appearing via WebEx.  WebEx connection information may also be found at<br>**http://www.stlcitycircuitcourt.com/** | |
| | | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** ADAM L LAYNE
        **Alias:** TREASURER CITY OF ST LOUIS

**1200 MARKET STREET ROOM 220
SAINT LOUIS, MO  63103**

> ### SPECIAL PROCESS SERVER

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

    ***Due to COVID19 challenges, virtual appearances by Webex.com are also required until further order of this Court. ***

If you have a disability requiring special assistance for your court appearance, please contact the court at least 48 hours in advance of scheduled hearing.

**July 26, 2022**

_____
Date

*Thomas Kloeppinger*

_____
Clerk

Further Information:

## Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

_____
Date

_____
Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.



**IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI**

| | |
|---|---|
| Judge or Division:<br>JASON MARK SENGHEISER | **Case Number:  2222-CC08920** |
| Plaintiff/Petitioner:<br> STATE OF MISSOURI | Plaintiff's/Petitioner's Attorney/Address<br>DEAN JOHN SAUER<br>MISSOURI ATTORNEY<br>GENERAL OFFICE<br>PO BOX 899<br>JEFFERSON CITY, MO  65102 |
| vs. | |
| Defendant/Respondent:<br> THE CITY OF ST LOUIS | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 |
| Nature of Suit:<br>CC Injunction | Please see the attached information for appearing via WebEx.  WebEx connection information may also be found at<br>**http://www.stlcitycircuitcourt.com/** |
| | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: DARLENE GREEN
                Alias:  COMPTROLLER CITY OF ST LOUIS

ST LOUIS CITY HALL
1200 MARKET STREET
ROOM 212
SAINT LOUIS, MO  63103

*COURT SEAL OF*



*CITY OF ST LOUIS*

| SPECIAL PROCESS SERVER |
|---|

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

   ***Due to COVID19 challenges, virtual appearances by Webex.com are also required until further order of this Court. ***

If you have a disability requiring special assistance for your court appearance, please contact the court at least 48 hours in advance of scheduled hearing.

| July 26, 2022 | *Thomas Kloeppinger* |
|---|---|
| Date | Clerk |

Further Information:

**Sheriff's or Server's Return**

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                              Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                         Date                                              Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.



## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JASON MARK SENGHEISER | Case Number: 2222-CC08920 |
| Plaintiff/Petitioner:<br> STATE OF MISSOURI | Plaintiff's/Petitioner's Attorney/Address<br>DEAN JOHN SAUER<br>MISSOURI ATTORNEY<br>GENERAL OFFICE<br>PO BOX 899<br>JEFFERSON CITY, MO  65102 |
| vs. | |
| Defendant/Respondent:<br> THE CITY OF ST LOUIS | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 |
| Nature of Suit:<br>CC Injunction | Please see the attached information for appearing via WebEx.  WebEx connection information may also be found at<br>**http://www.stlcitycircuitcourt.com/** |
| | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| The State of Missouri to:  **MATI HLATSHWAYO DAVIS**<br>Alias:  **DIRECTOR OF HEALTH OF ST LOUIS CITY** | |
| **1520 MARKET STREET<br>ROOM 4027<br>SAINT LOUIS, MO  63103** | **SPECIAL PROCESS SERVER** |

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

   ***Due to COVID19 challenges, virtual appearances by Webex.com are also required until further order of this Court. ***

If you have a disability requiring special assistance for your court appearance, please contact the court at least 48 hours in advance of scheduled hearing.

| July 26, 2022 | *Thomas Kloeppinger* |
|---|---|
| Date | Clerk |

Further Information:

**Sheriff's or Server's Return**

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                                Date                                              Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

Electronically Filed - City of St. Louis - July 26, 2022 - 12:13 PM

**In the**

# CIRCUIT COURT

## City of St. Louis, Missouri

The State of Missouri ex rel. Eric S. Schmitt;
_____
Plaintiff/Petitioner

vs.

The City of St. Louis, et al.
_____
Defendant/Respondent

July 25, 2022
_____
Date

2222-CC08920
_____
Case number

18
_____
Division

For File Stamp Only

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  the State of Missouri ex rel. Eric S. Schmitt, Plaintiff
_____, pursuant
                              Requesting Party
to Local Rule 14, requests the appointment by the Circuit Clerk of

| | |
|---|---|
| Jose Pineiro | 1430 Washington Ave. St. Louis 63103   (314) 825-5512 |
| Name of Process Server | Address                                    Telephone |
| Missouri Process Serving | 1430 Washington Ave. St. Louis 63103   (314) 825-5512 |
| Name of Process Server | Address                                    Telephone |
| Pam King Wheetley | 1430 Washington Ave. St. Louis 63103   (314) 825-5512 |
| Name of Process Server | Address                                    Telephone |

to serve the summons and petition in this cause on the below named parties.

