**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| THE STATE OF MISSOURI ex rel.<br>ERIC S. SCHMITT, | )<br>)<br>) |
| *Plaintiff*, | )<br>) Case No. 4:22-cv-00789-AGF |
| v. | )<br>) |
| THE CITY OF ST. LOUIS, et al. | )<br>) |
| *Defendants*. | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

COME NOW the City of Saint Louis, the Honorable Darlene Green – Comptroller for the City of St. Louis, the Honorable Adam Layne – Treasurer for the City of St. Louis, and Dr. Matifadza Hlatshwayo Davis – Director of Health for the City of St. Louis (collectively, "Defendants"), and in support of their Motion to Dismiss Plaintiff's State of Missouri's ("State") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), state as follows:

### BACKGROUND

In March 2021, Congress enacted the American Rescue Plan Act ("ARPA"), to establish a local fiscal recovery fund, providing that, through December 31, 2024, local governments may use the recovery funds "to cover costs incurred" to, among other things, "respond to the public health emergency with respect to the [COVID-19 pandemic] or its negative economic impacts . . ." Pub. L. No. 117-2, 135 Stat. 4 (2021) (codified at 42 USC § 803).

On January 27, 2022, the Department of Treasury promulgated final rules to guide in the implementation of, and identify categories of, eligible uses for ARPA funds. 87 Fed. Reg. 4338 (Jan. 27, 2022). The final rule provides that "[t]he [State and Local Fiscal Recovery Funds] program, and Treasury's interim final rule, provide substantial flexibility to recipients to respond

1

to pandemic impacts in their local community." Id. at 4340.  "This flexibility is designed to help state, local, and Tribal governments adapt to the evolving public health emergency and tailor their response as needs evolve and to the particular local needs of their communities." Id.  The eligible uses for Local Fiscal Recovery Funds are set forth in subpart A of 31 CFR § 35.[1] See 31 CFR § 35.6 (stating broadly that program or service is eligible for funds "if a recipient identifies a harm or impact to a beneficiary or class of beneficiaries caused or exacerbated by the public health emergency or its negative economic impacts" and the program or services "responds to such harm"). The regulation further provides, as relevant, that a State "may not place additional conditions or requirements on distributions to . . . units of general local government beyond those required by section 603 of the Social Security Act or this subpart."  31 CFR § 35.12(d).

On July 21, 2022, the City enacted Board Bill 61 ("BB 61"), providing for the expenditure of federal "State and Local Fiscal Recovery Funds" ("SLFRF")[2] under ARPA.  Specifically, BB 61 identifies beneficiaries and populations disproportionately affected by the COVID-19 public health crisis and its negative economic impacts, including people experiencing economic insecurity below the federal poverty line; uninsured individuals; and those in need of comprehensive reproductive healthcare. BB 61 further identified particular harms and impacts resulting from the COVID-19 pandemic, including: strained access to comprehensive reproductive healthcare; the exacerbation of existing social and economic inequities; as well as disruptions to how individuals access reproductive healthcare. BB 61 observes that women, Black women, and mothers are at the lowest workforce participation rate in 30 years. Additionally, BB 61 noted that

---

[1] 31 CFR § 35 implements section 9901 of the American Rescue Plan Act which amends Title VI of the Social Security Act (42 U.S.C. § 801, et seq.) by establishing the Coronavirus State Fiscal Recovery Fund and Coronavirus Local Fiscal Recovery Fund, establishing a fund for metropolitan cities, non-entitlement units of local government, and counties.

2

Missouri's pregnancy-related mortality ratio is one of the highest in the country and four times greater for Black women than white women at 87.6 per 100,000 live births.

BB 61 created a Reproductive Equity Fund to, among other things, "provide access to abortion through logistical support including but not limited to the funding of childcare, transportation, and other logistical support needs." BB 61 further provides that ARPA funds "will not be used to fund or assist abortion procedures nor shall funds be used to encourage or counsel an individual to have an abortion." Id.

