**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI ex rel. | ) | |
| ERIC S.  SCHMITT, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No.   4:22-cv-00789-AGF |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF ST. LOUIS, et al. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

COME NOW the City of Saint Louis, the Honorable Darlene Green – Comptroller for the City of St. Louis, the Honorable Adam Layne – Treasurer for the City of St. Louis, and Dr. Matifadza Hlatshwayo Davis – Director of Health for the City of St. Louis (collectively, "Defendants") in opposition to Plaintiff State of Missouri's motion for preliminary injunction and state as follows:

**INTRODUCTION**

The lawsuit at issue here arises from the City's enactment of Board Bill 61 ("BB 61"), which authorizes the expenditure of federal American Rescue Plan Act ("ARPA") funds awarded to the City by the United States government to address the impacts of COVID-19.  The State claims that Defendants are prohibited from, inter alia, expending federal ARPA funds to address the impacts of COVID-19 as those impacts relate to reproductive healthcare, because such expenditure amounts to unlawful use of public funds, employees, and facilities to support, encourage, and assist abortions in violation of Missouri Revised Statutes §§ 188.205, 188.210, and 188.215.

1

## LEGAL AND PROCEDURAL BACKGROUND

In 1986, the State enacted, as relevant, §§ 1.205 & 188.205-215, RSMo.

§ 188.205 states that:

[i]t shall be unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

§ 188.210 states that:

[i]t shall be unlawful for any public employee within the scope of his employment to perform or assist an abortion, not necessary to save the life of the mother.  It shall be unlawful for a doctor, nurse or other health care personnel, a social worker, a counselor or persons of similar occupation who is a public employee within the scope of his public employment to encourage or counsel a woman to have an abortion not necessary to save her life.

§ 188.215 further provides that:

It shall be unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

§ 188.200 defines "public facility" to mean "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof."  Notably, Chapter 188 does not define what constitutes unlawful "encouraging," or "assisting" of abortion procedures.

On July 21, 2022, the City enacted BB 61, which appropriated "[o]ne [m]illion [d]ollars [] of [] ARPA Funds . . . as part of a new Reproductive Equity Fund."  BB 61 expressly foreclosed the usage of such funds to "encourage or counsel an individual to have an abortion," and were directed to instead, "be used to provide *access* to abortion through logistical support."  Id.

2

(emphasis added).  Such support included subsidization of costs associated with constitutionally protected interstate travel a woman may incur, such as "childcare, transportation, and other logistical support needs."  Id.

That same day, the State filed the instant action in Missouri state court, which Defendants then removed to this Court.  See Compl., Doc. 6; Doc. No. 1.  The State claims BB 61 violates §§ 188.205-215.  As best the City is able to tell, the State also claims BB 61 violated other "state law," including its legislative findings in §§ 1.205 & 188.010.[1] The State specifically alleges that the Reproductive Equity Fund's subsidization of constitutionally protected interstate-travel expenses amounted to unlawful "encouragement" or "assistance" of abortion procedures and ran afoul of its findings that the state was "sanctuary of life."  See Doc. 6, Count I, generally.

The State also filed its motion for preliminary injunction, seeking the Court "enjoin the City from implementing [BB 61]."  See Doc. 7.  The State asserted that it was likely to succeed in establishing the City violated §§ 188.205-215; that it would suffer irreparable harm if injunctive relief was not granted; and that the balance of harm and public interest favored the State.  Id.

This Court should deny the State's request for a preliminary injunction because it is unlikely to succeed on the merits and because an injunction would harm the public interest by unreasonably and unlawfully preventing City from using federal funds to assist with the impacts of COVID-19 as those impacts relate to reproductive healthcare.

---

[1] § 1.205 states, as relevant, that "the general assembly [] finds that:  (1) the life of each human being begins at conception; [and] (2) unborn children have protectable interests in life, health, and well-being."  § 188.010 states, as relevant, that "it is the intention of the general assembly [] to: (1) defend the right to life of all humans, born and unborn; (2) declare the state and all of its political subdivisions are a 'sanctuary of life'[;] . . . and (3) regulate abortion to the full extent permitted by the Constitution of the United States[.]"

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Counsel, Inc., 555 U.S. 7, 24 (2008). In determining whether to grant a preliminary injunction, a district court applies "a flexible consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest." St. Louis Effort for AIDS v. Huff, 782 F.3d 1016, 1021 (8th Cir. 2015); see also Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981).

**DISCUSSION**

**I.     The State is not likely to succeed on the merits of its claims.**

The State has failed to demonstrate a likelihood of success on the merits—the most critical element to consider in granting preliminary injunctive relief—because §§ 188.205-215 are unconstitutional under the Supremacy Clause, the First Amendment to the United States Constitution, and Art. VI §§ 16 & 19 of the Missouri Constitution.  See S.J.W. v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 776 (8th Cir. 2012) (setting out the factors for determining whether to grant preliminary injunction).  Likelihood of success on the merits is the most significant factor. Id.; see also Mazurek v. Armstrong, 520 U.S. 968, 972, (1997) (per curiam) (preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion"); Phelps-Roper v. Nixon, 509 F.3d 480, 485 (at preliminary injunctive stage of litigation, the court asks whether there is substantial likelihood of prevailing on claim's merits).