SERVE:
City of St. Louis
_____
Name
1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Adam L. Layne, Treasurer City of St. Louis
_____
Name
Room 220 City Hall, 1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Darlene Green, Comptroller City of St. Louis
_____
Name
Room 212 City Hall, 1200 Market Street
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

SERVE:
Dr. Mati Hlatshwayo Davis
_____
Name
Room 4027, 1520 Market
_____
Address
St. Louis, Missouri 63103
_____
City/State/Zip

Appointed as requested:
**TOM KLOEPPINGER,** Circuit Clerk


By_____
       Deputy Clerk


_____
Date

/s/ D. John Sauer
_____
Attorney/Plaintiff/Petitioner
58721
_____
Bar No.
P.O. Box 899, Jefferson City, MO 65102
_____
Address
(573) 751-8870
_____
Phone No.

Electronically Filed - City of St. Louis - July 26, 2022 - 12:13 PM

**RULE 14 SPECIAL PROCESS SERVERS**

1. Any person appointed by the Court or the Circuit Clerk to serve process must have a license issued pursuant to this rule to serve process.

2. Licenses to serve process shall be issued by the Sheriff of the City of St. Louis if the applicant has met the following qualifications:

   a. Is twenty-one years of age or older;

   b. Has a high school diploma or an equivalent level of education;

   c. Has insurance coverage for any errors or omissions occurring in the service of process;

   d. Has not been convicted, pleaded guilty to or been found guilty of any felony, or of any misdemeanor involving moral turpitude; and,

   e. Has passed a training course for the service of process which shall be administered by the Sheriff of the City of St. Louis.

3. Each applicant for a process server license under the provisions of this rule shall provide an affidavit setting forth such person's legal name, current address, any other occupations and current telephone numbers.  Licensed process servers shall immediately notify the Sheriff of the City of St. Louis of any change in the above information, and the failure to do so shall constitute good cause for the revocation of such person's license.

4. The Sheriff of the City of St. Louis shall maintain a list of persons licensed to serve process pursuant to this rule, and shall make such list available to litigants upon request.

5. A photo identification card designed by the Sheriff of the City of St. Louis shall be issued in addition to the license.  No other identification will be allowed.  All licenses must be signed and approved by the Sheriff of the City of St. Louis and the Presiding Judge or his designee.

6. A license fee recommended by the Sheriff and approved by the Court En Banc shall be charged to cover the costs of compiling and maintaining the list of process servers and for the training of such process servers.  The license fees shall be made payable to the Sheriff of the City of St. Louis.

Electronically Filed - City of St. Louis - July 26, 2022 - 12:13 PM

7. A license for service of process issued under this rule may be revoked by the Sheriff with the approval of the Presiding Judge or his designee, for any of the following reasons:

   a. Misrepresentation of duty or authority;

   b. Conviction, guilty plea or finding of guilty of any state or federal felony, or a misdemeanor involving moral turpitude;

   c. Improper use of the license;

   d. Making a false return; or

   e. Any other good cause.

   Provided, no service of process made by an appointed process server with a revoked license shall be void if the Court or Circuit Clerk made the appointment in good faith without knowledge of the license revocation.

8. Any person authorized to serve process may carry a concealed firearm as allowed by Section 506.145, RSMo, only while actually engaged in the service of process and only if the person has passed a firearms qualification test approved by a law enforcement agency; provided, however, that any licensed special process server may file a written waiver of the right to carry a concealed firearm and thereby avoid the requirements of firearm training and testing.  Any violation of this section shall be considered beyond the scope of the privilege to carry a concealed weapon that is granted by the appointment, and shall constitute good cause for the revocation of the license.

9. Applications for the appointment of a special process server shall be made on forms available in the offices of the Sheriff and Circuit Clerk.  Orders Appointing special process servers may list more than one licensed server as alternatives.

10. The licenses granted pursuant to this rule shall be good for two years.  Each person granted a license shall be required to reapply at the expiration of the license and shall be required to provide all the information required in the initial application, including a current police record check.

(Approved 9/28/92; amended 11/23/92; 5/31/95; 12/17/07)