On July 21, 2022, the State filed the instant action, seeking declaratory relief that BB61 violates RSMo §§ 188.205, 188.210, and 188.215. Section 188.205 provides that "[i]t shall be unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life." Section 188.210 provides that "[i]t shall be unlawful for a doctor, nurse or other health care personnel, a social worker, a counselor or persons of similar occupation who is a public employee within the scope of his public employment to encourage or counsel a woman to have an abortion not necessary to save her life." Section 188.215 prohibits the use of "any public facility" "for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life."

The State's Complaint fails to state a claim upon which relief may be granted because: (1) § 188.205's limit on expenditure of ARPA funds violates the Supremacy Clause; (2) §§ 188.205-215 are impermissibly overbroad and vague under the First Amendment; and (3) §§188.205-215 are unconstitutional under Mo. Const. Art. VI, §19(a) and § 16.  The State's lawsuit should be dismissed pursuant to Rule 12(b)(6).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While a complaint challenged by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff must still provide the grounds for relief, and neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" will suffice. Twombly, 550 U.S. at 555.

## ARGUMENT

**1. RSMo. § 188.205, as applied to BB 61, violates the Supremacy Clause of the U.S. Constitution.**

The State fails to state a claim as to § 188.205 because it does not allege facts sufficient to show that expending ARPA funds for subsidizing the costs of interstate travel related to extra-jurisdictional reproductive healthcare is an illegal expenditure of *federal funds* under *federal law*. On the contrary, this Court should find that—because Congress intended to afford recipients maximum flexibility to spend funds in a manner that suits the needs of that particular community—ARPA permits such an expenditure; and, regardless, the State's restrictions run afoul of Congress's objectives in other areas of publicly funded healthcare. See 31 CFR § 35.6; see also CSX Transp. v. Easterwood, 507 U.S. 658, 663 (1993) (where a state statute conflicts with, or frustrates, federal law, the former must give way) (citations and quotations omitted); Wyeth v. Levine, 555 U.S. 555, 565 (2009) (congressional purpose "is the ultimate touchstone in every pre-emption case.").

In Lawrence County v. Lead-Deadwood School Dist., 469 U.S. 256, 270 (1985), the Supreme Court invalidated state legislation limiting the manner in which local governments could spend federal payments because the statute obstructed congressional purpose. There, the United States Supreme Court examined a state statute purporting to regulate the distribution of federal

4

funds received under an act that sought to compensate local governments for the loss of tax revenues resulting from the tax-immune status of federal lands. Id. at 257–58. The Court found the act granted local governments discretion "to spend in-lieu payments for any governmental purpose." Id. at 261. After examining regulations promulgated by the agency charged with administration of the act, the Court found that it had "consistently adhered to the view that local government units retain the discretion to spend the in-lieu payments for any governmental purpose they choose." Id. The Court further found that Congress intended to prohibit "the kind of state-imposed limitation on the use of" the federal payments represented by the challenged statute, Id. at 268, and Congress's objective was to "ensur[e] local governments the freedom and flexibility to spend the federal money as they saw fit." Id. at 263. Accordingly, the Court found the state law "obstructs this congressional purpose and runs afoul of the Supremacy Clause." Id. at 270.

Here, this Court should find, as the Supreme Court did in Lawrence County, that, to the extent § 188.205 purports to limit the expenditure of federal ARPA dollars, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 260; Hines v. Davidowitz, 312 U.S. 52, 67 (1941). ARPA's text and legislative history indicate an intent by Congress to provide flexibility to fund recipients to respond to pandemic impacts in a manner tailored to the particular needs of their communities. See 42 USC § 803(c); 167 Cong Rec H 773 (2021) (statement of Rep. Lee) (purpose of providing for direct payments to cities and counties is to permit local governments, who are in the best position to identify and respond, to tailor funding to meet urgent needs of their communities). As enacted, ARPA generally permits services or other assistance provided to a disproportionately impacted population or community, including services to address health disparities. 31 CFR § 35.6 (b)(3)(A)(ii)(11).