### A.  Section 188.205 is violative of the Supremacy Clause

The State is not entitled to preliminary injunctive relief because it has failed to demonstrate a substantial likelihood that §§ 188.205-215 apply to the City's expenditure of ARPA funds, where (1) Congress intended to afford maximum flexibility for recipients to spend funds to address the needs of their communities, and (2) where the State's application of §§ 188.205-215 thwarts Congress's objectives as to federally-funded healthcare-related programs.  See Wyeth v. Levine, 555 U.S. 555, 565 (2009) (congressional purpose "is the ultimate touchstone in every pre-emption case."); CSX Transp. v. Easterwood, 507 U.S. 658, 663 (1993) (where a state statute conflicts with, or frustrates, federal law, the former must give way) (citations and quotations omitted); see also Pac. Gas & Elec. Co. v. State Energy Res. Consvt'n & Dev. Comm'n, 461 U.S. 190, 220–21 (1983) (explaining it is well established that state law is preempted if it stands as obstacle to accomplishment of purposes and objectives of Congress).

As enacted ARPA generally permits services or other assistance for disproportionately impacted communities, including services to address health disparities. 31 CFR § 35.6 (b)(3)(A)(ii)(11).  ARPA is silent on abortion procedures, expenditures related to interstate travel subsidies, and the lawfulness of the expenditures contemplated by BB 61.  It bears noting that ARPA is not subject to the Hyde Amendment, a funding restriction on the use of federal funds to reimburse the cost of abortion procedures, except under certain specified circumstances. See Harris v. McRae, 448 U.S. 297, 302 (1980); see also 167 Cong. Rec. 763 (2021) (statements of Rep. Burgess) (noting "lack of any Hyde protections ensuring that none of this funding is used to subsidize abortion."); id. at 844 (statements of Rep. Walorski) (stating that amendments offered to include Hyde Amendment were rejected).  An amendment proposed by Sen. James Lankford, Okla.-R, to prohibit the funding from being used to cover abortion failed on a 52-47 vote. 167

Cong. Rec. S1247 (2021). Seven amendments offered to include Hyde protections were rejected. Id. at 1265 (statements of Rep. McCarthy).  Additionally, the final regulations promulgated by the Department of Treasury implementing ARPA further evince Congress's comprehensive intent and confirm that BB 61's appropriation of ARPA funds to provide interstate travel subsidies for otherwise lawful abortion procedures is an allowable expenditure.  See 87 Fed. Reg. 4361 (stating that "interpretive framework and enumerated eligible uses allow recipients flexibility to address identified pandemic impacts, including through solutions that consider [] particularized issues in their community."); see also id. at 4373 ("public health impacts of the pandemic are broader than just the COVID–19 disease itself").

With regard to BB 61, the City found that the pandemic exacerbated women's lack of access to the array of legally available reproductive-healthcare options.  See Doc. 6-1 at 38-43. Therefore, in compliance with Congressional direction, the Reproductive Equity Fund established by BB 61 uses ARPA funds to subsidize travel costs related to legally-accessible reproductive healthcare options and is a tailored response to "particular local" public health needs. 87 Fed. Reg. 4340 (Jan. 27, 2022).

In Lawrence County v. Lead-Deadwood School Dist., 469 U.S. 256, 270 (1985), the Supreme Court invalidated state legislation limiting the manner in which local governments could spend federal payments because the statute obstructed congressional purpose. There, the United States Supreme Court examined a state statute purporting to regulate the distribution of federal funds received under an act that sought to compensate local governments for the loss of tax revenues resulting from the tax-immune status of federal lands. Id. at 257–58. The Court found the act granted local governments discretion "to spend in-lieu payments for any governmental purpose." Id. at 261. After examining regulations promulgated by the agency charged with

6

administration of the act, the Court found that it had "consistently adhered to the view that local government units retain the discretion to spend the in-lieu payments for any governmental purpose they choose." Id. The Court further found that Congress intended to prohibit "the kind of state-imposed limitation on the use of" the federal payments represented by the challenged statute, Id. at 268, and Congress's objective was to "ensur[e] local governments the freedom and flexibility to spend the federal money as they saw fit." Id. at 263. Accordingly, the Court found the state law "obstructs this congressional purpose and runs afoul of the Supremacy Clause." Id. at 270.

In the instant action, the State has failed to sufficiently demonstrate a substantial likelihood of success that the expenditure of federal dollars to provide "access to abortion through logistical support" is an illegal expenditure of ARPA dollars under applicable federal law.  See id. Further, BB 61's expenditure of ARPA funds for subsidizing interstate travel costs—a constitutional right "firmly embedded" in Supreme Court jurisprudence—is also lawful. See Saenz v. Roe, 526 U.S. 489, 498–500 (1999) ("right to travel" protects the right of a citizen of one State to enter and to leave another State); see also Dobbs v. Jackson Women's Health Org., 597 U.S. ___, 142 S. Ct. 2228, 2304 (2022) (Kavanaugh, J., concurring) (constitutional right to interstate travel prevents State from barring residents from traveling to another state to obtain abortion).  Here, this Court should find, as the Supreme Court did in Lawrence County, that, to the extent § 188.205 purports to limit the expenditure of federal ARPA dollars, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 260; Hines v. Davidowitz, 312 U.S. 52, 67 (1941). ARPA's text and legislative history indicate an intent by Congress to provide flexibility to fund recipients to respond to pandemic impacts in a manner consistent with the particular needs of their communities. See 42 USC § 803(c); 167 Cong Rec H 773 (2021) (statement of Rep. Lee) (purpose of providing for direct payments to cities and counties is to permit

local governments, who are in the best position to identify and respond, to tailor funding to meet urgent needs of their communities).