5

To address serious social, economic and health inequalities exacerbated by COVID-19, the Board of Aldermen ("BOA"), the City's legislative body, passed BB 61, which tailors the expenditure of ARPA funding to the particular needs of women and Black women in the local community. With regard to BB 61, the BOA found decreased access to reproductive healthcare to be a public health issue exacerbated by the pandemic. In particular, the BOA found the "COVID-19 public health crisis exacerbated existing social and economic inequities," and "that Women, Black women, and mothers are at the lowest workforce participation rate in 30 years." The BOA further found that Missouri's pregnancy-related mortality ratio is one of the highest in the country and four times greater for Black women than white women. The Reproductive Equity Fund established by BB 61 uses ARPA funds to grant access to reproductive healthcare and is a tailored response to "particular local" public health needs. 87 Fed. Reg. 4340 (Jan. 27, 2022).

The expenditures contemplated by BB 61 are lawful and consistent with Congress's purpose—to permit local governments maximum flexibility in responding to particular local public health needs. ARPA is silent on abortion and expenditures related to provision of access to abortion, and the lawfulness of the access-related expenditures contemplated by BB 61 is evidenced by the fact that ARPA is not subject to the Hyde Amendment,[3] a funding restriction on the use of federal funds to reimburse the cost of abortions except under certain specified circumstances. See Harris v. McRae, 448 U.S. 297, 302 (1980). See 167 Cong. Rec. 763 (2021) (statements of Rep. Burgess) (noting "lack of any Hyde protections ensuring that none of this funding is used to subsidize abortion."); Id. at 844 (statements of Rep. Walorski) (stating that

---

[3] An amendment proposed by Sen. James Lankford, Okla.-R, to prohibit the funding from being used to cover abortion failed on a 52-47 vote. 167 Cong. Rec. S1247 (2021).

6

amendments offered to include Hyde protections were rejected); see also Id. at 1265 (statements of Rep. McCarthy).

Thus, even if BB 61 were to permit the use of funds to assist legally available or out-of-state abortion procedures or to encourage or counsel an individual to have an abortion, which BB 61 expressly states that it does not, BB 61 would still be wholly consistent with Congress's purpose. Ultimately, the State fails to sufficiently allege that the expenditure of federal dollars to provide "access to abortion through logistical support" is an illegal expenditure of ARPA dollars under applicable *federal law*. The final regulations promulgated by the Department of Treasury[4] implementing ARPA support this broad interpretation and confirm that BB 61's appropriation of ARPA funds to provide logistical support for access to abortion is an allowable expenditure. See 87 Fed. Reg. 4361 (stating that "[t]he interpretive framework and enumerated eligible uses allow recipients flexibility to address identified pandemic impacts, including through solutions that take into account the particularized issues in their community."); see also Id. at 4373 ("public health impacts of the pandemic are broader than just the COVID–19 disease itself . . ."). Indeed, the City is afforded "substantial flexibility" to use ARPA funds as it deems appropriate to respond to the particular needs of its community. Id. at 4339.

Further, BB 61's expenditure of ARPA funds for subsidizing the costs for women to travel from one state to another—a constitutional right "firmly embedded" in Supreme Court jurisprudence—is clearly lawful. See Saenz v. Roe, 526 U.S. 489, 498–500 (1999) ("right to travel" protects the right of a citizen of one State to enter and to leave another State); see also

---

[4] The interpretation of the agency charged with the administration of the statute is entitled to "substantial deference" so long as they are based upon "a sensible reading of the statutory language" and are "not inconsistent with the legislative history" of ARPA. See Lawrence County, 469 U.S. at 262 citing Blum v. Bacon, 457 U.S. 132, 141 (1982).

7

Dobbs v. Jackson Women's Health Organization, 597 U.S. ___, 142 S. Ct. 2228, 2304 (2022) (Kavanaugh, J., concurring) (constitutional right to interstate travel prevents a State from barring residents from traveling to another state to obtain an abortion).