It also bears noting that, even if ARPA and BB 61 were both taken out of the legal analysis all together, § 188.205 is impliedly preempted based on its impeding Congress's objective to direct federal funds towards the provision of certain abortions where the state or local agency participates in federal healthcare-related programs under the Social Security Act. See Pac. Gas & Elec. Co., 461 U.S. at 220–21 (in determining Congress's objective regarding atomic energy regulation, Court considered, as relevant, passage of other legislative acts). Indeed, a number of federal courts, as well as the Department of Health and Human Services, have concluded that state restrictions on federally-funded abortion-related healthcare services are violative of the Supremacy Clause. See Planned Parenthood Affiliates v. Engler, 73 F.3d 634, 638–39 (6th Cir. 1996) (explaining various circuits have addressed interplay between Hyde Amendment and state laws restricting abortion funding and concluded that states participating in Medicaid must fund abortions of pregnancies resulting from rape, incest, or in instances where abortion is medically necessary).[2]

Accordingly, this Court should conclude that § 188.205 not only stands in stark contrast to the federal government's objective of providing certain abortion-related care to the extent it is permitted by ARPA, the Hyde Amendment and EMTALA, but that it also actively impedes Congress's power to direct such funds towards achieving its end and is thus violative of the

---

[2] See, e.g., U.S. Dept. of Health & Human Servs., Ctr. for Medicare and Medicaid Servs., QSO-22-22, Reinforcement of [Emergency Medical Treatment and Labor Act] Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss (Jul. 11, 2022) (EMTALA, as codified at 42 U.S.C. § 1395dd, et seq. requires, inter alia, hospitals that participate in Medicare to treat "emergency medical condition," as that term is defined in 42 CFR § 489.24; listing specific pregnancy-related emergency medical conditions; concluding where state law contains more restrictive definition of "emergency medical condition[,]" it is preempted by EMTALA.

Supremacy Clause. ARPA's regulations are sufficiently broad to permit the finding that the appropriation of ARPA funds to provide logistical support for reproductive healthcare is an allowable expenditure. Because Congress intended to give local governments like the City significant flexibility to spend ARPA funds as they see fit, § 188.205 must give way.

**B.  Sections 188.205-215 are overbroad and vague under the First Amendment**

Next, §§ 188.205-215's prohibition on the usage of public funds, employees, and facilities that "encourage" or "assist" abortion procedures are impermissibly broad and vague.  See Bd. of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 574–75 (1987) (explaining void for overbreadth test); see also Kolender v. Lawson, 461 U.S. 352, 357–58 (1983) (explaining void for vagueness test); cf. NAACP v. Button, 371 U.S. 415, 433 (1963) (freedom of speech is "delicate and vulnerable, as well as supremely precious in our society[,] the threat of sanctions may deter [its] exercise almost as potently as actual application of sanctions [b]ecause First Amendment freedoms need breathing space to survive, [the] government may regulate in [an] area only with narrow specificity").

Initially, §§ 188.205-215 make unlawful the use of public funds, employees, or facilities "for the purpose of [] *assisting* an abortion . . . or for the purpose of *encouraging* [] a woman to have an abortion not necessary to save her life."  See §§ 188.205-215 (emphasis added).  The State concedes, in its motion for preliminary injunction, that neither §§ 188.205, nor Ch. 188, define what constitutes unlawful "assisting" or "encouraging" abortions.  See Doc. 7 at 4.  However, despite that concession, the State's understanding of those terms as proffered only in this litigation form the linchpin of its claims.  By its own words, the State construes the phrase "assist" to be "a *broad* term."  See Doc. 7 at 4 (emphasis added).  In support of the term's broad sweep, the State then offers its own nebulous definition of "assist" to mean activity which "give[s] *support* or aid."

9

See id.; see also Doc. 7 at 4-5 (emphasis in original).  The State then asserts "support" means "'to actively promote the interests or cause of' and to 'argue in favor of.'"  Id.  The State further asserts that it understands "encourage" to mean activity that "'[] spur[s] on: stimulate[s]' or '[] give[s] help or patronage to: foster.'"  Id.

Sections 188.205-215 are unconstitutionally overbroad, as the language at issue is so unclear—and the State's characterization and understanding of their application so sweeping—that they prohibit a multitude of protected First Amendment activity.  See Broadrick v. Oklahoma, 413 U.S. 601, 615–16 (1973) (to be unconstitutional, overbreadth of statute must be real and substantial, when judged in relation to the statute's plainly legitimate sweep).  Specifically, as the State admits, and as the Eighth Circuit has already held, the language contained in §§ 188.205-215 is on its face, broad.  See Reprod. Health Serv. v. Webster, 851 F.2d 1071, 1078–79 (8th Cir. 1988) (§§ 188.205-215's prohibition on use of public funds, employees, and facilities to, inter alia, encourage abortions was void for overbreadth and vagueness; concluding §§ 188.205-215 were "fraught with ambiguity"), rev'd in part on other grounds 492 U.S. 490 (1989).

Even setting aside the State's characterizations and the Eighth Circuit's previous disposition on the matter, the State's interpretation here of §§ 188.205-215 reaches far past its legitimate regulatory powers over abortion procedures, cf. Dobbs, 597 U.S. ___, 142 S. Ct. 2228, 2279 (2022); and into the realm of the Constitution's most sacrosanct right, i.e., freedom of expression.  See Broadrick, 413 U.S. at 615–16; see also Schad v. Mt. Ephraim, 452 U.S. 61, 66–67 (1981) (concluding ordinance prohibiting live entertainment was overbroad because it prohibited political and ideological speech; where law intrudes on protected liberties, court carefully examine government interests advanced by prohibition and extent to which they are

served by challenged prohibition; where law could limit communicative activity, government must show law is narrowly tailored); see also Webster, 851 F.2d at 1078–79.