It also bears noting that, even if ARPA and BB 61 were both taken out of the legal analysis all together, § 188.205 is impliedly preempted based on its impeding Congress's objective to direct federal funds towards the provision of certain abortions where the state or local agency participates in federal healthcare-related programs under the Social Security Act.  See Pac. Gas & Elec. Co. v. State Energy Res. Consvt'n & Dev. Comm'n, 461 U.S. 190, 220–21 (1983) (explaining it is well established that state law is preempted if it stands as obstacle to accomplishment of purposes and objectives of Congress; in determining Congress's objective regarding atomic energy regulation, Court considered, as relevant, passage of other legislative acts).  Indeed, a number of federal courts, as well as the Department of Health and Human Services, have concluded that state restrictions on federally-funded abortion-related healthcare services are violative of the Supremacy Clause.  See Planned Parenthood Affiliates v. Engler, 73 F.3d 634, 638–39 (6th Cir. 1996) (explaining various circuits have addressed interplay between Hyde Amendment and state laws restricting abortion funding and concluded that states participating in Medicaid must fund abortions of pregnancies resulting from rape, incest, or in instances where abortion is medically necessary).[5]

---

[5] See, e.g., U.S. Dept. of Health & Human Servs., Ctr. For Medicare and Medicaid Servs., QSO-22-22, Reinforcement of [Emergency Medical Treatment and Labor Act] Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss (Jul. 11, 2022) (EMTALA, as codified at 42 U.S.C. § 1395dd, et seq. requires, inter alia, hospitals that participate in Medicare to treat "emergency medical condition," as that term is defined in 42 CFR § 489.24; listing specific pregnancy-related emergency medical conditions; concluding where state law contains more restrictive definition of "emergency medical condition[,]" it is preempted by EMTALA.

Accordingly, this Court should conclude that § 188.205 not only stands in stark contrast to the federal government's objective of providing certain abortion-related care to the extent it is permitted by ARPA, the Hyde Amendment and EMTALA, but that it also actively impedes Congress's power to direct such funds towards achieving its end and is thus violative of the Supremacy Clause. ARPA's regulations are sufficiently broad to permit the finding that the appropriation of ARPA funds to provide logistical support for abortion is an allowable expenditure. Because Congress intended to give local governments like the City significant flexibility to spend ARPA funds as they see fit, § 188.205 must give way.

**2. RSMo. §§ 188.205-215 are unconstitutionally overbroad and vague under the First Amendment of the United States Constitution.**

The State fails to state a plausible claim for relief, as §§ 188.205-215 are impermissibly vague and overbroad under the First Amendment. See Kolender v. Lawson, 461 U.S. 352, 357–58 (1983) (explaining void for vagueness test); Connally v. General Construction Co., 269 U.S. 385, 391 (1926) (same); see also Bd. of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 574–75 (1987) (explaining void for overbreadth test); cf. NAACP v. Button, 371 U.S. 415, 433 (1963) (freedom of speech is "delicate and vulnerable, as well as supremely precious in our society[,] the threat of sanctions may deter [its] exercise almost as potently as actual application of sanctions [b]ecause First Amendment freedoms need breathing space to survive, [the] government may regulate in [an] area only with narrow specificity").

As to overbreadth, §§ 188.205-215, are constitutionally overbroad because they are so unclear, and the State's understanding of their application is so sweeping, that they prohibit a swath of protected activity, and as such, must be ruled unconstitutional in their entirety. See Broadrick v. Oklahoma, 413 U.S. 601, 615–16 (1973) (to be unconstitutional, overbreadth of statute must be real and substantial, when judged in relation to the statute's plainly legitimate sweep); see also

9

Schad v. Mt. Ephraim, 452 U.S. 61, 66–67 (1981) (where appellant's claims were rooted in First Amendment, they were entitled to rely on impact on expressive activities of others as well as their own).