Specifically, the State's interpretation of the terms "assist" and "encourage" evinces the statutes' malleability and potential to be weaponized against expression wholly unrelated to the performance of a particular abortion procedure. The State's interpretation could, for example, encompass debate or discussion of pro-choice issues wherein such expression uses public funds, employees, or facilities.   See Boos v. Barry, 485 U.S. 312, 318 (1988) (First Amendment protections show profound national commitment to principle that debate on public issues should be uninhibited, robust, and wide open) (quotations omitted); see also Webster, 492 U.S. 523–24 (O'Connor, J., concurring) ("[g]iven Missouri's definition of 'public facility' . . . there may be conceivable applications of the ban on the use of public facilities that would be unconstitutional," such as withholding private entity's access to publicly-funded utilities); Webster, 851 F.3d at 1083–84 (concluding prohibition of public funds to "assist" with abortion procedures did not include publicly funded transportation assistance; noting State's contention that "'assistance' within the meaning of [§ 188.205 d[id] not encompass" state employees actually driving patients to location where abortion procedure was to take place).

Indeed, by the State's broad interpretation of §§ 188.205-215, the statutes forbid the City from permitting or otherwise facilitating speech that indiscernibly "spurs," or argues in favor of abortion.  See Broadrick, 413 U.S. at 615–16; see also Schad, 452 U.S. at 66–67; cf. Phelps-Roper v. Nixon, 509 F.3d 480, 486–87 (8th Cir. 2007) (traditional public fora are ones traditionally used as forum for expression, such as public street or sidewalk; for statute to be narrowly tailored, it must not burden speech more than necessary to further state's legitimate interest).  Specifically, under §§ 188.210, impermissible uses of public employees may include utilization of City staff to

process permit requests for pro-choice rallies; deployment of City police or other first responders to ensure order at such events; and usage of City staff to facilitate public comment on pro-choice matters at City proceedings, online events, etc.  See Id.  Under §§ 188.200 and 188.215, the broad prohibition on using public facilities to encourage or assist abortion procedures would require the City to ensure individuals do not use its public parks, streets, buildings, etc. for the communication of pro-choice speech that may indiscernibly "spur," "stimulate," or argue in favor of abortion procedures, such as: demonstrations, protests, healthcare-related events, petition signings, soliciting membership in pro-choice organizations, etc.  See Id.  Additionally, under § 188.205, all of the above-mentioned activities would likewise be implicated, as they receive public funds or are the beneficiaries of public funds.  See Id.  Moreover, by the State's measure, any usage of public funds that, at some point in the causal chain of events, facilitates interstate travel would be prohibited.  The malleable definition of "encourage" or "assist" could also be applied in the future to compel the City take affirmative steps to ensure its funds are not remotely or indirectly used towards the costs of interstate travel, such as by compelling its employees or third-party contractors to take ambiguous oaths they will not aid or encourage abortion access.  See id.; cf. Baggett v. Bullitt, 377 U.S. 360, 367 (1964) (noting Supreme Court has disapproved requirement that employees swear oath to never lend "aid, support, advice, [or] counsel . . . " to a political party).

Next, for similar reasons, §§ 188.205-215 are unconstitutionally vague, as they provide no standard or rule for enforcement.  See Webster, 851 F.2d at 1078–79; see also Kolender, 461 U.S. at 357–58; cf. Keyishian v. Bd. of Regents, 385 U.S. 589, 603–04 (1967) (precision of regulation is touchstone where law touches constitution's most precious freedoms; standards of statutory vagueness are strict in area of free expression); Boutilier v. INS, 387 U.S. 118, 123 (1967) (statute may be void for vagueness where it is so vague and indefinite as to be no rule or standard at all).

12

The Eighth Circuit has already concluded that "encouraging" as used in Chapter 188, is void for vagueness, as it is "fraught with ambiguity," see 851 F.2d at 1079; and the Supreme Court has expressed concern at the potential unconstitutional ramifications presented by such nebulous language, see Webster, 492 U.S. at 523–24 (O'Connor, J., concurring).  Regardless, the State's shifting interpretation of §§ 188.205-215 over time evinces the incapability of not only reasonably minded individuals, but also of the State itself, to discern the statutes' meaning.  See Webster, 851 F.2d at 1078–79, 1084, aff'g Reprod. Health Servs. v. Webster, 662 F. Supp. 407, 425–26 (W.D. Mo. 1987).  Specifically, in response to a previous challenge to §§ 188.205-215, the State represented to the Western District of Missouri and the Eighth Circuit, that the scope of "encouraging" abortions applied to prohibit only "affirmative advocacy of abortions," and did not prohibit a publicly funded physician from "informing a woman of 'all options'" regarding her reproductive healthcare.  Id.  It further asserted, that the prohibition on "assisting" an abortion was limited to "direct participation in the surgical procedure itself," and did not include activity similar to the case at hand, i.e., travel-cost subsidization.  Id.  In this case, the State has, without offering a scintilla of legal support, retreated from its previously much narrower interpretation of §§188.205-215, and now offers a notably broader, amorphous, and inconsistent view of the statutes' scope.  See Baggett, 377 U.S. at 367 (law forbidding or requiring conduct in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ, as to its application is unconstitutionally vague; noting Supreme Court's disapproval of "aid, support, advi[se], [or] counsel []" language) (emphasis added).  Such inconsistent interpretation is not clearly demonstrative of whether the State is likely to succeed in claiming Defendants have actually engaged in proscribed conduct.  Indeed, the State's ever broadening and inconsistent interpretation demonstrates the language at issue is so vague that it lacks sufficient minimal

13

standards to guide the Attorney General in his enforcement of those laws.  See id.; see also City of Chi. v. Morales, 571 U.S. 41, 65–66 (1999) (concluding city loitering ordinance was unconstitutionally vague because it lacked sufficient minimal standards by which to guide law enforcement officers); cf. Mazurek, 520 U.S. at 972 (per curiam) (movant must make clear showing that he carries his burden of persuasion).