As the State alludes to in its Complaint, the plainly legitimate sweep of the State's power, in light of the Supreme Court's decision in Dobbs, includes the power to regulate abortion. See 142 S.Ct. at 2279. The State, in its judgment, has chosen to regulate the performance of abortion—an issue of great social significance and moral substance—through the prohibition of public funds and facilities for the purpose of assisting with, encouraging, or counseling receipt of an abortion, as well as forbidding public employees from engaging in such activity in the scope of their employment. See §§ 188.205-215. The State has further chosen to broadly define "public facility" to mean "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by [] any [] political subdivision"; and to similarly define "public funds" as including "any funds received or controlled by [] any [] political subdivision [] including, but not limited to, funds derived from federal [] taxes." See RSMo § 188.200 (definitions). In applying these prohibitions, the State has interpreted "assist" to mean "to give support or aid," and "encourage" to mean "'spur on: stimulate' or 'to give help or patronage to: foster.'" See Doc. 6, Compl., ¶¶ 52-53. In bringing the present action, the State applied these restrictions to mean the City and its officials are prohibited from subsidizing expenses related to interstate travel for the purpose of seeking reproductive healthcare, because such activity uses public funds and facilities to spur or stimulate receipt of abortions. See id.

Sections 188.205-215's prohibition of assistance or encouragement of abortions substantially exceeds the legitimate sweep of the State to regulate abortions within Missouri. See Broadrick, 413 U.S. at 615–16; see also Schad, 452 U.S. at 66–67 (concluding ordinance

prohibiting live entertainment was overbroad because it prohibited political and ideological speech; where law intrudes on protected liberties, court carefully examine government interests advanced by prohibition and extent to which they are served by challenged prohibition; where law could limit communicative activity, government must show law is narrowly tailored).

In the case at hand, much like in Schad, the statutory scheme under §§ 188.205-215 applies to restrict a wide spectrum of protected activities.  See id.; see also Reprod. Health Serv. v. Webster, 851 F.2d 1071, 1078–79 (8th Cir. 1988) (§§ 188.205-215's prohibition on use of public funds, employees, and facilities to encourage or assist abortions was void for overbreadth and vagueness; it was not within court's power to narrow laws' application, and that scope of bans were "much broader than the interpretation offered by the [S]tate"), rev'd in part on other grounds 492 U.S. 490 (1989).  For instance, as was the case in Schad, and Webster, the State's construction of "assist" or "encourage" here may permit it to bring civil actions prohibiting public forums "owned, leased, or controlled" by the City—such as parks, thoroughfares, or other community spaces—from being used for protected expressive speech—such as protests, speeches, or demonstrations advocating for out-of-state abortion access.  See Id.; Schad, 452 U.S. at 66–67; see also Jews for Jesus, 482 U.S. at 573 (explaining restrictions within public forums are subject to heightened scrutiny).  Likewise, the State's broad construction could also prohibit such speech if they require the usage of City-funded services, such as processing permits for pro-abortion demonstrations; accessing other City spaces to conduct healthcare outreach events, and or advocacy by health advocates and officials at online forums used for hearings, debate, and community outreach efforts.  Such activity may well spur, stimulate, or otherwise embolden a pregnant individual to take steps to receive a legal abortion in another jurisdiction.  See id.; see also Webster, 851 F.2d at 1078-79, 1085.

11

Moreover, as in Schad, §§ 188.205-215 also implicate other constitutionally protected expressive activity, including, associational rights that may arise in the context of interstate travel. See Aptheker v. Sec'y. of State, 378 U.S. 500, 507–08 (1964) (explaining revocation of claimant's passport based on political membership implicated freedom of association and travel); see also Jews for Jesus, 482 U.S. at 573-75 (explaining, in case regulating religious group's distribution of literature in airport, that government interest to regulate usage of its property was not justified where regulation imposed restrictions on wide array of protected activity); cf. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958) (explaining freedom to engage in association for advancement of ideas and beliefs is constitutionally protected liberty).