Moreover, notwithstanding the State's inconsistent interpretations, its present arguments, standing alone—which rely entirely on its assertions that dictionary definitions may guide the interpretation of §§ 188.205-215's constitutionally dubious language—provide little, if any, clarification or support as to why this Court should disregard the Eighth Circuit's prior analysis, as well as the noted concern from several Justices of the Supreme Court on the matter.  See id.; see also Webster, 492 U.S. at 523–24 (O'Connor, J., concurring), 540–41 n.1 (Blackmun, J., dissenting) (indicating "sweeping scope" of § 188.215 discouraged Missourians from exercising constitutional rights).  Indeed, the State's definitions and seemingly indiscriminate enforcement of §§ 188.205-215, amount to a sword of Damocles over Defendants, particularly Dr. Matifadza Hlasthwayo Davis, leaving them uncertain of when in the causal chain of events, their actions or expressions may be interpreted as "spurring" or otherwise facilitating an abortion procedure that might not ever occur, or of when the State may again change its mind and select a definition even more favorable to its case.

**C.  §§ 188.205-215, as applied to BB 61, violates Mo. Const. Art. VI, §§ 16 & 19(a)**

Next, the State has failed to demonstrate a likelihood of success, because §§ 188.205-215 are unconstitutional infringements of the City's charter powers under Art. 16 and 19 of the Missouri Constitution; and because, contrary to its assertions otherwise, BB 61 is not in conflict with state law.  See Art. VI, § 19(a) (charter cities have all powers which legislature has authority to confer, provided such powers are consistent with state constitution and are not limited or denied

by statute or city charter), § 16 (conferring charter cities with power to cooperate with the United States, for operation of common service); see also Cape Motor Lodge v. City of Cape Girardeau, 706 S.W.2d 208, 210–12 (city was able to enter into cooperative activity because no state law directly prohibited activity contemplated by agreement). Specifically, the City possesses a constitutionally conferred power to cooperate with the United States for the provision of public services, such as those contemplated by BB 61. See Id.; see also Roberts v. Maryville, 750 S.W.2d 69, 71–72 (Mo. 1988). Where the language contained in the relevant statutes, i.e., §§ 188.205-215, does not clearly and unequivocally conflict with the City's constitutional grants of power under Art. VI, the City's entry into cooperative activity is proper. See Cape Motor Lodge, 706 S.W.2d at 210–213 (concluding ordinance detailing cooperative activity between City and State University was not limited by state law, where law did not expressly prohibit what ordinance permitted; language of Art. VI, § 16, state law, and ordinance was not expressly inconsistent nor in irreconcilable conflict; explaining "caution should be exercised" in finding implied limitation on powers derived from Art. VI, § 19(a), unless such intent is clear from constitution or statute itself).

Here, Ch. 188 does not, on its face, conflict with BB 61, as Ch. 188 does not expressly proscribe cooperating with the United States to, as relevant, provide travel-subsidy programs related to lawful inter-state access to reproductive healthcare. Further, BB 61 expressly prohibits the Reproductive Equity Fund from being used to encourage or assist abortion procedures. See Doc. 6-1 at 38-43. It is only by the State's self-serving definitions of "encourage" and "assist," that it asserts a conflict exists. See Doc. 7. However, the State's vague and wavering interpretations of that language is insufficient to demonstrate irreconcilable conflict between §§ 188.205-215 and the challenged language of BB 61. See Cape Motor Lodge, 706 S.W.2d at 212–

15

13 (explaining that, "in keeping with spirit and letter" of Art. VI, § 19(a), court was unable to find any provision or language of statute that was susceptible to restrictive meaning; if legislature had intended to limit cooperative activity to only those instances delineated by statute, it could have so stated; test for determining if conflict exists is whether ordinance permits what statute prohibits).

Additionally, to the extent the State asserts that §§ 1.205 and 188.010 demonstrate "BB 61 is manifestly unlawful" and is preempted under those sections, such assertions should be unpersuasive, as § 1.205, and by extension the nearly identical language in § 188.010, amount to mere legislative findings, that do not have the preemptive effect of law.  See Webster, 492 U.S. at 504–06 (noting State's contention that § 1.205 was "precatory and impose[d] no substantive restrictions on abortions; concluding § 1.205 were legislative findings and could "be read simply to express [a] value judgment"); see supra fn. 1.  Even assuming §§ 1.205 and 188.010 could have any effect on local law, and thus disturb the City's constitutional powers under Art. VI §§ 16 and 19(a), there is no irreconcilable conflict between the General Assembly's findings in those sections, and the challenged activity here, as the text of BB 61 expressly forecloses any funds being appropriated or expended for the purpose of assisting or encouraging an abortion.  See Cape Motor Lodge, 706 S.W.2d at 212–13.