Indeed, by the State's understanding of §§ 188.205-215, those statutes would apply to limit the use of public facilities, as well as publicly funded programs or spaces, which ambiguously "spur" or "stimulate" an abortion at some point in the causal chain of events. This could apply, as is the case here, to implicate a government program that directly subsidizes the cost of interstate travel by providing monetary grants to certain vendors to provide services such as transportation or childcare services; but could also be read to apply to even more attenuated activities or programs that enable travelling across state lines, such as: the operation of Lambert International Airport, which enables air travel to abortion-providing states; City roads, which aid in the conveyance of persons across the Mississippi River; or even City compensation to employees, who may use their paychecks to travel and receive a legally available abortion. Cf. Aptheker, 378 U.S. at 507–08.

In light of the broad range of protected activity potentially implicated by enforcement of §§ 188.205-215, the State's power to regulate such conduct, in this case, far exceeds the legitimate sweep of its regulatory power over abortions. See Broadrick, 413 U.S. at 615–16. Indeed, while Dobbs may have returned regulatory power over abortion procedures to the States, it did not

empower the State to regulate intrastate activity that implicates fundamental rights; nor are they empowered to penalize or otherwise declare unlawful reproductive-healthcare activity occurring wholly outside of Missouri's borders. See Bigelow v. Virginia, 421 U.S. 809, 824 (state does not acquire power or supervision over internal affairs of another state, merely because welfare and health of its citizens may be affected when they travel to that state); cf. N.Y. Life Ins. Co. v. Head, 234 U.S. 149, 161 (1914) (explaining "it would be impossible to permit [] statutes of Missouri to operate beyond [] jurisdiction of that state"); cf. also Dobbs, 142 S. Ct. at 2304 (Kavanaugh, J., concurring) (right to travel prevents States from barring interstate travel to obtain abortion).

Next, §§ 188.200-215 are unconstitutionally vague, as they provide no rule or standard as to their enforcement. See Webster, 851 F.2d at 1078–79; see also Kolender, 461 U.S. at 357–58; cf. Keyishian v. Bd. of Regents, 385 U.S. 589, 603–04 (1967) (precision of regulation is touchstone where law touches constitution's most precious freedoms; standards of statutory vagueness are strict in area of free expression); Boutilier v. INS, 387 U.S. 118, 123 (1967) (statute may be void for vagueness where it is so vague and indefinite as to be no rule or standard at all).

The Eighth Circuit has already concluded in Webster that the words "encouraging" and "counseling" as used in Chapter 188, are void for vagueness, as they are "fraught with ambiguity." 851 F.2d at 1079. In assessing a First Amendment challenge against §§ 188.205-215, the Webster court reasoned that the proscription on "encouraging or counseling" was unconstitutionally vague because the scope of proscribed conduct included protected "affirmative advocacy" and was "incapable of objective measurement." Further, even setting aside this Circuit's previous assessment of §§ 188.205-215, the State's construction here evinces that §§ 188.205-215 are

13

nonetheless constitutionally infirm based on a traditional vagueness analysis.[6] In the case at hand, the prohibition of public funds, employees, or facilities from "encouraging" or "assisting" "abortions,"—as those terms are defined by statute or otherwise construed in the State's complaint—completely lacks any objective standard City-Official Defendants may follow in administering the Reproductive Equity Fund. See Id.  In disbursing funds to subsidize the cost of inter-state travel to provide access to reproductive healthcare, City-Official Defendants are left to wonder whether their conduct and attendant speech, impermissibly "spurs" or "stimulates" abortions; i.e., Defendants cannot discern when in the causal chain of events leading up to an out-of-state abortion, their speech related to reproductive healthcare access and interstate travel, is imputed with potential criminal or civil liability under §§ 188.205-215.  See Goguen, 415 U.S. at 580–81.  Additionally, notwithstanding the ambiguity of when advocacy for reproductive and interstate-travel rights amounts to impermissible encouragement of abortions, the statutory scheme gives no reasonable notice of whether it applies to conduct related to out-of-state abortions, which the State cannot regulate.  Cf. Bigelow, 421 U.S. at 824; cf. also Lujan v. Defs. of Wildlife, 504 U.S. 555, 564 (1992) (speculation of when injury might occur, without any concrete specification, was not enough to show imminent injury causally flowing from alleged government conduct).