## II.     The State cannot show that it will be irreparably harmed.

Next, the State fails to clearly demonstrate irreparable harm to justify preliminary injunctive relief for the same reasons it fails to show a substantial likelihood of success on the merits. See Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted) (to demonstrate threat of irreparable harm, "a party must show that [] harm is certain and great and of such imminence that there is [] clear and present need for equitable relief."); see also Sessler v. City of Davenport, 990 F.3d 1150, 1155–56 (8th Cir. 2021) (failure to show irreparable

harm is an independently sufficient basis upon which to deny preliminary injunction) (quotations omitted) (citations omitted).  The State alleges Missouri will suffer irreparable harm because the City is defying State law that thwarts the efficacy of duly enacted State policy. Doc. 7 at 9. Specifically, the State argues that it "has identified its interest in protecting unborn children, pregnant women, and medical professionals, §188.026.5"; that its interest includes: "encouraging childbirth over abortion, respecting all human life from contraception to natural death, and protecting unborn children from harm"; and that BB 61 irreparably harms the State's interests by undermining the State's enacted policy. Id. at 9–10.

The City is in no way acting in defiance of State law for several reasons:  BB 61 expressly prohibits the use of funds for assisting abortion procedures and for encouraging or counseling an individual to have an abortion; even if the funds were being used under the State's interpretation of logistical support, the alleged illegal conduct would not be taking place in Missouri; and the City is complying with all federal requirements under ARPA. Therefore, the State fails to show irreparable harm. See Sessler, 990 F.3d at 1155–56.

The State must further demonstrate that irreparable injury "is *likely* in the absence of an injunction." Winter v. NRDC, Inc., 555 U.S. 7, 22 (2008) (emphasis in original). Mere "possibility" of irreparable harm does not merit a preliminary injunction. Id. Here, no irreparable injury is likely in the absence of an injunction because there is nothing preventing the State from effectuating §§ 188.010, 1.205, RSMo, as alleged in its Motion.  Doc. 7 at 9-10. Indeed, outside of its self-serving and conclusory allegations, the State has made no clear showing that its ability to effectuate its statutes would be stymied by denying its motion for preliminary injunction. Maryland v. King, 567 U.S. 1301, 1303 (2012).

17

The State has offered no factual or legal support, other than conclusory allegations, that the City's efforts to appropriate federal funds to respond to the far-reaching public health and negative economic impacts of the pandemic, by supporting the health of communities, See 31 CFR § 35.6, interfere with the State's ability to enforce or effectuate State laws or policies. See N.M. Dep't of Game & Fish v. United States DOI, 854 F. 3d 1236, 1255 (10th Cir. 2017) (finding district court erred in granting injunctive relief where state department offered no factual or legal support, other than conclusory allegations, that challenged action interfered with department's ability to effectuate laws).

Absent a legal or factual basis supporting the State's contention that the use of federal funds interferes with its interest in protecting unborn children, pregnant women, and medical professionals, § 188.026.5, or pressure the State to change its laws, this Court should find the State's allegations of irreparable harm to the State's sovereignty unavailing and insufficient to provide a proper basis for a finding of irreparable harm. Id.

Additionally, the State's proposed injunction does not meet the requirements of Federal Rule of Civil Procedure 65(d) (providing that an injunction must "state its terms specifically"). The State proposes that the City be enjoined "from implementing Sections 1, 2, and 3 of BB 61, and from taking any action that involves the use of public funds, public employees, and/or public facilities to support, encourage, or assist abortions," in direct contravention of Missouri law. Doc. 7 at 11-12. The State's request is nothing more than "an injunction which does little or nothing more than order the defendants to obey the law" which is "not specific enough." Daniels v. Woodbury Cnty., 742 F.2d 1128, 1134 (8th Cir. 1984); Meyer v. Brown & Root Const. Co., 661 F.2d 369, 373 (5th Cir. 1981) ("[a] general injunction which in essence orders a defendant to obey the law is not permitted"). Fed. R. Civ. P. 65(d) provides that "every order granting an

injunction…shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail…the act or acts sought to be restrained…" <u>Daniels</u> (quoting <u>Schmidt v. Lessard</u>, <u>414 U.S. 473, 476</u> (1974). In <u>Schmidt</u>, the Supreme Court illustrated the interests served by the rule of specificity, those being "[to] prevent uncertainty on the part of those faced with injunctive orders and giv[e] them explicit notice of what conduct is unlawful[;]" and "[to] allow[] a reviewing court 'to know precisely what it is reviewing." <u>Id.</u> at 476–77. Here, the State's conclusory allegations are not specific enough to prevent uncertainty and fail to give explicit notice of what conduct falls within §§ 188.205-215 because even the State's own sweeping interpretation risks including constitutional rights of citizens. <u>Id.</u>

Furthermore, the State has made no specific allegations or clear showing otherwise that providing travel-cost subsidization for abortion access in other states will actually result in the performance or obtainment of abortion procedures at all, let alone unlawful abortion procedures. Indeed, the State mischaracterizes the text of BB 61 as "subsidiz[ing] people for exposing unborn children to imminent, fatal harm," yet they have made no showing that such harm—the crux of the States irreparable harm argument—will imminently, if ever, materialize. <u>Doc. 7 at 10</u>. The mere subsidization of interstate-travel costs related to abortion "access" does not indicate any abortion procedures are imminently occurring, and even if they were likely to occur, there has been no showing by the State that they would also necessarily be abortion procedures deemed unlawful under Missouri law, such that the State is entitled to facially invalidate BB 61. The State's attempt to speculatively enjoin the subsidization of out-of-state travel pushes the limits of potentially infringing upon citizens right to travel. <u>See Dobbs</u> ("may a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel." 567 U.S. ____, ___ (2022) (slip op. at 10) (Kavanaugh, J.,

concurring)).  However, this argument illustrates just how conclusory the alleged harm the State asserts here.  There is a serious risk of this Court enjoining constitutional rights of Missouri citizens.  As discussed below, the balance between the harm of authorizing unconstitutional laws, especially if constitutional rights are at risk, greatly outweighs the harm to the State.