### 3. RSMo. §§ 188.205-215, as applied to BB 61, are unconstitutional under Mo. Const. Art. VI §§ 16 & 19(a).

Finally, the State's claim fails because §§ 188.205-215 are unconstitutional under Art. VI §§ 16 and 19(a) of the Missouri Constitution, as applied to the expenditure of funds under § 803.

---

[6] See Kolender, 461 U.S. at 357–58; see also Smith v. Goguen, 415 U.S. 566, 580-81 n. 29 (1974) (majority opinion) (explaining that State's interpretation of statute evinced lack of precision running through laws prohibiting "contemptuous" treatment of flag; concluding law was impermissibly vague) & 587–89 (White, J. dissenting) (explaining law is vague where it works to punish communication of ideas held unacceptable to controlling majority of legislature).

See Art. VI, § 19(a) (charter cities have all powers which legislature has authority to confer, provided such powers are consistent with state constitution and are not limited or denied by statute or city charter), § 16 (conferring charter cities with power to cooperate with the United States, for operation of common service); see also Cape Motor Lodge v. City of Cape Girardeau, 706 S.W.2d 208, 210-12 (city was able to enter into cooperative activity because no state law directly prohibited activity contemplated by agreement). The City therefore possesses a constitutionally conferred power to cooperate with the United States, to provide public services, such as those contemplated by BB 61. See id.; see also Roberts v. Maryville, 750 S.W.2d 69, 71–72 (Mo. 1988).

Moreover, §§ 188.205-215 cannot prohibit the cooperative activity here, i.e. the provision of travel-cost subsidy programs, as the State has offered no allegations indicating the United States lacks power to fund such activity by partnering with the City, and, regardless, such activity does not amount to impermissible encouragement or assistance of abortions.[7]  Accordingly, as applied to BB 61, §§188.205-215 are an unconstitutional intrusion of the City's Charter powers.

## CONCLUSION

The State's Complaint fails to state a claim. Section 188.205's limit on expenditure of ARPA funds violates the Supremacy Clause, and §§ 188.205-.215 are impermissibly overbroad and vague under the First Amendment.  In addition, §§ 188.205-215 are an unconstitutional intrusion on City's charter powers under Mo. Const. Art. VI, §19(a) and § 16.  Accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

---

[7] See Roberts, 750 S.W.2d at 71–72 (rejecting baseless assumption that city lacked power to appropriate funds in connection with inter-governmental cooperative activity) ; see also Fischer v. Cty. of Washington, 55 S.W.3d 372, 378–79 (Mo. App. E.D.  2001) (Missouri Supreme Court has rejected narrow interpretation of Art. VI, § 16; state statutes do not limit City's powers to cooperate only on projects it may have legitimately pursued alone).

Dated: August 5, 2022

Respectfully submitted,

**SHEENA HAMILTON**
**CITY COUNSELOR**

By: */s/* Erin K. McGowan
Erin McGowan                              #64020MO
*Associate City Counselor, Affirmative Litigation Unit*

Ankoor Shah                                #65606MO
Rebecca S. Sandberg-Vossmeyer              #70342MO
Adam Sheble                                #74230MO
*Assistant City Counselors, Affirmative Litigation Unit*

314 City Hall
1200 Market St.
St. Louis, Missouri 63103
(314) 622-3361 (telephone)
(314) 622-4956 (facsimile)
mcgowane@stlouis-mo.gov
shaha@stlouis-mo.gov
vossmeyerr@stlouis-mo.gov
sheblea@stlouis-mo.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on **August 5, 2022** this Memorandum was electronically filed with the Clerk of Court using the Court's electronic filing system, to be served on all counsel of record.

/s/ Erin K. McGowan