The State cites multiple cases for the proposition that the inability to enforce its own laws constitutes irreparable injury.  Doc. 7 at 9.  However, the cases cited by the State involve injunctions issued against a state statute and illustrate how courts will find there is irreparable harm in enjoining a state statute. Id. (citing Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018) ("the District Court's orders, for all intents and purposes, constituted injunctions barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature. Unless that statute is unconstitutional, this would seriously and irreparably harm the State…" (footnote omitted); Maryland, 567 U.S. at 1303 (granting stay of Maryland Court of Appeals decision that invalidated a state law where law at issue protected Maryland's "law enforcement and public safety interests" and thus the inability to enforce it constituted irreparable harm); Org. for Black Struggle v. Ashcroft, 978 F.3d 603 (8th Cir. 2020) (granting a stay of district court's decision to enjoin enforcement of state law which provided for voting by mail-in ballot due to COVID-19 because the State "would suffer irreparable harm without a stay because otherwise it would be precluded from applying its duly enacted legislation regarding election procedures"); Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406 (5th Cir. 2013) (granting a stay of a district court's decision to enjoin enforcement of state abortion law that was declared unconstitutional after bench trial, stating: "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of laws.")).

Here, the State is not being enjoined—or even threatened with being enjoined—from enforcing the statutes and it has not established irreparable harm to its interests, i.e. regulating illegal conduct. As noted above, the State has only asserted conclusory statements of alleged harm that amount to speculative assertions of potential abortion procedures occurring in other states, and the cases relied upon are inapposite for the irreparable harm alleged by the State because the City—not the State—is at risk of being enjoined from effectuating its laws and ordinances. Therefore, this Court should hold the State fails to demonstrate irreparable harm and deny the State's preliminary injunction.

### III.    An injunction would not be in the public interest.

There is a compelling public interest in the City using ARPA funds to address local unmet public health needs and economic disparities. An injunction is therefore not in the public interest, and the public interest factor[3]—also favors Defendants.

The City's Board of Aldermen ("Board"), its elected body, after public review and debate, authorized the expenditure of ARPA funds to address serious social, economic and health inequalities exacerbated by COVID-19, tailoring the expenditure of ARPA funds to the particular needs of women and Black women in the local community. Doc. 1-4 at 55-60. Prior to passing BB 61, the Board found that Missouri's pregnancy-related mortality ratio is one of the highest in the country and four times greater for Black women than white women. Id. at 56. The Board further found "that Women, Black women, and mothers are at the lowest workforce participation rate in 30 years." Id. The Reproductive Equity Fund established by BB 61 is a lawful use of ARPA funds to address economic disparities and health needs particular to the community. Just as the State

---

[3] Given that the City's interest "is theoretically the public's" the balance of harm and public interest factors are, to some extent, connected. See Glenwood Bridge v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991).

asserts Chapter 188 is a "powerful expression of the public interest in Missouri" (Doc. 7 at 11), BB 61 is an important expression of the will of City residents and an exercise of the City's police power[4] to ensure the health and wellbeing of citizens. BB 61 aims to improve the health, comfort and welfare of City residents. Accordingly, the public interest weighs against the issuance of the injunction.

Further, there is a strong public interest in guarding the First Amendment rights of Dr. Matifadza Hlatshwayo and ensuring the supremacy of federal law. See Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty., 39 F.4th 95, 109 (3rd Cir. 2022) citing ACLU v. Ashcroft, 322 F.3d 240, 250 (3rd Cir. 2003) aff'd, 542 U.S. 656 (2004) ("[t]here is a strong public interest in upholding the requirements of the First Amendment."); New York Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013) (securing First Amendment rights is in the public interest); see also Am. Bev. Ass'n v. City & Cty. of San Francisco, 916 F.3d 749, 758 (9th Cir. 2019) (citation omitted) ("it is always in the public interest to prevent the violation of a party's constitutional rights."); Planned Parenthood Minn., N.D., S.D. v. Dauggaard, 799 F. Supp. 2d 1048, 1077 (D.S.D. 2011) (stating public has a clear interest in ensuring the supremacy of the United States Constitution); United States v. California, 921 F.3d 865, 894 (9th Cir. 2019) (preventing a violation of the Supremacy Clause serves the public interest); New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 365 (1989) (noting "there is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit constitutional guarantees").

---

[4] "An ordinance is a legitimate exercise of the police power if the 'requirements of the ordinance have a substantial and rational relationship to the health, safety, peace, comfort and general welfare of the inhabitants of a municipality.'" Marianist Province of the United States v. City of Kirkwood, 944 F.3d 996, 1005 (8th Cir. 2019) citing Schnuck Mkts., Inc. v. City of Bridgeton, 895 S.W.2d 163, 166 (Mo. Ct. App. 1995).

As discussed above in Section I, Defendants have sufficiently demonstrated that §§ 188.205-215 violate the First Amendment and also violate the Supremacy Clause to the extent that they purport to regulate the expenditure of federal funds. Even assuming the public has a general interest in the enforcement of state law, that interest is not present here because "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional [law]." ACLU, 322 F.3d at 251 n.11, aff'd, 542 U.S. 656 (2004).

The public interest is favored by preventing a violation of Dr. Matifadza Hlatshwayo's First Amendment rights and ensuring the supremacy of federal law.  The public interest factor weighs against the issuance of the injunction.

### IV.    The balance between the harm to the State and the harm to the Defendants favor Defendants.

The balance between the State's risk of irreparable harm and the injury the issuance of an injunction would inflict on Defendants does not favor injunctive relief.  The balance of harm factor analysis examines the harm to all parties to the dispute and other interested parties, including the public. See Dataphase, 640 F.2d at 113–14; Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991). "[T]he real issue…is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied[.]" Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd., 780 F.2d 589, 594 (7th Cir. 1986).

First, as established above, the public interest favors the implementation of BB 61 because City residents will be harmed by the issuance of an injunction preventing the expenditure of ARPA funds to address the health needs of women and Black women in the local community. If an individual or entity "faces the imminent threat of enforcement of a preempted state law and the resulting injury may not be remedied by monetary damages, the individual or entity is likely to suffer irreparable harm." Del Sol v. Whiting, 2012 U.S. Dist. LEXIS 172196 at *43–44 (D. Ariz.

Sept. 5, 2012) citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992). Here, the issuance of the injunction will harm the City and its residents because the statutes are preempted by federal law and the resulting harm to citizens—current public health needs going unmet— cannot be remedied by monetary damages. Indeed, it is the City—and the women therein now confronted with uncertain legal barriers to accessing reproductive healthcare—and not the State harmed by the request for preliminary injunctive relief.

Second, Defendants will be harmed by an improperly granted preliminary injunction because §§ 188.205-215 are overbroad and vague under the First Amendment and are violative of the Supremacy Clause to the extent they purport to regulate the expenditure of ARPA funds. First, the issuance of the injunction will inflict irreparable harm on Dr. Hlatshwayo Davis because §§ 188.205-215 threaten to restrict Dr. Hlatshwayo Davis's constitutionally protected speech and other expressive activity, and the statutes further provide no exceptions or guidance regarding protected speech. See Webster, 662 F. Supp. 407, 425–26 (noting State's (then) position that § 188.205's prohibition on "encouraging or counseling" bars only affirmative advocacy and does not prevent a physician from informing a woman of "all options" for reproductive healthcare, including abortion).

Dr. Hlatshwayo Davis regularly addresses the public regarding matters of public health, including on issues related to reproductive healthcare, and provides medically and legally sound healthcare-related services, advice, and assistance to City residents. Based on the State's (current) construction of §§ 188.205-215, Dr. Hlatshwayo Davis is unable to discern, based on the language of Chapter 188, how she and other City officials may conduct themselves and in what manner they may or may not speak on abortion-related matters.

It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). In Elrod, the court found that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 372–74 (citing New York Times Co. v. United States, 403 U.S. 713 (1971)). Further, First Amendment rights need only be threatened to constitute irreparable harm. In Elrod, the Supreme Court affirmed an appellate court's decision to grant a preliminary injunction where individuals were merely threatened with dismissal based on their lack of patronage for the political party in power. Id. at 373–74. The Court held that because First Amendment rights of association must be carefully guarded against infringement, injunctive relief was clearly appropriate. Id. at 373. Here, the converse is true—injunctive relief is inappropriate because the issuance of the injunction would infringe the First Amendment rights of Dr. Matifadza Hlatshwayo and other City officials.

The balance of harm inquiry does not favor the enforcement of state laws that are likely to be held unconstitutional. For example, in Planned Parenthood v. Cansler, a district court granted a preliminary injunction enjoining a state law that attempted to cut state and federal funding from Planned Parenthood for non-abortion services, finding that the plaintiff was likely to succeed on a preemption claim asserting that a federal law preempted state law under the Supremacy Clause. 804 F. Supp. 482 (D. M.D.N.C. Aug. 19, 2011). There, the district court found the balance of harms inquiry favored Planned Parenthood because the state "would simply be prohibited from enforcing potentially unconstitutional criteria[]." Id. at 500 (citing Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002)); see also Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1059–60 (9th Cir. 2009) (determining that "the balance of equities and the public interest [] weigh in favor of a preliminary injunction" against a likely preempted law).

Similarly, here, the issuance of the injunction would result in the enforcement of state statutes that, as Defendants have demonstrated, are likely preempted by federal law. See Section I. The balance of harm weighs against the entry of a preliminary injunction.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the State's request for a preliminary injunction, and grant City Defendants any such other and further relief the Court deems fair and appropriate.

Dated:  August 24, 2022                    Respectfully submitted,

**SHEENA HAMILTON**
**CITY COUNSELOR**

By:  */s/ Erin K. McGowan*

Erin McGowan                                    #64020MO
*Associate City Counselor, Affirmative Litigation Unit*

Ankoor Shah                                      #65606MO
Rebecca S.  Sandberg-Vossmeyer    #70342MO
Adam Sheble                                      #74230MO
*Assistant City Counselors, Affirmative Litigation Unit*

314 City Hall
1200 Market St.
St. Louis, Missouri 63103
(314) 622-3361 (telephone)
(314) 622-4956 (facsimile)
mcgowane@stlouis-mo.gov
shaha@stlouis-mo.gov
vossmeyerr@stlouis-mo.gov
sheblea@stlouis-mo.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 24, 2022 **Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction**, was electronically filed with the Clerk of Court using the Court's electronic filing system, to be served on all counsel of record.

/s/  Erin K. McGowan

27